# 23-591

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

IN RE: WADE PARK LAND HOLDINGS, LLC, WADE PARK LAND, LLC,

*Debtors,*

WADE PARK LAND HOLDINGS, LLC, WADE PARK LAND, LLC,

*Debtors-Plaintiffs-Appellants,*

THE THOMAS FAMILY TRUST, BY AND THROUGH ITS TRUSTEES,
ACTING IN THEIR OFFICIAL CAPACITIES,

*Plaintiff-Appellant,*

—against—

JONATHAN KALIKOW, WP DEVELOPMENT PARTNERS, LLC,
GAMMA LENDING OMEGA, LLC, GAMMA REAL ESTATE CAPITAL, LLC,
GRE WP, LLC, BLAKE GOODMAN,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANTS

DAVID L. BURY, JR.
THOMAS B. NORTON
STONE & BAXTER, LLP
577 Third Street
Macon, Georgia 31201
(478) 750-9898

LISA GEARY
RMP LLP
5519 Hackett Road
Springdale, Arkansas 72762
(479) 443-2705

JAMES COBB
JULIA BLACKBURN STONE
SARAH BREWERTON-PALMER
MICHAEL EBER
CAPLAN COBB LLC
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
(404) 596-5600

RENEE BEA
RICHARD WEINGARTEN
SLARSKEY LLC
767 Third Avenue, 14th Floor
New York, New York 10017
(646) 893-1700

*Attorneys for Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Wade Park Ventures, LLC, is the parent company to Plaintiffs-Appellants Wade Park Land Holdings, LLC, and Wade Park Land, LLC. Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants certify that no publicly held corporation owns ten percent or more of the membership of Wade Park Land Holdings, LLC, Wade Park Land, LLC, or their parent company, Wade Park Ventures, LLC.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ..........................................................................v

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE......................................................................2

I.      Factual Background......................................................................2

      A.      Wade Park: A multi-billion-dollar vision ..............................2

      B.      The Bridge Loan: Gamma begins its scheme to acquire Wade Park....4

      C.      Gamma secures a default on the bridge loan, inching closer to acquiring Wade Park. ..............................................................8

      D.      With the loan in default, Gamma squeezes money through forbearance agreements..........................................................9

II.     Proceedings Below .......................................................................12

STANDARD OF REVIEW ..........................................................................14

SUMMARY OF ARGUMENT .....................................................................16

ARGUMENT      18

I.      The district court erred by dismissing Plaintiffs' fraudulent-transfer claims and denying leave to replead. .........................................................18

      A.      The district court erroneously disregarded the SAC's allegations of value based on the Sage Appraisal.......................................20

      B.      The district court erroneously disregarded the SAC's allegations about the BBG Appraisal. ...................................................22

C.     The district court's inference that Thomas could not refinance or sell because of concerns about the property's value is factually and legally unfounded. .................................................................28

D.     The district court's reliance on the Estoppel Certificate is misplaced. ........................................................................33

E.     The district court erred in denying leave to replead ...........35

II.     The district court erred by dismissing the declaratory-judgment claim........40

A.     The district court's construction of the LLC Agreement violated settled rules of contract interpretation. ................................40

     1.     Section 2.4(d) expressly bars the Challenged Transactions. ....41

     2.     Section 3.3 does not override the plain language of 2.4(d). .....42

B.     The district court misapplied Delaware law on void and voidable transactions. ...........................................................44

III.     The district court erred when it dismissed Plaintiffs' claims for Georgia RICO and fraud........................................................................46

A.     Plaintiffs did not release their Georgia RICO and fraud claims. ........46

     1.     The district court erred in applying the release provisions of contracts procured by fraud. .....................................47

     2.     Even if enforceable, the releases do not bar the Georgia RICO claims..............................................................48

B.     Plaintiffs stated Georgia RICO claims. ................................52

     1.     The SAC plausibly alleges Gamma and Kalikow acquired property through a pattern of racketeering activity. .................53

          i.     Wire Fraud ......................................................55

          ii.     Other Predicate Acts .......................................62

2.  The SAC plausibly alleges a conspiracy to violate Georgia RICO. ..........................................................................62

C.  Plaintiffs stated a claim for fraud under Georgia law, and the court abused its discretion in denying leave to bring a fraud claim under New York law. ..................................................................63

1.  Georgia law applies to Plaintiffs' claim for fraud. ..................63

2.  Under Georgia law, Plaintiffs stated a claim for inceptive fraud. ..........................................................................65

3.  The district court abused its discretion in denying leave to allege fraudulent inducement under New York law. ................69

CONCLUSION    70

CERTIFICATE OF COMPLIANCE.......................................................72

CERTIFICATE OF SERVICE ..............................................................73

# TABLE OF AUTHORITIES

## CASES

*Absalom Absalom Tr. v. Saint Gervais LLC*,
   No. CV 2018-0452-TMR, 2019 WL 2655787 (Del. Ch. June 27, 2019)............45

*Alta Berkeley VI C.V. v. Omneon, Inc.*,
   41 A.3d 381 (Del. 2012) ...................................................................................43

*Arar v. Ashcroft*,
   585 F.3d 559 (2d Cir. 2009) (en banc) ........................................... 14, 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................... 14, 15

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*,
   447 F. Supp. 2d 329 (S.D.N.Y. 2006) ................................................................50

*BFP v. Resol. Tr. Corp.*,
   511 U.S. 531 (1994)........................................................................................27

*BTL COM Ltd., Co. v. Vachon*,
   278 Ga. App. 256 (2006) ......................................................... 60, 66, 68

*Cabrega v. Campbell Soup Co.*,
   No. 18-cv-3827(SJF)(ARL), 2019 WL 13215191 (E.D.N.Y. Nov. 18, 2019) ....36

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   142 S. Ct. 1502 (2022)....................................................................................63

*Chancey v. State*,
   256 Ga. 415 (1986) .........................................................................................53

*Cisneros v. Petland, Inc.*,
   972 F.3d 1204 (11th Cir. 2020) .......................................................................52

*Citizens United v. Schneiderman*,
   882 F.3d 374 (2d Cir. 2018) ............................................................................14

*City Dodge, Inc. v. Gardner*,
   232 Ga. 766 (1974) ............................................................................48

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ..............................................................70

*Cobb Cnty. v. Jones Grp. P.L.C.*,
   218 Ga. App. 149 (1995) ............................................................ 53, 54

*CompoSecure, LLC v. CardUX, LLC*,
   206 A.3d 807 (Del. 2018) ..................................................................45

*Conversion Properties, LLC v. Kessler*,
   994 S.W.2d 810 (Tex. App. 1999)......................................................57

*Cowart v. Gay*,
   223 Ga. 635 (1967) ............................................................................47

*CSX Transp., Inc. v. Georgia State Bd. of Equalization*,
   552 U.S. 9 (2007)...............................................................................35

*Denny v. Barber*,
   576 F.2d 465 (2d Cir. 1978) ..............................................................56

*DiFolco v. MSNBC Cable LLC*,
   622 F.3d 104 (2d Cir. 2010) ....................................................... 15, 33

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) ................................................................38

*Doninger v. Niehoff*,
   642 F.3d 334 (2d Cir. 2011) ..............................................................50

*Dover v. State*,
   192 Ga. App. 429 (1989) ........................................................ 52, 53, 54

*Est. of Ryan v. Shuman*,
   288 Ga. App. 868 (2007) ...................................................................47

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.*,
   858 F. Supp. 2d 306 (S.D.N.Y. 2012) ...............................................26

*Fieger v. Pitney Bowes Credit Corp.*,
    251 F.3d 386 (2d Cir. 2001) ................................................................63

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005) ................................................................63

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) ................................................................33

*Globe Comm'ns Corp. v. R.C.S. Rizzoli Periodici, S.p.A.*,
    729 F. Supp. 973 (S.D.N.Y. 1990) ......................................................65

*HBE Leasing Corp. v. Frank*,
    61 F.3d 1054 (2d Cir. 1995) ................................................................20

*In re Bernard L. Madoff Inv. Sec. LLC*,
    976 F.3d 184 (2d Cir. 2020) ................................................................19

*In re Bethlehem Steel Corp.*,
    390 B.R. 784 (Bankr. S.D.N.Y. 2008)................................................34

*In re Coinmint, LLC*,
    261 A.3d 867 (Del. Ch. 2021) ...................................................... 44, 46

*In re Glob. Technovations Inc.*,
    694 F.3d 705 (6th Cir. 2012) ...............................................................27

*In re Integrity Graphics, Inc.*,
    No. 17-21513(JJT), 2021 WL 2036472 (Bankr. D. Conn. May 20, 2021) ... 23, 27

*In re Jesup & Lamont, Inc.*,
    507 B.R. 452 (Bankr. S.D.N.Y. 2014)................................................26

*In re McMartin*,
    599 B.R. 622 (Bankr. D.N.D. 2019)....................................................29

*In re Mercury Cos., Inc.*,
    No. 08–23125 MER, 2015 WL 5920163 (Bankr. D. Colo. Oct. 9, 2015)............29

*In re Mina*,
No. AP 21-02013-PRW, 2022 WL 2657481 (Bankr. W.D.N.Y.
July 8, 2022)................................................................................. 21, 27

*In re Motors Liquidation Co.*,
576 B.R. 325 (Bankr. S.D.N.Y. 2017)......................................... 25, 27

*In re Positive Health Mgmt.*,
769 F.3d 899 (5th Cir. 2014) ..............................................................21

*In re Roblin Indus., Inc.*,
78 F.3d 30 (2d Cir. 1996) ...................................................................26

*In re Trib. Co. Fraudulent Conv. Litig.*,
10 F.4th 147 (2d Cir. 2021) ........................................... 19, 21, 29, 34

*In re WRT Energy Corp.*,
282 B.R. 343 (Bankr. W.D. La. 2001)..................................... 27, 28, 29

*Iowa Pub. Emps. Ret. Sys. v. Deloitte & Touche LLP*,
919 F. Supp. 2d 321 (S.D.N.Y. 2013) .................................................70

*John v. Whole Foods Mkt. Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017) ...................................................... 24, 36

*Kamyr, Inc. v. Combustion Eng'g, Inc.*,
603 N.Y.S.2d 451 (1993)....................................................................64

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019) ................................................................50

*Klein v. Tabatchnick*,
610 F.2d 1043 (2d Cir. 1979) .............................................................19

*Krock v. Lipsay*,
97 F.3d 640 (2d Cir. 1996) ......................................................... 64, 65

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020) ........................................................ 15, 36

*Mandala v. NTT Data, Inc.*,
   975 F.3d 202 (2d Cir. 2020) ........................................................ 23, 36

*Mason v. Am. Tobacco Co.*,
   346 F.3d 36 (2d Cir. 2003) ...........................................................25

*Nash v. Roberts Ridge Funding, LLC*,
   305 Ga. App. 113 (2010) .......................................................... 64, 66

*Nevins v. Bryan*,
   885 A.2d 233 (Del. Ch. 2005) .................................................... 44, 45

*Nolan v. Calhoun*,
   38 Ga. App. 227 (1928) ................................................................47

*Pasternack v. Shrader*,
   863 F.3d 162 (2d Cir. 2017) ...................................................... 15, 69

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .........................................................56

*Sack v. Low*,
   478 F.2d 360 (2d Cir. 1973) .........................................................64

*Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC*,
   284 A.3d 714 (Del. 2022) .............................................................43

*Schultz v. Boy Scouts of Am., Inc.*,
   65 N.Y.2d 189 (1985) ..................................................................64

*Schwimmer v. Office of Ct. Admin.*,
   857 F. App'x 668 (2d Cir. 2021) ...................................................69

*Slaick v. Arnold*,
   316 Ga. App. 141 (2012) ..............................................................66

*Smith v. Hogan*,
   794 F.3d 249 (2d Cir. 2015) .........................................................15

*Smith-Corona Grp. v. United States*,
   713 F.2d 1568 (Fed. Cir. 1983) ....................................................38

*Sonterra Cap. Master Fund Ltd. v. UBS AG*,
  954 F.3d 529 (2d Cir. 2020) ................................................................24

*Std. Sec. Life Ins. Co. of N.Y. v. Berard*,
  684 F. App'x 56 (2d Cir. 2017) .........................................................50

*Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*,
  206 A.3d 836 (Del. 2019) ..................................................................43

*Tom's Amusement Co. v. Total Vending Servs.*,
  243 Ga. App. 294 (2000) ...................................................................54

*Turk v. Morris, Manning & Martin, LLP*,
  --- F. Supp. 3d ---, 2023 WL 2359692 (N.D. Ga. Feb. 13, 2023). .......................51

*Turk v. Morris, Manning & Martin, LLP*,
  593 F. Supp. 3d 1258 (N.D. Ga. 2022).................................................53

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*,
  696 F. Supp. 2d 428 (S.D.N.Y. 2010) ...............................................31

*United States ex rel. Foreman v. AECOM*,
  19 F.4th 85 (2d Cir. 2021) ................................................................33

*United States v. Bonanno Organized Crime Fam. of La Cosa Nostra*,
  879 F.2d 20 (2d Cir. 1989) ...............................................................26

*Vaughn v. Air Line Pilots Ass'n*,
  377 F. App'x 88 (2d Cir. 2010) .........................................................70

*Volk v. Liggett Grp. Inc.*,
  No. 96 Civ. 1921 (SS), 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997).................50

*Williams v. Affinion Grp., LLC*,
  889 F.3d 116 (2d Cir. 2018) .............................................................55

*Williams v. Mohawk Indus., Inc.*,
  465 F.3d 1277 (11th Cir. 2006) ........................................................54

## STATUTES

11 U.S.C. § 544 ....................................................................................18

11 U.S.C. § 548 ....................................................................................18

11 U.S.C. § 550 ....................................................................................18

11 U.S.C. § 551 ....................................................................................18

18 U.S.C. § 1956 ..................................................................................62

18 U.S.C. § 1964 ....................................................................................1

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1332 ....................................................................................1

28 U.S.C. § 1334 ....................................................................................1

28 U.S.C. § 1367 ....................................................................................1

28 U.S.C. § 157 ......................................................................................1

O.C.G.A. § 16-14-3 ..............................................................................54

O.C.G.A. § 16-14-4 ................................................................... 52, 53, 62

O.C.G.A. § 16-8-3 ................................................................................62

O.C.G.A. § 18-2-70 ..............................................................................18

Tex. Prop. Code Ann. § 51.002 ...........................................................57

## RULES

Fed. R. Bankr. P. 7012 .........................................................................14

Fed. R. Civ. P. 9 ................................................................. 17, 55, 62, 69

Fed. R. Civ. P. 12 ....................................................................14

**OTHER AUTHORITIES**

APPRAISAL INSTITUTE,
   THE APPRAISAL OF REAL ESTATE 351 (15th ed. 2020) ........................................39

APPRAISAL STANDARDS BOARD,
   THE APPRAISAL FOUNDATION, UNIFORM STANDARDS OF PROFESSIONAL
   APPRAISAL PRACTICE 7 (2018-2019 ed.) ...................................................... 25, 35

Ga. Jur. Contracts § 1:52 ..........................................................................65

Green, GEORGIA LAW OF EVIDENCE § 3:13 ...........................................................68

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment dismissing all claims. SPA 144. Plaintiffs-Appellants Wade Park Land, LLC and Wade Park Land Holdings, LLC (the "Wade Park Plaintiffs")—debtors in an underlying bankruptcy action—and Plaintiff-Appellant The Thomas Family Trust (collectively "Plaintiffs"), timely filed a notice of appeal on April 6, 2023. JA 1934. This Court has jurisdiction under 28 U.S.C. § 1291. The district court had subject-matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 157, 1331, 1332, 1334, 1367.

## STATEMENT OF ISSUES

I.      To state a claim for constructive fraudulent transfer under the Bankruptcy Code and Georgia law, a complaint must allege the debtor became insolvent because of the transfer and received less than "reasonably equivalent value" in exchange for the transfer. Counts 12 and 13 of the Second Amended Complaint ("SAC") allege that the transfer of property to Defendants occurred when the property was worth at least $400 million more than the satisfied debts and left the Wade Park Plaintiffs insolvent, with more than $75 million in other liabilities. Did the district court err in dismissing Counts 12-13 for failure to state a claim and denying leave to replead?

II.      The Wade Park Ventures LLC Agreement states that "in no event" shall the LLC "have the authority to enter" certain related-party transactions. Count 1

seeks a declaratory judgment that five transactions with Defendants violated this prohibition and are void under Delaware law. Did the district court err in dismissing Count 1 for failure to state a claim by relying on an inapplicable contractual exception and alternatively holding that the transactions were voidable, not void?

III.     The Georgia RICO statute is significantly broader than its federal counterpart. It does not require proof of continuity or an enterprise. Georgia law also recognizes a claim for "inceptive fraud" if a party enters an agreement with no intent to honor its promise. Counts 5 and 6 allege Defendants violated Georgia RICO by working together to wrongfully obtain Plaintiffs' property through a series of fraudulent acts. Count 7 alleges Defendants engaged in inceptive fraud by entering an agreement with Plaintiffs while intending not to honor their promise. Did the district court err in dismissing these counts based on invalid contractual releases and for failure to state a claim, and abuse its discretion in denying leave to replead fraud under New York law?

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     Wade Park: A multi-billion-dollar vision

Due north of Dallas, Texas, lies a prized, single-mile stretch of land known as the "$5 Billion Mile." JA 861-63. Today, it boasts such attractions as The Star (the Dallas Cowboys' headquarters and training center), Toyota Stadium, and

several high-end, mixed-use properties. JA 863. In 2012, it was mostly raw land. JA 863.

Stanley Thomas—one of the most experienced and respected developers in the country—took notice. He envisioned a large, multi-use development built atop 176 acres of farmland. JA 863-64. The project, known as "Wade Park," would have two towers with over five-million square feet of office space, retail space, about 2,400 luxury residential units, and five hotels. JA 863.

The first step was acquiring the land. Thomas took on much of the acquisition costs himself, directly or through a family trust or affiliated entities. JA 863-64. The rest came via mortgages from Bridge Capital, LLC and BAMCAP Partners, LP. JA 863-64. After acquiring the 176 acres that would become Wade Park, Thomas bifurcated the land to create a north parcel and a south parcel. JA 864.[1] Lebanon 390WR LLC owned the north parcel (subject to two loans from BAMCAP), while Wade Park Land LLC owned the south parcel (subject to mortgages from Bridge Capital). JA 864. As construction continued, Thomas worked diligently to find tenants, locking down leases with household names like Whole Foods. JA 866.

An independent appraisal from the Sage Group showed that Wade Park, though only partially constructed, was worth $466.8 million in November 2016.

---

[1] When describing actions by "Thomas," we are referring to actions Stanley Thomas took in his capacity as an officer or manager of entities with which he was affiliated.

JA 741-42, 941. Two years later, a separate independent appraisal by BBG, Inc. determined Wade Park's as-is market value was $565 million. JA 939. The BBG Appraisal also noted that overall values had increased in the area "by about 40%" from 2015 to 2018. JA 1140. And internal analyses forecasted a post-development value of Wade Park exceeding $2 billion. JA 863.

The high reward that Wade Park promised came at a high cost. By the spring of 2016, Thomas and entities affiliated with him had invested about $60 million in the project. JA 866. On top of that, Lebanon 390WR owed $45 million to Bridge Capital, and Wade Park Land owed $48 million to BAMCAP. JA 866.

But realizing Wade Park's full potential required additional funding. Thomas anticipated needing $825 million and worked tirelessly to find a partner. JA 866-67. Two potential lenders—JP Morgan and USAA—expressed interest. JA 867. But procuring such deals takes time, and the BAMCAP and Bridge Capital loans were nearing maturity. JA 867. Thomas therefore decided to seek a bridge loan to pay off Bridge Capital and finance construction while JP Morgan, USAA, and others completed due diligence. JA 867.

### B. The Bridge Loan: Gamma begins its scheme to acquire Wade Park.

Jonathan Kalikow was an officer of Gamma Real Estate Capital LLC focused on hard-money lending. In 2016, he offered to provide a bridge loan until Thomas could secure permanent financing. JA 868, 870.

Under a term sheet executed in October 2016, Gamma Real Estate would make a $196 million bridge loan to pay off Bridge Capital and finance Wade Park's development for six months. JA 870-71. Thomas could extend that term up to four times, with each extension another six months. JA 871. The term sheet called for a quick closing in November 2016. JA 870-71.

But in late November—after Thomas paid over $1 million to extend the Bridge Capital loan and after the Sage Appraisal valued the property at $466.8 million—Kalikow and Gamma unilaterally changed the deal's terms. JA 872. They reduced the bridge loan by nearly $30 million and demanded a second lien in favor of Gamma Real Estate on the south parcel, behind BAMCAP. JA 872-73. They also required an intercreditor agreement between Gamma Real Estate and BAMCAP to cross-collateralize and cross-default their loans. JA 873.

Kalikow and Gamma Real Estate recognized Thomas could do little to oppose this unexpected shift. JA 874. The Bridge Capital loans would soon mature, extending them would be costly, and Thomas's ongoing development work needed financing. JA 874. Thomas therefore accepted the new terms. JA 874.

But just days later, Kalikow and Gamma Real Estate exploited their leverage to alter the deal yet again, this time insisting on two blockbuster changes. JA 874-75. First, they reduced the loan by about 50%—to just $83 million—leaving Thomas with insufficient funds to pay off Bridge Capital *and* fund construction. JA 874-75.

Second, they insisted on a provision called "the Hammer." JA 875. The Hammer was, in Kalikow's words, designed to be "painful enough" to deter Thomas from filing bankruptcy. JA 876. It would give Gamma an effective 75% ownership interest in Wade Park unless the loan was repaid within 60 days of maturing. JA 875-76.

Still, Kalikow continued to (falsely) insist that he and Gamma did not want to own Wade Park. JA 876. Relying on these misrepresentations, Thomas spent another $2 million to extend the Bridge Capital loan so he could finalize the deal. On January 17, 2017, the parties executed the loan documents. JA 878.

The final agreement created two special-purpose entities—the Wade Park Plaintiffs—to own the property. JA 878. They borrowed $82.75 million from Gamma Real Estate—more than $100 million less than originally agreed to—for a four-month term, which could be extended three (not four) times for three (not six) months, provided the loan was not in default. JA 219-22, 878.

In exchange, Gamma[2] obtained a first mortgage on the north parcel, a second mortgage on the south parcel, and second priority liens on other property that Thomas-affiliated entities owned. JA 878. Upon a default, Gamma could accelerate the loans and foreclose on Wade Park. JA 254-55. Finally, they implemented the "Hammer" by creating Wade Park Ventures, LLC, which became the sole member

---

[2] Gamma Real Estate transferred its interests in the bridge loan to Gamma Lending Omega LLC ("Omega"). JA 879. From here on, we refer to all Gamma-related Defendants as "Gamma" unless reference to a specific entity or person is made.

of the Wade Park Plaintiffs. JA 878. Ownership of Wade Park Ventures was split among the Thomas Family Trust (25%) and GRE WP LLC, a Gamma affiliate (75%):



Gamma went even further to control Wade Park. First, it obtained a right to approve any modification to the BAMCAP loan encumbering the south parcel and promised (falsely) not to unreasonably withhold consent to any such modification. JA 878. Second, it drafted Wade Park Ventures' Operating Agreement ("LLC Agreement"), which prohibits the company or its subsidiaries from transacting business with any affiliate or "related party" of a member. JA 880-81. And third, Gamma executed an intercreditor agreement with BAMCAP, which gave Gamma an option to buy the BAMCAP loan if Wade Park Land defaulted. JA 878-79.

Through these carefully orchestrated efforts, Gamma ensured it could manufacture a default under the BAMCAP loan, declare a cross-default under its own bridge loan, and take title to Wade Park. JA 881-82.

### C. Gamma secures a default on the bridge loan, inching closer to acquiring Wade Park.

Having obtained interim financing through the Gamma Bridge Loan, Thomas continued construction of Wade Park. JA 884. During this time, the Wade Park Plaintiffs exercised extension rights—pushing the loan's maturity date to February 2018—and paid roughly $12 million in interest, while Thomas diligently pursued permanent financing. JA 885. Three potential partners expressed strong interest, with two signing letters of intent for investments and loans worth over $550 million. JA 885-86.

To complete the negotiations, Thomas needed more breathing room on the BAMCAP loan, which was set to mature in January 2018. JA 886. Thomas and BAMCAP agreed to a one-month extension in exchange for a $530,000 fee added to the loan's principal—increasing the BAMCAP loan by about 1%. JA 886-87. This modification required Gamma's consent. JA 887. But even though the proposed 1% increase would not have affected Gamma's bridge loan, and even though Gamma had expressed a willingness to allow the modification, Gamma refused to consent. JA 887. As a result, BAMCAP declared Wade Park Land in default. And because

the BAMCAP loan and Gamma Bridge Loan were cross-defaulted, Gamma also declared default—even though Plaintiffs had paid every dollar owed to date. JA 888.

**D.    With the loan in default, Gamma squeezes money through forbearance agreements.**

Over the next several months, the Wade Park Plaintiffs entered a series of forbearance agreements with Gamma to avoid foreclosure. JA 890. In exchange, Gamma received more than $38 million in fees on an $83 million loan. JA 891. But Gamma agreed to forbear only for limited periods (usually less than two months at a time) to keep the pressure on Thomas. JA 890. Gamma also began advertising foreclosure, which increased the pressure on Thomas and made procuring permanent financing even more difficult. JA 891.

During this period, Gamma required Thomas to keep it informed of his efforts to secure financing. JA 892. Armed with this information, Gamma thwarted Thomas's efforts at every turn. JA 892. For example, Thomas planned to refinance mortgages on other properties to pay back the bridge loan. But Gamma bought those loans to prevent the refinancing. JA 893-95. Kalikow also blocked a potential $725 million refinancing, for which Thomas had secured a term sheet with Bluebell International, by telling the lender's principal he was a "thief" and "scumbag" and that Gamma would never agree to the loan. JA 896-97. Kalikow did the same with Columbia Pacific, yelling at its executives and telling them Gamma would never

consent to any refinancing. This caused Columbia Pacific to walk away from a deal that otherwise would have closed. JA 897-900.

In the meantime, Omega bought the BAMCAP loan, giving it ownership of *all* loans encumbering Wade Park. The parties entered three more forbearance agreements (six total) covering the BAMCAP loan and Gamma Bridge Loan. JA 900-01.

As the sixth forbearance period neared expiration, Thomas was discussing permanent financing with Hines, one of the world's largest real-estate development firms. JA 902. Gamma agreed to allow Thomas more time for these discussions. But rather than offer another forbearance agreement, Gamma insisted on a deed-in-lieu-of-foreclosure agreement ("DIL Agreement"). JA 902-03.

The DIL Agreement required the Wade Park Plaintiffs to deliver the property deeds to Omega's designee, which would hold them in escrow until the Gamma Bridge Loan and BAMCAP loan were repaid. JA 902-03. Kalikow assured Thomas this would not cause a transfer of the deeds to Gamma. Rather, Gamma promised to afford Thomas time to "buy back" the property by paying off the loans. In Kalikow's words, Thomas had to "trust" that Gamma would honor that promise. JA 903.

It did not. After executing the DIL Agreement, Gamma agreed to only a six-week buy-back period (much shorter than promised), meaning Thomas had just a month-and-a-half to raise over $150 million. In mid-April 2019, the buy-back

agreement expired. Kalikow continued to assure Thomas he would have more time to get back the deeds, but only if whoever bought the property was a "strawman"— *i.e.*, not affiliated with Thomas. JA 905-07.

Thomas enlisted Hines as his "strawman," but Gamma rejected all of Hines' proposals and inexplicably told Hines it would not sell the property if Thomas were involved. Eventually, Gamma caused Hines to walk away, cementing Gamma's takeover of Wade Park. JA 907-08.

Gamma's ploy turned out to be wildly profitable. In just over two years, it received over *$640 million* on an $83 million loan. Gamma not only received $76.6 million in interest payments and fees, it also obtained free-and-clear ownership of Wade Park, which had a value as of the transfer date in excess of $565 million. JA 909. Recall that in 2016, the property was independently appraised at $466.8 million. JA 941. After that appraisal, Plaintiffs made improvements to the property with a market value above $70 million. JA 941. And in October 2018, BBG appraised the property at $565 million. JA 939. By the time Gamma gained ownership of the property in 2019, Plaintiffs had made another $500,000 in improvements. JA 939.

Gamma's windfall was extremely prejudicial to the Wade Park Plaintiffs' other creditors. After the property transfers, the Wade Park Plaintiffs were left with $75 million in liabilities but only $105.05 in assets. JA 939-41.

## II.    Proceedings Below

This case began as an adversary proceeding in bankruptcy court in the Northern District of Georgia. The parties agreed to withdraw the reference, and the Plaintiffs amended the complaint. JA 24-27. The First Amended Complaint ("FAC") raised 18 causes of action for declaratory relief and damages. JA 27-147. Among other things, Plaintiffs alleged the property transfers were constructively fraudulent; sought a declaration that the last three forbearance agreements, DIL Agreement, and transfer of the Wade Park deeds were void under the LLC Agreement and Delaware law; and asserted various fraud, tort, and RICO claims.

As to fraud, the FAC alleged numerous, specific misstatements of material fact. For example: (1) in a December 2, 2016 phone call with Thomas and others, Kalikow "falsely stated that [Gamma] did not want to own the Wade Park Project," when that was Gamma's intent from the start, JA 53, 100; (2) in January 2017, Gamma falsely represented in the Bridge Loan that it would not unreasonably withhold consent to a modification of the BAMCAP loan, even though its intent was to do just that, JA 58-59; (3) between September 2018 and January 2019, Kalikow repeatedly encouraged Thomas to pursue deals with Bluebell, Columbia Pacific, and Hines, stating those were "viable refinancing options" and that Gamma would consent to the loans, when Gamma knew it would never consent and eventually admitted as much, JA 3, 75-76; and (4) in January and February 2019, Kalikow

repeatedly told Thomas the DIL Agreement "would not actually cause a transfer of the Wade Park deeds to Gamma" and that Gamma would give him sufficient time to buy back the property, JA 80-84.

Gamma moved to dismiss and transfer the case to New York. JA 606-07. The district court for the Northern District of Georgia transferred the action but withheld ruling on Gamma's motion to dismiss.[3] JA 656. After the transfer, the district court for the Southern District of New York ordered the parties to re-brief Gamma's motion to dismiss and address any choice-of-law questions that resulted from the venue change. SPA 112.

In March 2022, the court granted the motion to dismiss. SPA 2. It dismissed all but the fraudulent-transfer and declaratory-judgment claims as barred by contractual releases. SPA 28-29. Alternatively, the court held the FAC failed to state a single claim for relief and dismissed it with prejudice. SPA 36-90.

Plaintiffs filed a Rule 59 motion to amend the judgment to be a dismissal without prejudice and requested leave to amend the fraudulent-transfer claims and to allege fraudulent inducement under New York law. SPA 91-92. The court granted the motion in part, denying leave to add the New York fraud claim but granting the motion with respect to the proposed fraudulent-transfer allegations. SPA 97-98.

---

[3] The district court did, however, grant a motion to dismiss filed by Defendant-Appellee Blake Goodman. JA 637. Plaintiffs do not challenge this ruling.

After Plaintiffs filed the SAC (JA 850-980), Gamma moved to dismiss again. The district court granted the motion, holding the SAC failed to plausibly allege that Plaintiffs did not receive "reasonably equivalent value" for Wade Park. SPA 127-42. The court rejected the SAC's allegations that long before this litigation, two independent appraisers separately determined the value of Wade Park was $466.8 million and $565 million. The court held that these appraisals' "*opinion[s]*" do not plausibly show the property's value because they were merely "idiosyncratic view[s]" by professionally licensed appraisers. SPA 133-34.

This appeal followed.

## <u>STANDARD OF REVIEW</u>

Federal Rule of Bankruptcy Procedure 7012 incorporates Federal Rule of Civil Procedure 12(b)(6). This Court reviews dismissals under Rule 12(b)(6) *de novo*. *E.g.*, *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (en banc).

"To survive a motion to dismiss, a complaint need only provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Rule 8 "does not require 'detailed factual allegations.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plausibility standard "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the wrongdoing

14

alleged, "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks omitted).

At the pleading stage, a court must accept all factual allegations as true and construe all reasonable inferences in favor of the plaintiff. *E.g.*, *Arar*, 585 F.3d at 567. "When there are well-pleaded factual allegations, a court should assume their veracity and *then* determine whether they plausibly give rise to an entitlement to relief.'" *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "'The choice between two plausible inferences … is not a choice to be made by the court ….'" *Id.* (quoting *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012)).

This Court ordinarily reviews denials of leave to amend for an abuse of discretion. *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017). But when the denial "is based on a legal interpretation, such as a determination that amendment would be futile," this Court's review is *de novo. Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015) (quotation marks omitted).

# SUMMARY OF ARGUMENT

This appeal arises from a multi-billion-dollar real-estate project in which a bridge lender orchestrated a series of fraudulent acts to obtain title to a $565 million property on an $83 million loan. At the motion-to-dismiss stage, the district court was supposed to accept the SAC's factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. It did the opposite. It discredited well-pleaded allegations, drew inferences *against* Plaintiffs, and resolved disputed factual questions. The dismissal of Plaintiffs' claims for fraudulent transfer, declaratory judgment, Georgia RICO, and fraud should be reversed.

I.      The district court erroneously dismissed Plaintiffs' fraudulent-transfer claims for failing to plausibly allege the transfer of Wade Park was for less than "reasonably equivalent value." That ruling improperly disregarded allegations that two independent, pre-litigation appraisals determined the value of the property was more than three times what Plaintiffs later received for the transfer. The ruling was also based on improper and unfounded factual assumptions about Thomas's ability to obtain refinancing, his ability to sell the property, and the representations in an Estoppel Certificate the SAC alleged was false. Finally, the district court erred in denying leave to replead these claims based on an inaccurate, *Daubert*-type analysis that was wholly inappropriate at the motion-to-dismiss stage.

II.     The district court erroneously dismissed the declaratory-judgment claim by misconstruing the LLC Agreement and misapplying Delaware law. Under the LLC Agreement, Plaintiffs lacked authority to enter the last three forbearance agreements and DIL Agreement and to deliver the deeds to Wade Park. The district court circumvented that agreement's plain language by ignoring critical features of the transactions and shoehorning them into an inapplicable contractual exception. It also found a conflict in the LLC Agreement that does not exist and used that "conflict" to override a clear prohibition on the challenged transactions. The court alternatively held that the transactions would, at most, be voidable not void—but that is contrary to Delaware law.

III.     The district court erred in dismissing Counts 5-7 for Georgia RICO and fraud. *First*, the court erroneously held those claims were released, because the agreements containing the releases were part of the fraudulently induced Gamma Bridge Loan. Even if enforceable, the releases did not bar the unaccrued Georgia RICO claims, which also fell within an exception for fraud.

*Second*, the court erred by holding that Counts 5-7 failed to satisfy Rule 9(b). The court ignored critical differences between Georgia RICO and its federal counterpart, dismissing the former based solely on its rejection of the federal RICO claims. The court also overlooked detailed allegations describing Defendants' fraudulent acts and drew inferences *against* Plaintiffs, even though the allegations

plausibly support the claimed fraud. As for inceptive fraud under Georgia law, the court ignored allegations of unusual behavior that create a strong inference Gamma fraudulently induced Thomas to enter the Gamma Bridge Loan by falsely promising not to unreasonably withhold consent to modifications of the BAMCAP loan when it intended all along to withhold consent and obtain title to Wade Park.

*Third*, the court abused its discretion in denying leave to add a claim for fraudulent inducement under New York law based solely on "delay" without any finding of bad faith or prejudice.

## **ARGUMENT**

## I. **The district court erred by dismissing Plaintiffs' fraudulent-transfer claims and denying leave to replead.**

Counts 12 and 13 allege the transfer of Wade Park to WP Development Partners (Omega's designee) was constructively fraudulent under the Bankruptcy Code (11 U.S.C. §§ 544, 548, 550, and 551) and Georgia law (O.C.G.A. § 18-2-70, *et seq.*) because it left the Wade Park Plaintiffs insolvent and because they did not get reasonably equivalent value in exchange. JA 967-73.[4] This claim has two elements: (1) "the debtor … became insolvent as a result of the transfer," and (2) "the debtor received less than 'a reasonably equivalent value in exchange for such

---

[4] Because the SAC includes the same allegations (in the same numbered paragraphs) the district court considered when it dismissed the FAC, we refer only to the SAC.

transfer.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 190 (2d Cir. 2020) (quoting 11 U.S.C. § 548(a)(1)(B)(i)).[5]

Reasonably equivalent value is "determined by the value of the consideration exchanged between the parties at the time of the conveyance … which is challenged." *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 172 (2d Cir. 2021) ("*Tribune*") (quotation marks and emphasis omitted). This inquiry does not require "mathematical precision." *Id.* Instead, courts "examine the totality of the circumstances, including the arms-length nature of the transaction" and "the good faith of the transferee," keeping in mind that "***any significant disparity*** between the value received and the obligation assumed … will have significantly harmed the innocent creditors." *Id*. (quotation marks omitted and emphasis added).

Whether "reasonably equivalent value was exchanged is largely a question of fact" that "usually should not be made at the motion to dismiss stage," especially if the determination requires more than a "simple math calculation." *Id.* at 172-73 (quotation marks omitted); *cf. Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (when "intelligent adjudication [of fraudulent-transfer claims] requires more than the use of lay knowledge and the resolution of a disputed issue hinges in large

---

[5] The district court correctly observed that the analysis of these claims under bankruptcy law and Georgia law is substantially the same. SPA 82, 127.

measure upon conflicting opinions … of expert witnesses, summary judgment is not appropriate").[6]

Despite this lenient pleading standard, the district court held that the SAC does not adequately plead the transfer was not for reasonably equivalent value. SPA 128-40. That ruling is wrong for at least five reasons.[7]

### A. The district court erroneously disregarded the SAC's allegations of value based on the Sage Appraisal.

The transfer of Wade Park was not for reasonably equivalent value because the value of the property—over $565 million—"greatly exceeded" the indebtedness to Gamma (roughly $140 million). JA 939, 968-69. As factual support for the $565 million valuation, the SAC alleged that Gamma requested "an independent appraisal from Sage Group" in November 2016 showing Wade Park's as-is market value was $466.8 million. JA 941; *see also* JA 741-42.[8] The SAC also alleged that between the Sage Appraisal and the "date of the transfer in February 2019, improvements with a

---

[6] The district court correctly ruled that "the mere satisfaction of an antecedent debt cannot be presumed to be reasonably equivalent value." SPA 128 n.8 (citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir. 1995)).

[7] The court did not reach whether the SAC adequately pleads insolvency, SPA 127 n.7, but it does. The SAC alleges the transfers caused the Wade Park Plaintiffs to become insolvent and identifies the exact dollar value of their assets and liabilities before and after transfer. JA 939, 968-69.

[8] Defendants attached the Sage Appraisal to their motion to dismiss, and Plaintiffs acknowledged the district court could consider it. Doc. 86 at 5 n.4.

market value in excess of $70 million were made to the Wade Park propert[y]." JA 941.

The SAC's allegations about the Sage Appraisal alone show the plausibility of the fraudulent-transfer claims because "reasonably equivalent value" does not exist if there is "any significant disparity" between the value received and the value given. *Tribune*, 10 F.4th at 172 (quotation marks omitted). The disparity here is not only significant but *vast*—the amount owing to Gamma, $140.1 million, was just 30% of $466.8 million and less than 25% of the $565 million value as of the transfer.

The district court erroneously disregarded those allegations. It ruled the Sage Appraisal was too "f[ar] afield" because it was from 2016, but that is an unsupported factual assumption the court was not permitted to make. SPA 137-38. Though the appraisal occurred two years before the deeds were transferred, a reasonable inference is that the real-estate market for the high-end "$5 Billion Mile" was steady (if not improving). *See, e.g.*, JA 861-63; *cf. In re Positive Health Mgmt.*, 769 F.3d 899, 905 (5th Cir. 2014) (court appropriately relied on 2006 appraisal to determine 2008 market value); *see also In re Mina*, 2022 WL 2657481, at *5 (Bankr. W.D.N.Y. July 8, 2022) (denying motion to dismiss where complaint alleged value based on appraisal that pre-dated transfer by four years).

The district court drew the opposite inference, speculating that February 2019 was "an entirely different market period." SPA 138. In other words, the court found

the property's $466.8 million value fell so dramatically in two years that $140 million was reasonably equivalent to its value in 2018. But nothing supports that extraordinary inference *against* Plaintiffs. The SAC certainly does not allege that property values plummeted during that period. To the contrary, it alleges the property's value *increased* from $466.8 million in November 2016 to $565 million in October 2018.[9]

The district court's other criticisms of the Sage Appraisal also miss the mark. Though the appraisal occurred "before changes to the Wade Park propert[y] were made" (SPA 138), the district court ignored the allegation that these changes *raised* Wade Park's market value. JA 941. And Plaintiffs did not ask the district court to "*determine* reasonably equivalent based on [the] appraiser's opinion." SPA 138 (emphasis added). The Sage Appraisal simply shows the plausibility of Plaintiffs' allegations of value; no facts are "determined" at this stage.

## B. The district court erroneously disregarded the SAC's allegations about the BBG Appraisal.

Standing alone, the SAC's allegations about the Sage Appraisal easily satisfy *Iqbal*'s plausibility standard. But that was not the only appraisal. The SAC also alleged that "independent appraiser BBG, Inc. appraised the market value of the

---

[9] The inference that the market strengthened after 2016 is not only reasonable, but true. As the November 2018 BBG Appraisal noted, "[o]verall values in this area have increased by about 40% since 2015." JA 1140.

Wade Park propert[y]" at $565 million in October 2018. JA 939, 986. The district court disregarded this allegation of value, improperly concluding the BBG Appraisal was just an "opinion" based on "an unidentified methodology" and "undisclosed assumptions." SPA 136-37.[10] That rationale is deeply flawed.

**First**, Rule 8 does not require specific allegations about the methodology or assumptions used in an appraisal. *See, e.g.*, *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209-10 (2d Cir. 2020) ("[W]e do not require a plaintiff to prove in detail the methodological soundness of her statistical assessment to survive a motion to dismiss."). Such a pleading requirement would go far beyond the "short and plain statement" required by Rule 8, particularly for complex commercial appraisals, *see generally* JA 740-828 (Sage Appraisal containing 89 pages of assumptions, data, and analysis). Whether an appraiser's assumptions are reasonable is a fact question. *See, e.g.*, *In re Integrity Graphics, Inc.*, 2021 WL 2036472, at *3 (Bankr. D. Conn. May 20, 2021) (on motion to dismiss, value allegations based on an appraisal must be "taken as true").

Indeed, this Court has made clear that it is reversible error for a district court, at the pleading stage, to question the findings or methodology of an opinion

---

[10] For this appeal, we assume the district court correctly declined to consider the full BBG Appraisal (JA 1091-837) in ruling on the motion to dismiss. *See* SPA 121-26. The district court did consider that document in denying leave to amend, and that ruling is discussed *infra* Part I.E.

supporting a factual allegation. *See John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d

732 (2d Cir. 2017). In *John*, the complaint relied on a press release in which the New

York City Department of Consumer Affairs ("DCA") announced preliminary

findings that Whole Foods routinely overstated weights of pre-packaged foods. *Id.*

at 734. The district court disregarded those allegations based, in part, on "the absence

of allegations describing the DCA's methodology." *Id.* at 737. This Court reversed,

holding that "a facial attack on the pleadings is not the proper stage to determine

whether the DCA's sampling methods justified its declaration of widespread

overcharging." *Id.* "At the pleading stage, [the plaintiff] *need not prove* the accuracy

of the DCA's findings or *the rigor of its methodology*; he need only *generally* allege

facts that, accepted as true, make his alleged injury plausible." *Id.* (emphases added);

*see also Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir.

2020) ("[O]n a motion to dismiss we presume that general allegations embrace those

specific facts that are necessary to support the claim." (quotation marks omitted)).[11]

**Second**, even if the reliability of an appraiser's assumptions were relevant at

this stage, the district court ignored various indicia of the BBG appraisal's reliability.

The SAC alleges BBG is an "independent appraiser." JA 939. BBG's cover letter

---

[11] *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), a RICO
case cited by the district court with a "cf." signal, SPA 135, is not to the contrary.
That case was "governed by the more stringent pleading requirements of [Rule]
9(b)" and held that the complaint did not adequately allege proximate causation
based on the "cumulative effect" of many factors. *Id.* at 771-72.

states that the appraisal "was prepared to conform with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP)." JA 986. Under those standards, appraisers "must perform assignments with impartiality, objectivity, and independence."[12] The letter adds that BBG "inspect[ed]" the property, considered "recent market transactions," and had "discussions with market participants." JA 986. Contrary to the district court's statements, the appraiser's credentials are not "unknown," SPA 136; instead, the letter is signed by a "T[exas] Certified General Appraiser." JA 987. And BBG's contemporaneous appraisal bears "additional indicia of reliability" because it was "not made in anticipation of litigation." *In re Motors Liquidation Co.*, 576 B.R. 325, 425 (Bankr. S.D.N.Y. 2017) (quotation marks omitted).

**Third**, the district court's refusal to accord "a presumption of truthfulness" to the BBG Appraisal because it is an "opinion" is legal error. SPA 137. That presumption applies to all factual allegations, whether they relate to an opinion or not. The case cited by the district court merely states that "'*legal* conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.'" *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (quoting *United States v. Bonanno Organized Crime Fam. of La Cosa Nostra*, 879 F.2d 20,

---

[12] Appraisal Standards Board, The Appraisal Foundation, USPAP 7 (2018-2019 ed.); *see also id.* at 24 (requiring "impartial" and "unbiased" appraisal reports).

27 (2d Cir. 1989) (emphasis added)). But the BBG Appraisal is not a legal opinion; it supports *factual* allegations about value and does not purport to address the legal question whether the transaction lacked "reasonably equivalent value." Indeed, the line of cases cited by the district court expressly distinguishes "[l]egal conclusions, deductions or opinions," which the court need not accept, from "factual" allegations, which the court is "constrained to accept." *Bonanno*, 879 F.2d at 27. Thus, at the pleading stage, courts cannot ignore *factual* allegations about a professional appraiser's opinion.[13]

Allowing district courts to disregard an expert's appraisal at the pleading stage also conflicts with the Bankruptcy Code's protection of creditors because it undermines a bankruptcy trustee's ability to pursue avoidance claims. Appraisals are a common and indispensable tool to prove constructive fraud. For instance, this Court has instructed that, "*[w]henever possible*, a determination of insolvency should be based on seasonable appraisals or expert testimony." *In re Roblin Indus., Inc.*, 78 F.3d 30, 38 (2d Cir. 1996) (emphasis added); *see also In re Jesup & Lamont, Inc.*, 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014) ("To prove insolvency, a trustee may rely on balance sheets, financial statements, appraisals, [and] expert reports[.]")

---

[13] "[A]lthough … appraisals are matters of opinion in one sense, they also constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property." *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).

(quotation marks omitted). Likewise, trustees regularly rely on *contemporaneous* appraisals (as opposed to appraisals obtained for litigation), to plead the lack of reasonably equivalent value. *See, e.g.*, *In re Mina*, 2022 WL 2657481, at *1; *In re Integrity Graphics*, 2021 WL 2036472, at *3.

"The detailed fact-finding and valuation entailed in the reasonably equivalent value analysis *often requires the fact finder to assess the contrary opinions of the competing experts*." *In re WRT Energy Corp.*, 282 B.R. 343, 405 (Bankr. W.D. La. 2001) (quotation marks omitted and emphasis added); *see also BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 538-39 (1994) (noting that "reasonably equivalent value" is often based on "[a]n appraiser's reconstruction of 'fair market value'"); *In re Glob. Technovations Inc.*, 694 F.3d 705, 717 (6th Cir. 2012) (court "followed an acceptable methodology" by determining reasonably equivalent value based on appraisers' testimony). Indeed, "[i]n the absence of a fair market sale price to use as a benchmark"—as in this case—"the Court must look to other indicia of value, including the appraisals offered by the parties at trial." *In re Motors Liquidation Co.*, 576 B.R. at 425. Holding that appraisals deserve no presumption of truthfulness would place a thumb on the scale in favor of defendants to the detriment of creditors, whom the Bankruptcy Code seeks to protect.

**C. The district court's inference that Thomas could not refinance or sell because of concerns about the property's value is factually and legally unfounded.**

The district court also rejected the SAC's allegations of value by repeatedly speculating that Thomas's inability to refinance, sell, or buy back the property, and Gamma's willingness to permit a buyback, must have been due to the property's value not being "anywhere close" to $565 million. *See, e.g.*, SPA 131, 136. But the SAC certainly does not allege that is why the deals fell through. The district court's inference against Thomas is unsupported by the pleadings and unreasonable.

The court's conclusion also depends on Thomas and Gamma's *subjective* needs, preferences, and incentives—which are irrelevant to the *objective* test for determining fair market value. Contrary to the district court's repeated emphasis on what Thomas and Gamma thought the property was worth, "fair market value" is based on "an informed, *hypothetical* willing seller and an informed, *hypothetical* willing buyer not under compulsion to buy or sell, and having a reasonable amount of time to sell the property." *In re WRT Energy Corp.*, 282 B.R. at 369 (emphasis added). For that reason, the fair-market-value element of "reasonably equivalent value" is not concerned with the debtor's subjective beliefs or, for that matter, any facts that are unique to the debtor and transferee.[14] *See, e.g.*, *In re McMartin*, 599

---

[14] That is not to suggest that facts unique to the transacting parties are irrelevant to the "reasonably equivalent value" inquiry entirely. This Court uses a totality-of-the-

B.R. 622, 629 (Bankr. D.N.D. 2019) ("[m]ost courts that have considered this issue find that an objective standard is applied to the reasonably equivalent value analysis"); *In re Mercury Cos., Inc.*, 2015 WL 5920163, at *8 (Bankr. D. Colo. Oct. 9, 2015) (same); *In re WRT Energy Corp.*, 282 B.R. at 407 (same).

The district court acknowledged this objective-analysis rule, SPA 134 (citing *McMartin* and *Mercury*)—but then repeatedly violated it by relying on the subjective beliefs and preferences of Thomas and Gamma to reject well-pleaded allegations about the property's value. *See, e.g.*, SPA 130 (focusing on what "Plaintiffs thought in February 2019" and whether they "needed" the DIL Agreement); SPA 131 (observing what Plaintiffs had "every interest in doing"); SPA 132 (examining "belie[fs]" stated in the Estoppel Certificate); SPA 138 (considering whether Plaintiffs took "economically rational actions"). That is legal error.

In any event, many plausible explanations exist for Thomas's inability to refinance Gamma's loans that have nothing to do with the property's value. For example, even if a property is worth *more* than what the borrower believes it is worth, factors that have no bearing on collateral valuation may still prevent the owner from borrowing or selling. Such factors could include the borrower's payment history, liquidity, and financial distress; the position and rights of existing lenders;

---

circumstances test that considers three factors: (i) fair market value; (ii) the arms-length nature of the transaction; and (iii) whether the parties acted in good faith. *Tribune*, 10 F.4th at 172.

and the time available to close a loan or market and sell the property. Indeed, the pleadings here support at least three explanations—other than market value—for Thomas's inability to refinance, sell, or buy back Wade Park.

***First***, Gamma repeatedly interfered with Thomas's efforts to secure funding. JA 892-900, 907-08, 944-45, 947. The district court rejected this explanation on the grounds that (i) the SAC does not allege intentional misconduct sufficient to support a tortious-interference claim; and (ii) Gamma's consent to a refinancing was not contractually required. SPA 138-40. But whether Gamma's interference is actionable in tort or contract is irrelevant. Gamma's interference is a factual allegation that offers a plausible explanation for Thomas's inability to refinance that has nothing to do with the property's market value. Even if the interference were not motivated "solely by malice," as required to state a tort claim (*id.* at 40 n.11), it was still *effective* in deterring refinancing opportunities.[15]

It is also irrelevant whether Thomas had a contractual right to borrow without Gamma's consent because, as a factual matter, the SAC alleges everyone acted *as if* Gamma had the right to withhold consent. *See, e.g.*, JA 944-45 (active interference included "telling potential lenders that the Gamma Defendants would never consent

---

[15] The district court said the SAC does not allege any interference during the period of the DIL Agreement and buy-back agreement, SPA 139, but that is incorrect. *See* JA 905, 907-08, 945. And the short amount of time—rather than concerns about value—explains why Thomas could not buy back the property. JA 906-07.

to the refinancing of the BAMCAP Loan"). Even if that understanding of Gamma's contract rights were mistaken, the effect was the same: potential deals fell through for reasons *other than* the property's value.

The district court's conclusion that Thomas could refinance without Gamma's consent is also wrong as a matter of contract law. Section 6.19 of the Gamma Bridge Loan provides that "[a]ny amendment, modification *or termination* of the documents evidencing [one of the loans held by Gamma] shall require the prior written consent of [Gamma]; provided that [Gamma] shall not unreasonably withhold its consent." JA 246 (emphasis added). Paying off the loan via a refinancing transaction would have "terminat[ed]" it and thus required Defendants' consent. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010) (Chin, J.) (discussing "plain meaning" of "termination" and holding that a loan payoff "terminat[es]" the loan agreement). And even if the district court were correct that Section 8.2 of the Gamma Bridge Loan agreement "governs over the general language of Section 6.19," SPA 77, that section categorically prohibits Thomas from "incur[ring] *any Indebtedness*" other than the original Gamma loan or customary trade debt "without the prior consent of" Gamma. JA 249 (emphasis added). On its face, Section 8.2 applies to any effort by Thomas to obtain a third-party loan for any purpose, including refinancing.

***Second***, another plausible explanation for Thomas's inability to refinance is that prospective lenders had concerns about Thomas's liquidity and his entities' risk of bankruptcy. Aside from the transferred property and debt to Gamma, the Wade Park Plaintiffs had just $105.05 in assets compared to $75 million in liabilities. JA 939-41. Similarly, Thomas was locked out of the equity on some of his other large projects that had been mortgaged because Gamma purchased those loans to prevent refinancing. JA 892-95. And the SAC alleges Gamma "demanded the Hammer because [it] wanted an interest in Wade Park that was large enough *and 'painful enough' to deter Thomas from filing bankruptcy*." JA 876 (emphasis added). A reasonable inference is that, like Gamma, potential lenders had bankruptcy concerns and passed on refinancing even though Wade Park's collateral value was acceptable.

***Third***, Thomas's ability to sell Wade Park also had nothing to do with the property's objective value. It had everything to do with his reluctance to abandon an interest in property that he *believed* would have a "developed value" that "exceed[s] $2 billion," JA 863. And, in any event, he did not have enough time to complete a quick, forced sale in the face of a pending foreclosure. High-end, partially developed properties like Wade Park can rarely be sold in just a few weeks or months. Indeed, the Sage Appraisal estimates that it would take "18-24 months" to "effectively expose [Wade Park] to the market." JA 741, 819.

Given these plausible explanations for why Thomas did not refinance, sell, or buy back the property, the district court was not authorized to draw an inference *against* Plaintiffs and reject the SAC's allegations of the property's value.

**D.    The district court's reliance on the Estoppel Certificate is misplaced.**

The district court ruled that Plaintiffs' allegations of value are "undermined by the more specific statements" in an Estoppel Certificate in which the Wade Park Plaintiffs said they were solvent and believed the transfer reflected fair market value. SPA 128-29, 132-33. That ruling is wrong for three reasons.

*First*, the district court erred by considering the Estoppel Certificate because the SAC alleges it is inaccurate. JA 942. The court may not consider an extraneous document, "even if [it] is 'integral' to the complaint," unless it is "clear on the record that *no dispute* exists regarding the authenticity *or accuracy* of the document." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (quotation marks omitted and emphasis added); *accord Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 235 (2d Cir. 2016); *DiFolco*, 622 F.3d at 111. Here, "not only did the district court consider external material in its ruling, it relied on those materials to make a finding of fact that *controverted* the plaintiff[s'] own factual assertions set out in [their] complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006). "At the pleadings stage this was error." *Id.*

***Second***, the SAC plausibly alleges the Estoppel Certificate is false and Defendants knew it was false.[16] JA 942. *Gamma* requested the independent Sage Appraisal, which shows a $466.8 million value in November 2016. JA 941. Gamma also knew about subsequent property improvements with a market value above $70 million. JA 941. Gamma thus knew Wade Park's value was far above the $140.1 million still owing on the Gamma loans. JA 941-42. Against this backdrop, the Estoppel Certificate merely reflects Gamma's attempt to insulate itself from exposure to fraudulent-transfer claims. For this reason, among others,[17] the transaction was not negotiated at "arms-length" and does not reflect the "good faith of the transferee." *Tribune*, 10 F.4th at 172.

***Third***, in relying on the Estoppel Certificate while criticizing professional appraisals as "idiosyncratic" and "subjective," SPA 134, 136, the district court got it backwards. The Estoppel Certificate merely states a subjective, conclusory, and self-serving "belie[f]" that the consideration for the deeds "represents the fair market

---

[16] The district court agreed that Plaintiffs, who sued in their capacities as trustees of the bankruptcy estates, are "not bound by the Estoppel Certificate or legally estopped from asserting new facts." SPA 132; *see, e.g.*, *In re Bethlehem Steel Corp.*, 390 B.R. 784, 792-93 (Bankr. S.D.N.Y. 2008); 11 U.S.C. § 1107.

[17] Given their ownership affiliation with Wade Park Ventures, Gamma and Thomas were hardly arms-length parties. And the entire SAC raises doubts about Gamma's good faith.

value of the property." JA 581.[18] By contrast, the Sage and BBG appraisals reflect the independent analysis of disinterested experts. JA 939, 941; *see also* JA 745 (certifying Sage Appraisal reflects "impartial" and "unbiased professional analyses"); JA 1150 (same certification in BBG Appraisal). Indeed, "objectivity" is a core tenet of the USPAP standards followed by both appraisers. Appraisal Standards Board, *supra* n.12, at 7.[19]

For all these reasons, the district court erred in dismissing Counts 12 and 13 for failure to state a claim. Alternatively, and as explained in the next section, the district court should have given Plaintiffs leave to replead.

### E. The district court erred in denying leave to replead.

The district court correctly observed that "[i]f the body of the BBG appraisal report permitted a plausible inference that Plaintiffs had" alleged the transfer was not for reasonably equivalent value, Rule 15 would permit Plaintiffs to file an

---

[18] The Estoppel Certificate's conclusory statement about fair-market value is not "more specific" (SPA 128) than the SAC, which goes into detail about why that statement is not accurate, including specific allegations about the property's actual value. JA 863, 939, 941-43, 968-69.

[19] The district court cited cases that appraisals are not actionable "statements of fact" in the context of misrepresentation claims *under the securities laws*. SPA 136. But those cases have no bearing on whether appraisals are factual for pleading purposes in the fraudulent-transfer context. And the exercise of discretion does not transform appraisers' findings into "subjective" opinions. While real-property valuation is "not a matter of mathematics, … the calculation of true market value is an applied science" in which professionals estimate market value "based on careful scrutiny of all the data available." *CSX Transp., Inc. v. Georgia State Bd. of Equalization*, 552 U.S. 9, 16-17 (2007).

amended complaint. SPA 140. But the court erred in ruling that the 748-page report's findings are "conclusory" and "do not have sufficient weight to make Plaintiffs' claims plausible." SPA 141-42; *see also* SPA 135 ("Nothing is said about … why [BBG's] opinion should have any weight.").

Respectfully, this part of the district court's decision reads more like a *Daubert* order than a ruling on a motion to dismiss. At the pleading stage, the court's task "is not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 75. Defendants are "free to challenge the reliability and admissibility of the expert's opinions on a motion for summary judgment or a *Daubert* motion; but not on a motion to dismiss." *Cabrega v. Campbell Soup Co.*, 2019 WL 13215191, at *6 n.8 (E.D.N.Y. Nov. 18, 2019); *see also Mandala*, 975 F.3d at 209-10; *John*, 858 F.3d at 737.

Every one of the district court's critiques of the BBG Appraisal is improper at the pleading stage, or factually incorrect, or both:

**Value of Excess Land.** The district court disputed the BBG report's valuation of 117 acres of "excess land"—zoned primarily for mid- and high-rise office developments and limited retail establishments—at $40 per square foot, or $204 million total. JA 1124, 1144. This valuation, if credited, would by itself demonstrate the fraudulent-transfer claims' plausibility.

The district court's only reason for discarding the excess-land valuation is that the report supposedly "provides no facts to support the application of the $40.00 value per square foot … aside from cursorily mentioning a 'discount for economies of scale.'" SPA 141 (quoting JA 1144). But this overlooks the explanation provided on the cited page: "comparable land sales reflect a range from $23.36 to $51.30 per square foot, with an average of $37.19 per square foot." JA 1144. A value "toward the upper end of the adjusted range is reasonable," the report explains, "[g]iven the subject's high-profile location, entitlements in place and similarity to Comparable 7, which also has direct frontage to the Tollway." JA 1144. And the modest discount from $45 per square foot (for the primary site) to $40 per square foot (for the excess land) is sensible, given that "typical economies of scale do not play such a large role for land values in this particular area." JA 1143.

***Value of Leases and Tax Increment Financing.*** The district court said these two parts of the appraisal, which respectively yield $99 million and $71 million in additional value, "rely primarily on projections from the 'developer,' Thomas." SPA 141. But the court may not draw inferences *against* Thomas by assuming his projections are *wrong*. Those projections "may turn out to be self-serving and

untrue … [b]ut a court at this stage of our proceeding is not engaged in an effort to determine the true facts." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

***Value of Cost Spent to Date.*** The appraisal includes $71 million of additional value for existing property improvements. JA 1095-96. The district court said there is "no explanation" of this figure, SPA 141, but it reflects the actual cost of the "partially constructed buildings" on the property. JA 1095. The SAC also expressly alleges that "improvements with a market value in excess of $70 million were made to the Wade Park propert[y]." JA 941.

The district court also refused to credit this part of the appraisal because it "appears to conflate *cost* with *value*." SPA 141. But it is not implausible to assume that spending $71 million on construction will increase a property's value by about $71 million—that is usually how it works. *Cf. Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1577 n.26 (Fed. Cir. 1983) ("[A]bsent evidence that costs do not reflect value, the Secretary may reasonably conclude that cost and value are directly related."). The BBG Appraisal is also corroborated by the Sage Appraisal, which assigned an even larger dollar figure to the value of cost spent. JA 742. At the very least, this is another fact question that cannot be decided at this stage, let alone decided *against* Plaintiffs.

***Primary Building Site.*** The appraisal report values the primary building site at $45 per square foot, for a total value of $117 million. JA 1144. The district court

erroneously discredited the report's "comparables analysis" as "conclusory," SPA 142, but the report delves into the appraiser's methodology. JA 1136-43. It also identifies a local broker who stated that "a value at $50 [per square foot] would be appropriate for the subject as it is the largest piece of land available along the Tollway that is entitled." JA 1145.

The district court's remaining concerns with BBG's comparables analysis are also misplaced. First, there is nothing unusual or improper about using pending sales as comparables. *See, e.g.*, Appraisal Institute, The Appraisal of Real Estate 351 (15th ed. 2020) (sales-comparison valuation methodology considers "closed sales, *pending sales*, active listings, and cancelled or expired listings of properties that are similar to the property being appraised" (emphasis added)); *see also id.* at 354. Second, whether the pending sales went through is a subject for discovery, not a motion to dismiss. Third, though the district court quibbled with certain price adjustments, the report identifies the basis for each one. JA 1141-44. And fourth, BBG's use of confidential sources to verify some of the comparables is irrelevant at this stage. The appraiser viewed those sources as reliable, and it is improper to assume his professional judgment was wrong without any discovery.

Thus, even if the district court's dismissal of Counts 12 and 13 were correct, the court erred by denying leave to replead based on misplaced concerns about the full BBG Appraisal.

## II. The district court erred by dismissing the declaratory-judgment claim.

The district court also erroneously dismissed Count 1, which sought a declaration that these five transactions are *ultra vires* and void: the August, October, and December 2018 forbearance agreements; the DIL Agreement; and the February 2019 delivery of deeds to Wade Park (the "Challenged Transactions"). The Challenged Transactions violate the plain language of Section 2.4(d) of Wade Park Ventures' LLC Agreement and are void under Delaware law.[20]

### A. The district court's construction of the LLC Agreement violated settled rules of contract interpretation.

Wade Park Ventures is a Delaware LLC and the sole member of the Wade Park Plaintiffs. JA 853-54, 860-61, 879. Thomas managed Wade Park Ventures, whose members were the Thomas Family Trust and GRE WP. JA 859-60, 879-80. The LLC Agreement provides that Wade Park Ventures and its subsidiaries lack authority to enter certain transactions with an affiliate or related party of Thomas, the Trust, or GRE WP:

> Notwithstanding anything to the contrary set forth herein, *in no event shall the Manager, the Company or any Subsidiary have the authority to enter into any engagement for services, transactions or agreement with any Member or Manager or any Affiliate or Related Party of a Member or Manager* …, except for [certain] services agreements …; and provided, however, that the Initial

---

[20] It is undisputed Delaware law governs the LLC Agreement. SPA 40-41; doc. 46 at 19 n.8.

Loan by the Initial Lender shall be deemed permitted under this section.

JA 165 (§ 2.4(d)) (emphasis added).

Section 2.4(d) does not merely require certain approvals or conditions to be met for the Wade Park Plaintiffs to enter these transactions; they lack "authority to enter into" such transactions at all. *Id.* Section 2.4(d) does, however, permit some related-party transactions, including "services agreements" under certain conditions. It also states that the "Initial Loan by the Initial Lender," which would otherwise be barred, is deemed "permitted under this section." *Id.*

### 1. Section 2.4(d) expressly bars the Challenged Transactions.

In July 2018, Omega—an affiliate of GRE WP—acquired the BAMCAP loan and thus became a lender to Wade Park Land. JA 880, 950. In August, October, and December 2018, the Wade Park Plaintiffs entered forbearance agreements with Omega for the BAMCAP loan. JA 950. And in February 2019, they entered the DIL Agreement with Omega and delivered the deeds to Wade Park. JA 950.

These five transactions are expressly barred by the LLC Agreement. There is no dispute they are "transactions or agreement[s]" with "an[] Affiliate or Related Party of [GRE WP]." And they fall outside the exception in 2.4(d) for the "Initial Loan." That carve-out exempts only the *Gamma Bridge Loan*, "as the same may be amended, modified, [or] supplemented from time to time"—not the BAMCAP loan.

41

Despite the plain language of Section 2.4(d), the district court held that the transactions fall within the "Initial Loan" exception. It considered the Challenged Transactions to have "amended, modified, or supplemented the Gamma Bridge Loan," and to merely "include[] *terms affecting* the BAMCAP loan." SPA 40. That is wrong. The forbearance agreements and DIL Agreement expressly state that they are agreements to forbear from foreclosing *on the BAMCAP* loan and a deed-in-lieu *for the BAMCAP* loan. JA 374-76, 506-07. They do not contain terms that simply *affect* the BAMCAP loan; they are agreements to exercise (or forbear from exercising) rights under that loan.

### 2. Section 3.3 does not override the plain language of 2.4(d).

The district court also erroneously concluded that Section 3.3, which places conditions on the *Manager*'s authority to enter certain transactions, supersedes 2.4(d) and authorizes the Challenged Transactions.

Section 3.3 states:

> Notwithstanding anything to the contrary in this Agreement, as long as any obligations owed under the Initial Loan … remain outstanding, the Manager shall have no authority to cause the Company or any Subsidiary to take any of the following actions without the written consent … by the Initial Lender: … (v) Entering into any engagement for services, transaction or agreement with any Member or Manager or any Affiliate or Related Party of a Member or Manager ….

JA 168 (§ 3.3). The district court read this provision to mean that related-party transactions are allowed with the lender's written consent. SPA 39.

The district court found conflict between Sections 2.4(d) and 3.3 and held Section 3.3 prevailed because it was "more specific." SPA 40. It is bedrock Delaware law, however, that contract provisions must be harmonized if possible. *Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC*, 284 A.3d 714, 721 (Del. 2022). And Sections 2.4(d) and 3.3 do not conflict. Section 2.4(d) expressly prohibits Wade Park Ventures, its subsidiaries (*i.e.*, the Wade Park Plaintiffs), *and* the Manager from entering certain related-party transactions. Section 3.3 provides *another* condition precedent before Wade Park Ventures' Manager can enter one of the related-party transactions that Section 2.4(d) permits: if the Initial Loan is still outstanding, he must *also* obtain the Initial Lender's written consent before causing the companies to enter a permitted transaction.

The district court's reading also renders Section 2.4(d) superfluous. If the Manager can enter any related-party transaction with the Initial Lender's written consent, Section 2.4(d)'s prohibition means nothing. Delaware law requires this Court to "give effect to *all* terms of the instrument." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385-86 (Del. 2012) (emphasis added); *see also Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019)

("The contract must also be read as a whole, giving meaning to each term …."). The district court did not do that; it gave effect to just one of the provisions.

In any event, even if there were a conflict between Sections 2.4 and 3.3, Section 2.4 is "more specific" on the issue of related-party transactions. It states that in "*no event*" shall the LLC, its subsidiaries, *or* the manager have authority to enter the prohibited transactions. Section 3.3 refers only to the manager and says nothing about the authority of the Wade Park Plaintiffs to enter the prohibited transactions.

## B. The district court misapplied Delaware law on void and voidable transactions.

The district court dismissed Plaintiffs' declaratory-judgment claim on the alternative ground that the Challenged Transactions were "voidable" and "subject to ratification." SPA 40-41. It held that "*even if the transactions at issue were beyond the power authorized by the LLC Agreement*, they would be at most voidable … rather than void" because the LLC Agreement did not explicitly state that related-party transactions are "void." *Id.* (emphasis added).

Under Delaware law, however, "[v]oid acts are those the entity itself has *no implicit or explicit authority to undertake* …. They are acts that the entity lacks the power or capacity to effectuate." *In re Coinmint, LLC*, 261 A.3d 867, 890 (Del. Ch. 2021) (quotation marks omitted and emphasis added). Voidable acts, by contrast, can be lawfully accomplished *if* they are done "in the appropriate manner." *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch. 2005).

44

The Challenged Transactions are not voidable—they are void. Section 2.4(d) is clear on this point: "*in no event* shall [the Wade Park Plaintiffs] *have the authority* to enter into any engagement for services, transactions or agreement with … any Affiliate or Related Party of [GRE]." JA 165 (emphasis added). Related-party transactions, in other words, are *beyond the authority* of the Wade Park Plaintiffs. Under Delaware law, that makes them void, not voidable, and therefore not subject to ratification. *See, e.g.*, *Nevins*, 885 A.2d at 245.

The two cases cited by the district court—*CompoSecure* and *Absalom*—are not to the contrary. Those cases dealt with transactions that were authorized by the LLC agreements so long as the parties obtained written consent. *See CompoSecure, LLC v. CardUX, LLC*, 206 A.3d 807, 816 (Del. 2018); *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *3 (Del. Ch. June 27, 2019). Under the common law, that type of transaction, if made without the requisite consent, would ordinarily be voidable. But the courts ultimately held the transactions were void because the LLC agreements said the transactions were "void" and "null" and could not be ratified. *See CompoSecure*, 2016 A.3d at 816; *Absalom*, 2019 WL 2655787, at *3.

Here, the LLC Agreement did not need to use the terms "null" and "void" to render the Challenged Transactions void, because it already states that "*in no event*" do the parties "have the authority" to enter them. Because the parties had "no implicit or explicit authority to undertake" the Challenged Transactions and "lack[ed] the

45

power or capacity to effectuate" them, *In re Coinmint*, 261 A.3d at 890, the Challenged Transactions are *void*, whether or not the LLC Agreement expressly uses that term.

## III. The district court erred when it dismissed Plaintiffs' claims for Georgia RICO and fraud.

Counts 5-7 of the SAC alleged violations of Georgia RICO and fraud. The district court dismissed these claims on two grounds. First, it held they were barred by "at least one of [eight] agreements" containing releases. SPA 28. Second, it held that, "even if the claims were not released," the SAC failed to state a claim for Georgia RICO or fraud. SPA 36. Both rulings are wrong.

### A. Plaintiffs did not release their Georgia RICO and fraud claims.

The district court dismissed most of Plaintiffs' claims on the ground that they were "released" by eight agreements relating to the Gamma Bridge Loan. SPA 23-28. Four of those agreements—the last three forbearance agreements and the DIL Agreement—are void for the reasons stated in Part II. But even if Plaintiffs' declaratory-judgment claim fails, all eight agreements are invalid because they amend the Gamma Bridge Loan, which itself was procured by fraud. And even if the releases were valid, they do not apply to the Georgia RICO claims.

### 1. The district court erred in applying the release provisions of contracts procured by fraud.

The SAC alleges Gamma entered the bridge-loan agreement in 2017 with the intent not to honor the agreement's terms—a type of misrepresentation known as "inceptive fraud" under Georgia law. JA 957-60; SPA 30. Specifically, when the parties executed the Gamma Bridge Loan, Gamma falsely promised it would not unreasonably withhold consent to modifications of the BAMCAP loan, when its intent was to manufacture a default by refusing any proposed modification. JA 881-83, 957-60. Under Georgia law, that is fraud, and it is ground to invalidate the contract. *See Cowart v. Gay*, 223 Ga. 635, 637 (1967); *see infra* Part III.C.

The same fraud that induced Plaintiffs to enter the Gamma Bridge Loan invalidates the releases in the later modification and forbearance agreements, all of which flowed from the initial fraud. Indeed, in its ruling on the declaratory-judgment claim the district court recognized that the agreements containing the releases all "amended, modified, or supplemented the Gamma Bridge Loan." SPA 40. The Loan Modification Agreement purported to *modify* the bridge loan; the six forbearance agreements were to *forbear* rights under the bridge loan; and the DIL Agreement deeded assets that were the *subject of* the bridge loan. *Id.* Under Georgia law, the eight agreements containing releases are thus "as much the offspring of the fraud as was the principal contract itself" and are also invalid. *Nolan v. Calhoun*, 38 Ga. App. 227 (1928); *see also Est. of Ryan v. Shuman*, 288 Ga. App. 868, 874 (2007)

(unenforceable agreement that violates statute of frauds cannot be "transform[ed]" into enforceable contract based on later agreements).

The district court rejected that argument, holding—without citation—that the releases "covered any claims Plaintiffs would have based on the [bridge loan]." SPA 32. But Georgia law is clear that "[i]t is inconsistent to apply a … provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract." *City Dodge, Inc. v. Gardner*, 232 Ga. 766, 770 (1974). "If the contract is invalid because of the [inceptive] fraud, then [its] provision[s] … [are] ineffectual since, in legal contemplation, there is no contract between the parties." *Id.* The district court's ruling also contradicts its conclusion that the forbearance agreements and DIL Agreement "amended, modified, or supplemented the Gamma Bridge Loan." SPA 40.

Without the fraudulently induced bridge loan, there never would have been the Loan Modification Agreement, six forbearance agreements, nor a property interest to transfer through the DIL Agreement. The district court erred in applying the terms of the later releases to "cover" the fraud that vitiated the initial contract.

## 2. Even if enforceable, the releases do not bar the Georgia RICO claims.

Even if the eight agreements containing releases were not invalidated by the fraudulently induced bridge loan, they do not bar claims for Georgia RICO. As

explained below, the first seven releases were superseded by the release in the DIL Agreement, and, if that agreement is not void for the reasons stated in Part II, its release still does not encompass unaccrued claims like RICO and contains an explicit exception for fraud.

***First***, the DIL Agreement contains the only effective release. Section 14 of the DIL Agreement states "[t]his Agreement, the [Gamma Bridge] Loan Documents and the BAMCAP Loan Documents constitute the entire understanding and agreement by and between the parties with respect to their subject matter and the transactions contemplated thereby, *superseding all prior writings*, discussions and understandings between the parties with respect thereto." JA 516 (§ 14) (emphasis added). The DIL Agreement's release therefore "supersed[es]" the releases in the forbearance agreements and contains the only effective release.[21]

The district court rejected this argument, stating the releases in the forbearance agreements were "immediately effective" and any released claims "cannot be … revive[d]" by the DIL Agreement's integration clause. SPA 36. But releases discharge only an ***existing*** obligation or cause of action. A "covenant not to sue" is "prospective" and can be rescinded by a subsequent agreement. *See Volk v. Liggett*

---

[21] The DIL Agreement refers to the "Prior Forbearance Agreements" separately from the "GRE Loan Documents" and the "BAMCAP Loan Documents," confirming the integration clause intended the DIL Agreement's release to supersede the prior releases. JA 507 (Recital M; § 1(a)).

*Grp. Inc.*, 1997 WL 107458, at *4 (S.D.N.Y. Mar. 11, 1997) (Sotomayor, J.); *see also Std. Sec. Life Ins. Co. of N.Y. v. Berard*, 684 F. App'x 56, 60 (2d Cir. 2017) (distinguishing release from covenant not to sue, which applies to future claims). The district court recognized this distinction but put the forbearance agreements' "releases" of unaccrued claims in the wrong category. SPA 36. They were covenants not to sue that were superseded by the DIL Agreement's release.[22]

**Second**, the DIL Agreement's release does not apply to unaccrued claims. It releases only claims Plaintiffs "now have, ever had, or which they may have … arising from the beginning of the world *until the Effective Date*," which was February 4, 2019. JA 511 (§ 6) (emphasis added).[23] Plaintiffs' Georgia RICO claims, however, did not accrue by that date. "[U]nlike Federal RICO claims, Georgia RICO

---

[22] The district court considered and decided the integration-clause issue on the merits, even though it erroneously determined the argument was waived because it was raised for the first time at oral argument on Gamma's first motion to dismiss. SPA 35; *see Doninger v. Niehoff*, 642 F.3d 334, 352-53 (2d Cir. 2011) (issue raised at oral argument on summary judgment sufficiently preserved for appellate review). Even if the argument were waived, however, this Court has "discretion to consider waived arguments and should exercise this discretion where," as here, "the argument presents a question of law and there is no need for additional fact-finding." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 62 (2d Cir. 2019) (quotation marks omitted).

[23] The district court noted, in dicta, that "language in the releases suggest[s] that unaccrued claims are also included," citing a phrase in the release provision of a forbearance agreement "whether heretofore or hereinafter arising." SPA 34 n.5. But the DIL Agreement's release does not contain that same language and does not "clear[ly] and unequivocal[ly]" relinquish claims that have "not yet arisen as of the date of the release." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 339 (S.D.N.Y. 2006) (quotation marks omitted).

claims do not accrue until plaintiffs are both aware of the injury and aware that the injury was the result of a pattern of racketeering activity, or else could have discovered both of these things through reasonable diligence." *Turk v. Morris, Manning & Martin, LLP*, --- F. Supp. 3d ---, 2023 WL 2359692, at *4 (N.D. Ga. Feb. 13, 2023). "This is ultimately a question of fact which must be resolved by a jury." *Id.* (quotation marks omitted).

The earliest Plaintiffs could have known their injuries were the "result of a pattern of racketeering activity" was *after* the summer of 2019, when they "learned of [Gamma's] improper interference with Thomas's efforts to secure financing that would have paid the loans [Gamma] held." JA 908. Thus, Plaintiffs' Georgia RICO claims accrued well after the effective date of the DIL Agreement's release.

The court rejected this argument without analysis. It noted "Plaintiffs' claims almost completely rely on *allegations* that precede at least one of the releases" and, in general, they "allege *injuries* that precede at least one release." SPA 27, 33 (emphasis added). But it did not address when the claims *accrued*. Even if the court were correct that, as to some claims, an injury is suffered (and therefore a claim accrues) when a right is conveyed, that is not true under Georgia RICO. Those claims do not accrue until a plaintiff is aware of the injury *and* that it resulted from racketeering activity. *Turk*, 2023 WL 2359692, at *4.

***Third***, the DIL Agreement's release excludes "any claims for [Gamma's] fraud relating to [the DIL] Agreement." JA 511 (§ 6). The district court acknowledged that Plaintiffs' RICO claims "sound[e]d in fraud" and that some of the RICO allegations "relate[d] to the DIL Agreement." SPA 29. Yet the court held those claims fell outside the fraud exception because they "cannot fairly be characterized to be claims for fraud relating to the DIL Agreement, when the overwhelming thrust of the allegations concern allegations of fraud released by the forbearance agreements." SPA 30. That conclusion ignores the bulk of the fraud-related allegations in the SAC. As explained in more detail below, the Georgia RICO claims were based on fraudulent acts also relating to the DIL Agreement and fall squarely within its exception for fraud.

## B.    Plaintiffs stated Georgia RICO claims.

Counts 5 and 6 allege violations of Georgia's RICO statute, O.C.G.A. § 16-14-4. The district court erroneously dismissed those claims, concluding "[t]he Federal and Georgia RICO acts are 'essentially identical, meaning failure to state a claim under the federal act warrants dismissal under the Georgia act.'" SPA 62 (quoting *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1221 (11th Cir. 2020)). But there are a "number of significant differences" between the Georgia and federal statutes, *Dover v. State*, 192 Ga. App. 429, 430 (1989), and Georgia courts have repeatedly

explained that the "Georgia RICO statute is *significantly broader* than its federal counterpart." *Chancey v. State*, 256 Ga. 415, 418 (1986) (emphasis added).

First, unlike the federal statute, Georgia RICO claims do not require proof of continuity. *Turk v. Morris, Manning & Martin, LLP*, 593 F. Supp. 3d 1258, 1300 (N.D. Ga. 2022). Second, for violations of O.C.G.A. § 16-14-4(a), there is no need to prove an enterprise. *Cobb Cnty. v. Jones Grp. P.L.C.*, 218 Ga. App. 149, 152 (1995); *Dover*, 192 Ga. App. at 430. Third, a violation of subsection (a) does not require proof that the defendant was a principal participant in the racketeering activity, and it proscribes more conduct than the federal statute, including the acquisition of real property. *Chancey*, 256 Ga. at 418.[24]

Because of its failure to account for the differences between federal and Georgia RICO, and because it erroneously construed the SAC's allegations *against* Plaintiffs, the dismissal of the Georgia RICO counts should be reversed.

### 1. The SAC plausibly alleges Gamma and Kalikow acquired property through a pattern of racketeering activity.

Count 5 charges a violation of O.C.G.A. § 16-14-4(a), which makes it "unlawful for any person, through a pattern of racketeering activity or proceeds

---

[24] With respect to the sections of Georgia RICO that mirror the federal statute, Georgia courts often look to federal law as persuasive authority. *E.g.*, *Chancey*, 256 Ga. at 428-29. We cite case law concerning federal RICO for points that are equivalent between the statutes and rely solely on Georgia RICO cases for points that are unique to that statute.

derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Unlike federal RICO, this claim does not require proof of an "enterprise." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1293 (11th Cir. 2006); *Dover*, 192 Ga. App. at 430. Instead, "the plaintiffs need only establish racketeering activity; that is, 'a plaintiff must show that the defendant committed predicate offenses … at least twice." *Williams*, 465 F.3d at 1293 (quoting *Cobb Cnty.*, 218 Ga. App. at 154); *see also Tom's Amusement Co. v. Total Vending Servs.*, 243 Ga. App. 294, 299 (2000) ("Georgia defines a pattern of racketeering activity as at least two interrelated acts indictable under certain categories of state and federal laws …."). O.C.G.A. § 16-14-3(5) contains the list of predicate acts.

The SAC alleges Kalikow and Gamma engaged in a pattern of racketeering by committing multiple predicate acts, including wire fraud, money laundering, violations of the Georgia Uniform Securities Act, and theft by deception. *E.g.*, JA 922-35. The SAC further alleges Kalikow and Gamma, through their racketeering activity, acquired real property valued in excess of $565 million and cash, personal property, and other real estate worth $76.6 million. JA 938-39. The district court erred when it held the SAC did not sufficiently allege any predicate acts to show a pattern of racketeering activity. SPA 64.

### i. Wire Fraud

First, the SAC plausibly alleges Gamma committed wire fraud under 18 U.S.C. § 1343. The elements of wire fraud are "(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate … wires." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018). A scheme to defraud exists if there has been "a material misrepresentation." *Id.*

The SAC describes the following material misrepresentations: (1) in a December 2016 call, Kalikow and Gamma falsely stated they did not want to own Wade Park, JA 876, 923; (2) in January 2019 calls, Kalikow falsely stated that Gamma would agree to a loan proposal made by Columbia Pacific, JA 898-99, 923; (3) in September 2018, Kalikow and Gamma made multiple false statements that Bluebell was a viable refinancing option Thomas should pursue, only to tell Bluebell weeks later that Gamma would never agree to a Bluebell loan, JA 896-97; (4) in January and February 2019, Gamma and Kalikow falsely stated they would support a refinancing deal with Hines, JA 902, 907-08; and (5) during the same two months, Kalikow and Gamma falsely promised the DIL Agreement "would not actually cause a transfer of the Wade Park deeds to Gamma," and falsely told Thomas he could have whatever time he needed to buy the property back. JA 903-06.

The district court rejected these allegations by first concluding the SAC's fraud allegations are inadequate under Rule 9(b). SPA 52, 64. As the district court

noted, "'[a]llegations of predicate … wire fraud acts should state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent.'" SPA 52 (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (alterations omitted)). But as set forth above, Plaintiffs alleged these details and more. JA 896-99, 902-03, 905, 907, 923. This is more than enough to apprise Kalikow and Gamma of the conduct at issue and "provide [them] with fair notice of [the] claim[s]." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

Next, the district court reasoned the SAC did not plausibly establish falsity when the statements were made. SPA 52-53. The district court accused Plaintiffs of alleging "classic fraud-by-hindsight" and assuming fraudulent intent based solely on the fact that "Defendants obtained both forbearance fees and the rights to Wade Park as a result of Plaintiffs' default on the loans." SPA 51; *see also* SPA 52-53.[25] To reach this conclusion, the district court once again improperly drew inferences against Plaintiffs and ignored many allegations that Kalikow and Gamma knowingly made misrepresentations to induce Thomas into certain actions.

---

[25] For this point, the district court cites *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). There, the plaintiff accused a company of securities fraud by misrepresenting its financial condition, but the fraud theory "simply seized upon [public] disclosures made in later annual reports and alleged that they should have been made in earlier ones." *Id.* There were no additional facts suggesting the company knowingly failed to disclose information foretelling a downturn. *Id.* at 469-70. The SAC is far more robust than those allegations.

For example, the district court found it implausible that Kalikow and Gamma falsely asserted their intent to own the property in 2016 because, had Gamma wanted the property, it would have *foreclosed* rather than extend the loans. SPA 53. But that erroneously conflates foreclosure with ownership. Foreclosure would not have allowed Gamma to obtain either the property's title or the (massive) excess value above the loan amount. Foreclosing would have required a public sale at auction. Tex. Prop. Code Ann. § 51.002(a). And Thomas—not Gamma—would have been "entitled to the excess foreclosure proceeds" above the loan amount. *E.g.,* *Conversion Properties, LLC v. Kessler*, 994 S.W.2d 810, 815 (Tex. App. 1999). As the SAC explains, rather than foreclose, Gamma maneuvered Thomas into signing the DIL Agreement and then cut off his ability to repay so Gamma could obtain the deeds outright. JA 902-09. These allegations support the inference that Kalikow and Gamma lied when they said Gamma had no desire to own the property, would accept refinance options, and would give Thomas plenty of time to buy back the deeds.

The district court suggested Kalikow and Gamma acted "inconsistent with the allegation that [they] wanted to own the Wade Park project" because, after they obtained title to the property, Kalikow and Gamma "were interested in selling the Wade Park propert[y]." SPA 53. But an attempt to sell the property aligns with Plaintiffs' theory. After obtaining title through the DIL Agreement—rather than through foreclosure—Gamma was free to realize the full value of the property

through a sale, with no obligation to return excess proceeds to Thomas. That is precisely *why* Gamma wanted to own (and not foreclose on) Wade Park.

For the same reason, the district court erroneously found that Gamma's alleged refusal of refinancing was implausible because such refinancing "would have been in the Gamma Defendants' interest." SPA 54. Refinancing, like foreclosure, would have limited the interest and fees Gamma earned on the loan and interfered with its scheme to own Wade Park. Gamma could not have obtained the property's excess value except through the DIL Agreement. The district court again improperly drew inferences in Gamma's favor, and it did so based on incorrect factual assumptions about foreclosure.

The district court next attacked the allegation that Kalikow and Gamma refused to accept refinancing proposals, despite previously (and falsely) assuring Thomas that they would approve such financing. SPA 54. According to the district court, these allegations are "entirely implausible" because Gamma "did not have a consent right with respect to Thomas's efforts to obtain" refinancing. SPA 54. As explained in Part I.C, the district court's contract interpretation is wrong. But regardless, in 2019 all parties acted *as if* Thomas needed Gamma's consent to refinance. Indeed, Gamma not only encouraged that view, it falsely led Thomas to believe it would give consent before pulling the rug out from under him once he signed the DIL Agreement.

As for the Bluebell loans, the district court said the SAC did not "allege what Kalikow said to Thomas that was false or why it was false." SPA 55. But the SAC alleges that in September 2018, after Thomas and Bluebell agreed to a term sheet for a $725 million loan, Kalikow and Gamma "made multiple statements to Thomas, to members of Thomas's team, and to Plaintiffs … that the Gamma Defendants *believed the loan to be a viable refinancing option*." JA 896 (emphasis added). Nonetheless, two months later, Kalikow and Gamma torpedoed the loan by telling Bluebell's principal that Gamma would never agree to a refinance. JA 896-97, 899, 944. These allegations demonstrate, with specificity, that Gamma falsely represented its willingness to allow Thomas to refinance with Bluebell. If Gamma truly believed Bluebell was a viable option—a statement Gamma made *after* Thomas had set the loan's major terms—it would not have categorically refused to accept the loan soon after that representation.

As for Hines, the district court concluded that Gamma's rejection of any Hines financing proposal in summer 2019 "hardly suggests that they were not being honest when in the winter of 2018-2019 they expressed support for Thomas doing a deal with Hines." SPA 55. The district court's analysis ignores the contradictions between Gamma's statements to Thomas and its statements to Hines. In January and February 2019, Gamma repeatedly expressed to Thomas that it would support a deal with Hines. JA 902. Yet Gamma later told Hines it would categorically reject any

deal in which Thomas maintained involvement after the refinance. JA 907-08. These statements are so inconsistent, they raise a reasonable inference that Gamma's earlier statements were lies. *See BTL COM Ltd., Co. v. Vachon*, 278 Ga. App. 256, 261 (2006) ("Fraudulent intent at the time of contracting can be inferred based on subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith.").

The same is true of the Columbia Pacific deal. In December 2018 and January 2019, Kalikow and Gamma said they "would agree to the terms proposed by Columbia Pacific" and "encouraged Thomas to pursue the Columbia Pacific deal," only to tell Columbia mere weeks later that Gamma "would never agree to the terms Columbia Pacific had proposed." JA 898-99. Indeed, Gamma told Columbia Pacific that it "would *never* agree to let [Thomas] refinance the Gamma Bridge Loan"—a statement that supports an inference of fraud with respect to not only Columbia Pacific, but also Hines and Bluebell. JA 899 (emphasis added).

In the context of assessing whether Plaintiffs alleged a RICO enterprise—an element required only for federal RICO—the district court also concluded the SAC did not plausibly allege Gamma and Kalikow were "collectively trying to make money by fraud, as opposed to the obvious alternative explanation, that they were simply trying to make money." SPA 44 (quotation marks and alterations omitted).

60

To the extent the district court thought this reasoning also supported its conclusion about the plausibility of the predicate acts of fraud, the district court was wrong.

The proper inference to be drawn is that Kalikow and Gamma were *not* engaging in typical real-estate financing. Had that been the case, Kalikow would not have called a principal of another potential lender a "thief" and a "scumbag" to block a loan that would have allowed Thomas to repay Gamma. *See* JA 896-97. He would not have yelled at the executives from another lender to scare them off. *See* JA 899. Defendants would not have falsely promised to consent to reasonable modifications of the BAMCAP loan or to say they found certain lenders agreeable, only to turn around and tell those same lenders that Gamma would *never* agree to let the Wade Park Plaintiffs refinance. *See* JA 886-92, 899, 944-45, 957. And they would not have extracted tens of millions of dollars in fees from Thomas based on these false promises. *See* JA 891. When considered in the light most favorable to Plaintiffs, these facts support the plausible inference that Kalikow and Gamma intended to defraud Thomas and enrich themselves by taking Wade Park.

Given the SAC's detailed allegations showing fraud by Kalikow and Gamma, the district court erred in rejecting the predicate acts of wire fraud. Those fraudulent acts establish a pattern of racketeering activity.

### ii. Other Predicate Acts

Building on the allegations of wire fraud, the SAC plausibly alleges that Gamma and Kalikow committed the following other predicate acts: (i) laundering proceeds (such as fees on the forbearance agreement) that were obtained through their wire fraud, in violation of 18 U.S.C. § 1956, JA 934-35; (ii) violating the Georgia Uniform Securities Act in connection with the purchase of a 75% membership interest in Wade Park Ventures by making the same misrepresentations, JA 936-38; and (iii) obtaining Plaintiffs' property as a result of those misrepresentations, resulting in theft by deception in violation of O.C.G.A. § 16-8-3, JA 938. The district court rejected these predicate acts for the same reason it rejected the wire fraud allegations—that they did not satisfy Rule 9(b). SPA 64. But the SAC includes more than enough detail about the alleged misrepresentations. *Supra* Part III.B.1. Like wire fraud, these predicate acts establish a pattern of racketeering activity.

### 2. The SAC plausibly alleges a conspiracy to violate Georgia RICO.

Count 6 alleges that Kalikow and Gamma conspired to violate O.C.G.A. § 16-14-4. JA 956-57. The district court dismissed this claim because it found that Thomas "failed to plead a substantive claim under Georgia RICO." SPA 65. But as shown above, the SAC sufficiently alleged a substantive RICO claim, and for that reason, Count 6 should proceed.

**C.**     **Plaintiffs stated a claim for fraud under Georgia law, and the court abused its discretion in denying leave to bring a fraud claim under New York law.**

Count 7 alleges Gamma entered the bridge loan with no intent to honor its promise not to unreasonably withhold consent to a modification of the BAMCAP loan. JA 881-82, 886-88, 957-60. The district court held the SAC failed to state a claim under Georgia or New York law, without deciding which state's law applied and going out of its way to find Plaintiffs' well-pleaded allegations inadequate. SPA 65-70. It also abused its discretion in denying leave to amend based solely on delay.

**1.     Georgia law applies to Plaintiffs' claim for fraud.**

Federal courts apply the choice-of-law rules of the forum state to decide which state's substantive law governs a claim. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1509 (2022). The first step in New York's choice-of-law analysis is determining whether there is an actual conflict between the laws of the jurisdictions involved. *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001). An actual conflict exists if the applicable law from each jurisdiction provides different substantive rules, and the differences have a significant possible effect on the outcome. *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005). If there is a conflict, "the law of the jurisdiction having the greatest interest in the litigation [must] be applied."

*Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quotation marks omitted) ("interest analysis" applies to tort claims).

There is an actual conflict between Georgia law and New York law over the type of fraud alleged here. Under Georgia law, Gamma's entering the bridge loan with no intent to honor its promise not to unreasonably withhold consent to a modification of the BAMCAP loan is inceptive fraud. JA 881-82, 957-60; *see Nash v. Roberts Ridge Funding, LLC*, 305 Ga. App. 113, 116 (2010) ("To establish a claim for … inceptive fraud to enter into a contract, a plaintiff must prove both that the defendant failed to perform a promised act and that the defendant had no intention of performing when the promise was made."). New York law, by contrast, seldom recognizes fraud based solely on a promise to perform under a contract. *See Kamyr, Inc. v. Combustion Eng'g, Inc.*, 603 N.Y.S.2d 451, 452 (1993) ("An allegation that one did not intend to perform a contract does not amount to a cause of action for fraud."). Although exceptions exist, New York's different substantive rules have a significant possible effect on the outcome of the claim: under New York law, the claim may not exist at all; under Georgia law, it does.

Because an actual conflict exists, New York's "interest analysis" would apply the law of the state "where the plaintiffs' injuries occurred." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 195 (1985); *see also Sack v. Low*, 478 F.2d 360, 265 (2d Cir. 1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where

the loss is sustained …." (quotation marks omitted)). In this case, that is Georgia. Plaintiffs' principal places of business are in Georgia, and they suffered injury to their businesses in Georgia, where they sustained the economic impact. JA 853-54. *See Globe Comm'ns Corp. v. R.C.S. Rizzoli Periodici, S.p.A.*, 729 F. Supp. 973, 976 (S.D.N.Y. 1990) (applying *Schultz* to a fraud claim and concluding Florida law applied because plaintiff's "economic loss" occurred in Florida, where it "maintain[ed] its principal place of business"); *Krock*, 97 F.3d at 646 (noting that, under New York law, fraud claims are governed by the law "where the injury occurred—generally, the place where the [plaintiffs] resided and sustained the economic impact of the loss" (quotation marks omitted)).

Because Plaintiffs sustained injuries to their businesses in Georgia, the tort occurred in Georgia, and Georgia law applies.

## 2. Under Georgia law, Plaintiffs stated a claim for inceptive fraud.

To state a claim for fraud under Georgia law, a complaint must allege a false representation or omission of material fact, scienter, intent to induce the party claiming fraud to act or refrain from acting, justifiable reliance, and damages. Generally, "a claim of fraud cannot be based on statements that promise future actions." Ga. Jur. Contracts § 1:52. But "[t]here is a very important exception" for what Georgia calls "inceptive" fraud. *Id.*

To state a claim for inceptive fraud, a plaintiff must allege the defrauding party made a promise "with a present intention not to perform." *Slaick v. Arnold*, 316 Ga. App. 141, 144-45 (2012); *see also Nash*, 305 Ga. App. at 118 (issue of fact as to whether defendants "lacked a present intent to perform at the time that the agreement was signed" under inceptive-fraud claim). Subsequent conduct that is "unusual, suspicious, or inconsistent with what would be expected" can support an inference of fraudulent intent. *BTL*, 278 Ga. App. at 261.

The SAC adequately alleges inceptive fraud against Gamma for entering the Gamma Bridge Loan with no intention to honor its promise to consent to reasonable modifications of the BAMCAP loan. JA 881-82, 957-60. The SAC alleges that "[a]t the time Kalikow and Gamma executed the agreements underlying the Gamma Bridge Loan, they did not intend to comply with the contractual obligation not to unreasonably withhold consent to a modification of the BAMCAP loan." JA 882. That's because, all along, Gamma "intended to manufacture a default" so it could ultimately obtain title to Wade Park. JA 882. The consent requirement was the "tool" Gamma used to accomplish that goal. JA 882. By requiring Plaintiffs to obtain its consent to modifications of the BAMCAP loan, Gamma ensured it could "prevent [the Wade Park Plaintiffs] from curing [a] default" on the BAMCAP loan and then use that default to "declare a default of the Gamma Bridge Loan." JA 882.

And while Plaintiffs could not possibly have had evidence of Gamma's mental state before discovery, the SAC alleged additional facts giving rise to a strong inference Gamma never intended to comply with its contractual promise. JA 886-89. For example, the SAC alleges that, before the BAMCAP loan's maturity date, Thomas and BAMCAP agreed to a one-month extension to give Thomas time to finalize ongoing negotiations with permanent financing partners, for a minimal 1% increase to the underlying loan. JA 886-87. Even though Thomas kept Gamma apprised of these negotiations, Gamma waited until *after* the BAMCAP loan had matured to communicate its decision to withhold consent—singlehandedly creating a default on the BAMCAP loan and Gamma Bridge Loan, even though, until then, Plaintiffs had "paid every dollar due." JA 888.

Moreover, by withholding consent, Gamma could extract nearly $40 million in fees it would not otherwise have obtained. JA 965. It also allowed Gamma to control Plaintiffs' ability to obtain financing to pay off the Gamma Bridge Loan by, among other things, "dictat[ing] whatever terms they wanted in exchange for forbearing from foreclosing on the Wade Park project; demand[ing] that Thomas inform them of his efforts to obtain financing to pay the Gamma Bridge Loan; and demand[ing] that they be allowed to meet with prospective financiers … and then us[ing] this access to prevent Thomas from securing financing." JA 889.

The SAC also alleges unusual conduct by Gamma after the manufactured default that supports an inference of fraudulent intent. Gamma bought up loans on other properties Thomas owned to choke off his ability to pull equity out of those properties, JA 892-93; it interfered with efforts to refinance, scaring off potential lenders, JA 896-99; it agreed to a "buy-back" arrangement only if a "strawman" repurchased the property and not any entity affiliated with Thomas, JA 902-08; and it ultimately received almost the entire principal amount of the Gamma Bridge Loan *along with* the deeds to Wade Park. Those allegations are exactly the kind of "unusual, suspicious, or inconsistent" behavior that supports an inference of fraudulent intent under Georgia law. *BTL*, 278 Ga. App. at 261.

"[W]hether a misrepresentation is fraudulent and intended to deceive is generally a jury question." *Id.* (quotation marks omitted). Likewise, whether Gamma entered the bridge loan with the intent not to honor its promise to approve reasonable modifications of the BAMCAP loan is a quintessential jury question. *See* Green, GEORGIA LAW OF EVIDENCE § 3:13 (2022) ("The question of fraud is said to be a question of fact for determination by the jury.") (citing cases). The district court usurped the jury's role and answered that factual question before a single piece of evidence had been introduced. The SAC plausibly stated a claim for inceptive fraud.

### 3. The district court abused its discretion in denying leave to allege fraudulent inducement under New York law.

It is an abuse of discretion to deny leave to amend based solely on alleged "delay" without any accompanying prejudice or bad faith. *Pasternack*, 863 F.3d at 174. That was the district court's *only basis* for denying leave to add a fraudulent-inducement claim under New York law. SPA 98. There was no mention of bad faith or prejudice, nor could there be, given the case's procedural posture: no defendant had answered, no scheduling order was in place, and discovery had not yet begun.

According to the district court, Plaintiffs could have sought to add a New York fraud claim when Gamma first argued New York law applied to Plaintiffs' tort claims in March 2021. SPA 98. But that was less than twelve months before Plaintiffs sought leave to amend. Even then, Plaintiffs reasonably believed Georgia law applied to their tort claims. Plaintiffs promptly sought leave to add the New York fraud claim *just 14 days* after the district court dismissed the Georgia fraud claim. Given the short "delay," lack of bad faith or prejudice, and pre-discovery status of the case, it was an abuse of discretion to deny leave to amend. *See Schwimmer v. Office of Ct. Admin.*, 857 F. App'x 668, 673 (2d Cir. 2021) (ten-month delay insufficient to warrant denial of leave to amend).

The district court also stated in dicta that such amendment would "likely be futile" as to Gamma's "knowledge of … falsity." SPA 98 n.5. But knowledge of falsity "may be alleged generally," Fed. R. Civ. P. 9(b), if the facts alleged "give rise

to a strong inference of fraudulent intent." *Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88, 90 (2d Cir. 2010). Such an inference is appropriate where the allegations provide a "motive for committing fraud and a clear opportunity for doing so" or "identify[] circumstances indicating conscious behavior by the defendant." *Id.*

Here, the SAC alleged Gamma made numerous misrepresentations related to the DIL Agreement, and these allegations strongly suggest fraudulent intent. JA 902-06, 948, 959; *supra* Part III.B.1. Gamma had a massive financial motive for its misconduct—it stood to gain over $500 million in assets to which it would not otherwise be entitled. Moreover, Gamma's interference with Thomas' attempted financing, demand for a "strawman," rejection of Hines' reasonable proposals, and insistence that Thomas no longer be involved in the project were all "highly unreasonable." *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (scienter may be established through "conduct which is highly unreasonable"). "Courts … should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Iowa Pub. Emps. Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 332 (S.D.N.Y. 2013). Plaintiffs should have been permitted to add a claim for fraud under New York law.

## CONCLUSION

For all these reasons, this Court should reverse the dismissal of Counts 1, 5-7, 12, and 13, and allow Plaintiffs to add a claim for fraud under New York law.

Dated: July 20, 2023                          Respectfully Submitted,

                                              */s/ James Cobb*

RENEE BEA                                     JAMES COBB
RICHARD WEINGARTEN                            JULIA BLACKBURN STONE
SLARSKEY LLC                                  SARAH BREWERTON-PALMER
767 Third Avenue, 14th Floor                  MICHAEL L. EBER
New York, New York 10017                      CAPLAN COBB LLC
(646) 893-1700                                75 Fourteenth Street NE, Suite 2700
                                              Atlanta, Georgia 30309
DAVID L. BURY, JR.                            (404) 596-5609
THOMAS B. NORTON
STONE & BAXTER, LLP                           LISA GEARY
577 Third Street                              RMP, LLP
Macon, Georgia 31201                          5519 Hackett Street, Suite 300
(478) 750-9898                                Springdale, Arkansas 72762
                                              (479) 443-2705

## CERTIFICATE OF COMPLIANCE

I, James Cobb, hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7), as modified by this Court's June 6, 2023 Order granting in part Appellants' Motion for Expansion of Word Count Limitations, because the document contains 16,960 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14-point Times New Roman font.

Dated: July 20, 2023                    */s/ James Cobb*
                                        James Cobb

## CERTIFICATE OF SERVICE

I, James Cobb, hereby certify that on July 20, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 20, 2023             */s/ James Cobb*
                                          James Cobb