# 23-0591-bk

## United States Court of Appeals

*for the*

## Second Circuit

In re: Wade Park Land Holdings, LLC, Wade Park Land, LLC, Debtors,

WADE PARK LAND HOLDINGS, LLC, WADE PARK LAND, LLC,

*Debtors-Plaintiffs-Appellants,*

THE THOMAS FAMILY TRUST, by and through its Trustees,
acting in their official capacities,

*Plaintiff-Appellant,*

— v. —

JONATHAN KALIKOW, WP DEVELOPMENT PARTNERS, LLC, GAMMA
LENDING OMEGA, LLC, GAMMA REAL ESTATE CAPITAL, LLC, GRE
WP, LLC, BLAKE GOODMAN,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANTS-APPELLEES JONATHAN KALIKOW, WP
DEVELOPMENT PARTNERS, LLC, GAMMA LENDING OMEGA, LLC,
GAMMA REAL ESTATE CAPITAL, LLC AND GRE WP, LLC**

MICHAEL J. DELL
KAREN S. KENNEDY
TOBIAS B. JACOBY
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for Defendants-Appellees Jonathan Kalikow, WP Development
Partners, LLC, Gamma Lending Omega, LLC, Gamma Real Estate
Capital, LLC and GRE WP, LLC*

CP COUNSEL PRESS   (800) 4-APPEAL • (324190)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

COUNTER-STATEMENT OF ISSUES ..................................................1

COUNTER-STATEMENT OF CASE ......................................................3

    A.    Counter-Statement of Facts ...............................................3

        1.    GRE's January 2017 Four-Month $82.75 Million Bridge Loan to Debtors.........................................................3

        2.    Omega's 2017 and 2018 Loan Extensions and Forbearances ...............................................................5

        3.    WP Took Title to the Property in 2019 and Gave Debtors' Designee an Option to Buy it Back for $150 Million.......................................................................8

    B.    Procedural History...........................................................10

SUMMARY OF ARGUMENT ..............................................................12

ARGUMENT ......................................................................................12

STANDARD OF REVIEW ...................................................................12

I.    THE DISTRICT COURT CORRECTLY DISMISSED COUNTS XII AND XIII ................................................................................13

    A.    The Facts Alleged in the SAC, and the Documents Integral to it, Show the Transfer Was Not for Less Than REV ................14

        1.    Plaintiffs Allege Thomas Could Not Obtain Alternative Financing.....................................................................15

        2.    The $150 Million Market Price..................................23

        3.    Thomas's Affidavit Swore the Fair Market Value was $140 Million.............................................................24

    B.    The SAC's Appraisal Allegations Are Conclusory and Implausible .................................................................26

    C.    Count XIII Fails to Plead a Fundamental Element ..............33

    D.    Plaintiffs Were Not Entitled to Replead.............................33

    E.    The Court Should Disregard *Amici*'s Arguments ..............40

II.    THE DISTRICT COURT CORRECTLY DISMISSED COUNT I.............42

A.   Count I Does Not State a Claim ........................................................42

B.   Plaintiffs Released This Claim .........................................................46

III.  THE DISTRICT COURT CORRECTLY DISMISSED COUNTS
      V AND VI...........................................................................................48

A.   Plaintiffs Released their Georgia RICO Claims................................48

     1.   "Inceptive Fraud" Does Not Invalidate the Releases ..............48

     2.   Plaintiffs Cannot Narrow the Scope of the Releases ...............49

     3.   The DIL Release Exception Does Not Apply...........................53

B.   Plaintiffs Fail to State a Claim ........................................................53

IV.  THE DISTRICT COURT CORRECTLY DISMISSED COUNT
      VII......................................................................................................61

A.   Plaintiffs Released Their Fraud Claim .............................................61

B.   Plaintiffs Fail to State a Claim .......................................................61

     1.   New York Law.......................................................................63

     2.   Georgia Law..........................................................................63

V.   THE DISTRICT COURT CORRECTLY DENIED LEAVE TO
     AMEND THE JUDGMENT TO ALLEGE A NEW COUNT XVII............68

CONCLUSION .................................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

*Absalom Absalom Tr. v. Saint Gervais*,
2019 WL 2655787 (Del.Ch. June 27, 2019)........................................................45

*AHW v. Citigroup*,
980 F. Supp. 2d 510 (S.D.N.Y. 2013), *aff'd,* 661 F. App'x 2 (2d
Cir. 2016) ........................................................................................................62

*Ambrosia Coal & Constr. v. Pages Morales*,
482 F.3d 1309 (11th Cir. 2007) ........................................................................68

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................12, 13, 17, 27

*Atuahene v. Hartford*,
10 F. App'x 33 (2d Cir. 2001) ..........................................................................56

*In re Axa Equitable COI Litig.*,
595 F. Supp. 3d 196 (S.D.N.Y. 2022) ...............................................................62

*Axar Master Fund, v. Bedford*,
806 F. App'x 35 (2d Cir. 2020) .........................................................................69

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................27, 30

*Benicorp Ins. v. Nat'l Med. Health Card Sys.*,
447 F. Supp. 2d 339 (S.D.N.Y. 2006) ...............................................................52

*In re Bernard Madoff Inv. Sec.*,
976 F.3d 184 (2d Cir. 2020) .............................................................................13

*BFP v. Resol. Tr. Corp.*,
511 U.S. 531 (1994)..........................................................................................32

*Bitter v. Chase Manhattan Bank*,
1983 WL 610 (S.D.N.Y. Dec. 7, 1983) .............................................................47

*BTL COM v. Vachon*,
278 Ga.App. 256 (2006) ..................................................................66

*Cabrega v. Campbell Soup Co.*,
2019 WL 13215191 (E.D.N.Y. Nov. 18, 2019) ................................35

*Cambridge Cap. v. Ruby Has*,
565 F. Supp. 3d 420 (S.D.N.Y. 2021) ...............................................74

*City Dodge v. Gardner*,
232 Ga. 766 (1974) ...........................................................................49

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS*,
752 F.3d 173 (2d Cir. 2014) ..............................................................72

*CompoSecure v. CardUX*,
206 A.3d 807 (Del. 2018) ..................................................................45

*Conopco v. Wein*,
2007 WL 9818902 (S.D.N.Y. Aug. 31, 2007)....................................56

*Coppelson v. Serhant*,
2021 WL 148088 (S.D.N.Y. Jan. 15, 2021) .......................................71

*Cruz v. FXDirectDealer*,
720 F.3d 115 (2d Cir. 2013) ..............................................................34

*CSX Transp. v. Georgia State Bd. of Equalization*,
552 U.S. 9 (2007)...............................................................................40

*Dantas v. Citibank*,
2018 WL 3023158 (S.D.N.Y. June 18, 2018) ..............................51, 52

*DeBlasio v. Merrill Lynch*,
2009 WL 2242605 (S.D.N.Y. July 27, 2009)......................................28

*DiFolco v. MSNBC*,
622 F.3d 104 (2d Cir. 2010) ..............................................................25

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016) ................................................................38

*Doninger v. Neihoff*,
  642 F.3d 334 (2d Cir. 2011) ...............................................................50

*Dynamic Worldwide Logistics v. Exclusive Expressions*,
  2015 WL 5439217 (S.D.N.Y. Sept. 14, 2015) ...................................69

*Eclectic Props. E. v. Marcus & Millichap*,
  751 F.3d 990 (9th Cir. 2014) .............................................................27

*Emergent Cap. Inv. Mgmt. v. Stonepath Grp.*,
  343 F.3d 189 (2d Cir. 2003) ..............................................................74

*Eurycleia Partners v. Seward & Kissel*,
  12 N.Y.2d 553 (2009) .........................................................................71

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits*,
  726 F.3d 62 (2d Cir. 2013) .................................................................41

*Fin. Guar. Ins. v. Putnam Advisory.*,
  783 F.3d 395 (2d Cir. 2015) ..............................................................73

*First Nationwide Bank. v. Gelt Funding*,
  27 F.3d 763 (2d Cir. 1994) .................................................................32

*U.S. ex rel. Foreman v. AECOM*,
  19 F.4th 85 (2d Cir. 2021) ..................................................................25

*In re Fundamental Long Term Care*,
  873 F.3d 1325 (11th Cir. 2017) ...................................................14, 27

*In re Glob. Technovations Inc.*,
  694 F.3d 705 (6th Cir. 2012) .............................................................32

*Global Network Commc'ns v. NYC*,
  458 F.3d 150 (2d Cir. 2006) ..........................................................3, 25

*Grasso v. Donnelly-Schoffstall*,
  2022 WL 728839 (2d Cir. Mar. 11, 2022).........................................35

*Gray v. Wesco Aircraft Holdings*,
  847 F. App'x 35 (2d Cir. 2021) ....................................................27, 38

*Horoshko v. Citibank*,
   373 F.3d 248 (2d Cir. 2004) .................................................................34

*HSM Holdings, v. Mantu I.M. Mobile*,
   2021 WL 918556 (S.D.N.Y. Mar. 10, 2021).......................................74

*Hu v. NYC*,
   927 F.3d 81 (2d Cir. 2019) ...................................................................34

*Info. Superhighway v. Talk Am.*,
   274 F. Supp. 2d 466 (S.D.N.Y. 2003) .................................................52

*In re Integrity Graphics, Inc.*,
   2021 WL 2036472 (Bankr. D. Conn. May 20, 2021).......................28

*Iowa Pub. Empls. Ret. Sys. v. Deloitte & Touche*
   919 F. Supp. 2d 321 (S.D.N.Y. 2013) .................................................72

*J. Kinson Cook v. Heery/Mitchell*,
   284 Ga. App. 552 (2007) .....................................................................64

*J&R v. U.S. Bank Nat'l*,
   2019 WL 6619329 (S.D.N.Y. Dec. 5, 2019) ......................................63

*In re Jesup & Lamont, Inc.*,
   507 B.R. 452 (Bankr. S.D.N.Y. 2014).................................................32

*Kavanagh v. Zwilling*,
   578 F. App'x 24 (2d Cir. 2014) ...........................................................12

*Kraft v. Third Coast Midstream*,
   2021 WL 860987 (S.D.N.Y. Mar. 8, 2021).........................................14

*Ledford v. Peeples*,
   568 F.3d 1258 (11th Cir. 2009) ...........................................................60

*Lerner v. Fleet Bank*,
   459 F.3d 273 (2d Cir. 2006) ...........................................................56, 71

*Licci v. Lebanese Canadian Bank*,
   739 F.3d 45 (2d Cir. 2013) ...................................................................62

*Mandala v. NTT Data*,
  975 F.3d 202 (2d Cir. 2020) ...............................................................13

*Mecum v. Mooyer*,
  166 A.D. 793 (1st Dep't 1915) ............................................................56

*In re Mina*,
  2022 WL 2657481 (Bankr. W.D.N.Y. July 8, 2022) ..................................28, 30

*In re Motors Liquidation Co.*,
  576 B.R. 325 (Bankr. S.D.N.Y. 2017) ..................................................32

*Nelson v. Publishers Circulation Fulfillment*,
  2012 WL 760335 (S.D.N.Y. Mar. 7, 2012) ............................................58

*Nicosia v. Amazon.com*,
  834 F.3d 220 (2d Cir. 2016) ...............................................................25

*Nolan v. Calhoun*,
  38 Ga. App. 227 (1928) ....................................................................49

*In re Nortel Networks Corp. Sec. Litig.*,
  539 F.3d 129 (2d Cir. 2008) ...............................................................18

*In re Old CarCo*,
  2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011)........................................23

*In re Old CarCo LLC*,
  509 F. App'x 77 (2d Cir. 2013) ..........................................................14

*One World v. Onoufriadis*,
  2021 WL 4452070 (2d Cir. Sept. 29, 2021) ...........................................55

*Option One Mortg. v. Allstate*,
  2006 WL 2285358 (N.D. Ga. Aug. 3, 2006) ..........................................56

*Perry v. NYSARC*,
  424 F. App'x 23 (2d Cir. 2011) ..........................................................35

*In re Positive Health Mgmt.*,
  769 F.3d 899 (5th Cir. 2014) ..............................................................30

*Quituizaca v. Garland*,
  52 F.4th 103 (2d Cir. 2022) ................................................................50

*Roberts v. JP Morgan Chase Bank*,
  342 Ga. App. 73 (2017) ......................................................................64

*In re Roblin Indus., Inc.*,
  78 F.3d 30 (2d Cir. 1996) ...................................................................32

*Rothstein v. UBS*,
  708 F.3d 82 (2d Cir. 2013) .................................................................26

*Estate of Ryan v. Shuman*,
  288 Ga. App. 868 (2007) ....................................................................49

*Saks Mgmt. v. Sung Gen. Contracting*,
  356 Ga. App. 568 (2020) ....................................................................66

*Salahuddin v. Jones*,
  992 F.2d 447 (2d Cir. 1993) ...............................................................28

*San Diego Cnty. Emps. Ret. Ass'n v. Maounis*,
  749 F. Supp.2d 104 (S.D.N.Y. 2010) .................................................62

*Savitsky v. Mazzella*,
  210 F.App'x 71 (2d Cir. 2006) ...........................................................36

*Sims v. Bayside Cap.*,
  327 Ga. App. 47 (2014) ......................................................................67

*Starr Found. v. AIG*,
  76 A.D.3d 25 (2010) ...........................................................................73

*Std. Sec. Life Ins. v. Berard*,
  684 F. App'x 56 (2d Cir. 2017) ..........................................................51

*Stevelman v. Alias Resch.*,
  174 F.3d 79 (2d Cir. 1999) .................................................................71

*Sunline Com. Carriers v. CITGO*,
  206 A.3d 836 (Del. 2019) ...................................................................43

*Thomas Lee Equity Fund v. Mayer Brown*,
  612 F. Supp. 2d 267 (S.D.N.Y. 2009) .................................................................62

*Tiffany v. eBay*,
  600 F.3d 93 (2d Cir. 2010) ...............................................................................41

*In re Tribune Co. Fraudulent Conv. Litig.*,
  10 F.4th 147 (2d Cir. 2021) ...................................................................14, 41, 42

*Turk v. Morris, Manning & Martin*,
  2023 WL 2359692 (N.D. Ga. Feb. 13, 2023) .....................................................52

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*,
  696 F. Supp. 2d 428 (S.D.N.Y. 2010) ...............................................................20

*United States v. 50 Acres of Land*,
  469 U.S. 24 (1984) .............................................................................................23

*Vaughn v. Air Line Pilots Ass'n*,
  604 F.3d 703 (2d Cir. 2010) ..............................................................................24

*Vaughn v. Air Line Pilots Assn.*,
  377 F. App'x 88 (2d Cir. 2010) .........................................................................72

*Volk v. Liggett*,
  1997 WL 107458 (S.D.N.Y. Mar. 11, 1997) ................................................51, 52

*Wade Park v. Kalikow*,
  522 F. Supp. 3d 1341 (N.D.Ga. 2021) ...............................................................10

*Wang v. Verizon*,
  2023 WL 309607 (2d Cir. Jan. 19, 2023) ..........................................................55

*Williams v. Affinion*,
  889 F.3d 116 (2d Cir. 2018) ..............................................................................54

*Woodling v. Garrett Corp.*,
  813 F.2d 543 (2d Cir. 1987) ..............................................................................48

*In re WRT Energy Corp.*,
  282 B.R. 343 (Bankr. W.D. La. 2001) ...............................................................32

**Statutes & Rules**

Fed. R. Civ. P. 8 ...........................................................................57

Fed. R. Civ. P. Rule 9(b) ..................................................*passim*

Fed. R. Civ. P. Rule 10b-5 ...........................................................61

Fed. R. Civ. P. Rule 12(b)(6) ..........................................................3

Fed. R. Civ. P. Rule 15(a)(2) ....................................................3, 69

Fed. R. Civ. P. Rule 59(e) .....................................3, 12, 69, 70

O.C.G.A. §16-14-4(a) ..................................................48, 54, 60

O.C.G.A. §16-10-71..................................................................26

O.C.G.A. §18-2-80....................................................................33

## COUNTER-STATEMENT OF ISSUES

Plaintiffs-Appellants Wade Park Land, LLC ("WPL") and Wade Park Land Holdings, LLC ("WPH;" together with WPL, "Debtors") borrowed $82.75 million from Defendant-Appellee Gamma Real Estate Capital LLC ("GRE") as a four-month bridge loan to refinance land they owned in Frisco, Texas (the "Property"). They never repaid the loan despite numerous extensions and forbearances. That failure had consequences, spelled out in the Construction Loan Agreement ("CLA") and many other detailed contracts they negotiated and signed, including a Deed-in-Lieu Agreement ("DIL"). Unhappy with those consequences and their decision to enter into the DIL, Plaintiffs brought this case in a brazen attempt to turn their failure to honor their obligations into a windfall.

Plaintiffs have no basis to sue Defendants. Plaintiffs' kitchen-sink complaints rely on implausible, conclusory, speculative, and contradictory allegations and assert claims they released in multiple agreements. Judge Liman correctly dismissed Plaintiffs' First Amended Complaint ("FAC"), denied leave to amend the judgment to add a new fraud claim and, after permitting repleading of two fraudulent transfer claims in a Second Amended Complaint ("SAC"), dismissed those claims as well.

Plaintiffs cannot escape the contractual consequences of Debtors' failure to repay their debt. The Court should affirm the judgment dismissing this

case with prejudice.

The issues are:

1. Did Judge Liman correctly dismiss Plaintiffs' fraudulent transfer claims (SAC Counts XII-XIII) because they rest on the "utterly implausible" conclusory allegation that when Debtors transferred the Property in exchange for cancellation of their approximately $140 million debt to GRE's assignee, Defendant-Appellee Gamma Lending Omega LLC ("Omega"), the Property was actually worth $565 million, even though the SAC's factual allegations show the market did not value the Property at more than the $140 million, let alone significantly more?

2. Did Judge Liman correctly dismiss Plaintiffs' declaratory judgment claim that certain transactions in which Omega granted Debtors more time to repay their debt, and pursuant to which Debtors ultimately transferred the Property, were *ultra vires* under the LLC Agreement ("LLCA") of Wade Park Ventures LLC ("Ventures"), which owned Debtors (FAC Count I), when the transactions were authorized by the LLCA and Plaintiffs consented to and ratified and released the transactions?

3. Did Judge Liman correctly dismiss Plaintiffs' Georgia RICO claims (FAC Counts V and VI) and fraudulent inducement of the CLA claim (FAC Count VII), which were released by Plaintiffs and do not state a claim?

4.     Did Judge Liman correctly deny Plaintiffs' request to amend the judgment dismissing the FAC to file a new count for fraudulent inducement of their DIL, when they did not satisfy Rules 59(e) and 15(a)?

## COUNTER-STATEMENT OF CASE

### A.     Counter-Statement of Facts

The SAC concerns a heavily documented real estate financing.[1]  The SAC did not provide the District Court with the parties' agreements, which contradict many of its allegations, and Plaintiffs' brief often ignores them.  But Plaintiffs cannot so easily avoid their terms.  On a Rule 12(b)(6) motion, the Court considers documents referenced in the complaint, documents the plaintiff relied on in bringing the lawsuit, and matters of which judicial notice can be taken.  *Global Network Commc'ns v. NYC*, 458 F.3d 150, 157 (2d Cir. 2006).

Plaintiffs' SAC and brief also inappropriately lump Defendants together.  (Br.6 n.2).

### 1.     GRE's January 2017 Four-Month $82.75 Million Bridge Loan to Debtors

Between 2012 and 2015, Stanley Thomas's affiliates, Lebanon 390WR and WPL, borrowed to acquire the Property.  (JA863-64).  Lebanon's $45

---

[1]  Plaintiffs appeal dismissal of FAC Counts I, V, VI, and VII and SAC Counts XII and XIII.  Since Plaintiffs cite only the SAC, we do too, except where noted.

million debt to Bridge Capital, and WPL's $48 million debt to BAMCAP were "set to mature in early 2017." (JA866). Bridge said "it could not continue to extend" its loan. (JA867).

Beginning in "2015," Thomas "worked tirelessly to find a financing partner." (JA866-67). He was unsuccessful (JA877), even though the SAC asserts he is "one of the most experienced and respected developers of retail and mixed-use properties in the United States." (JA852).

Thomas sought a "short-term bridge loan." He identified "several potential lenders;" GRE was the "only one" willing to lend "sufficient funds." (JA868). Plaintiffs now assert Defendant-Appellee Jonathan Kalikow "offered to provide a bridge loan until Thomas could secure permanent financing." (Br.4). But the SAC acknowledges GRE's loan had a four-month term. (JA878).

GRE insisted its affiliate, Defendant-Appellee GRE WP LLC ("GWL"), acquire a 75% Class B non-voting membership interest in a new entity, Ventures, that owned Debtors, to deter Thomas from filing for bankruptcy, as his affiliates often did. (JA658-60). Ventures became Debtors' sole member. (JA154-91). Plaintiff-Appellant Thomas Family Trust ("Trust") owned a 25% class A interest. (JA875-78).

On January 17, 2017, GRE and Debtors signed the CLA, and GRE assigned its interest to Omega. (JA192-319, JA879). Plaintiffs complain

"Defendants" "changed the deal's terms" during negotiations.  (Br.5-6).  If Plaintiffs agreed to terms they did not like, because Thomas could not find other financing, that makes their conclusory allegations about the Property's value even less plausible.  (JA867-68).

### 2.    Omega's 2017 and 2018 Loan Extensions and Forbearances

The CLA gave Debtors an option to extend the loan three times, for three months each.  (JA878, JA219-22).  Plaintiffs assert they "exercised extension rights."  (Br.8).  In May 2017, however, they could not meet the CLA's terms for the first extension.  Rather than foreclose, Omega agreed to modify the terms.  The Loan Modification Agreement ("LMA") gave Thomas more time.  (JA320-32).  Debtors agreed the Loan Documents are their "valid and binding obligation," "[t]here exist no defenses or claims of set-off with respect to any sums owing," and "[a]ll agreements regarding the Property [and] the Loan ... have been reduced to writing."  They gave Omega and its affiliates broad releases.  (JA324-26).

In August and November 2017, Debtors exercised their option to extend the "Gamma Loan" until February 17, 2018.  "Thomas continued his significant efforts to secure a permanent financing partner for the project," but still could not find one.  (JA885).

Plaintiffs now assert two potential financing partners "sign[ed] letters of intent for investments and loans worth over $550 million."  (Br.8).  The SAC

alleges an unnamed lender signed for $360 million and USAA signed for $195 million, but not that either would lend if the other did. (JA885). The SAC does not allege either lender lent Plaintiffs anything.

On November 15, 2017, Debtors asked Omega to have discussions relating to the Property with potential lenders, investors or other capital providers. They agreed statements made during the discussions shall not "be utilized for any purpose whatsoever … unless and until memorialized in a formal written agreement." Debtors released the Lender Parties in respect of any such discussions. (JA570-79).

In January 2018, WPL was about to default on the BAMCAP Loan. For a one-month extension, BAMCAP required a $530,000 fee, which WPL could add to the loan. Omega, whose four-month loan had already stretched to a year, did not consent to a larger first lien ahead of its second lien. (JA886-87).

Plaintiffs now assert the proposed increase "would not have affected" Omega. (Br.8). As Judge Liman found, however, it would have meant "Defendants would be further subordinated to BAMCAP by $530,000." (SPA104). The "increase represented incremental risk" to Omega because the request "signal[ed] that [WPL] would be unable to pay even BAMCAP" and WPL's "apparent inability to pay even the $530,000 in cash and its need to borrow that sum from BAMCAP demonstrated that, unless circumstances changed, [WPL] was

even less likely to be able to satisfy its obligations to [Omega]." (SPA78-79).

BAMCAP declared WPL in default. Omega declared the "Gamma Loan" in default too. (JA888). Yet for another year, Omega granted forbearances and Plaintiffs failed to find other lenders.

On March 5, 2018, Omega signed its first Forbearance Agreement (an "FA") with Debtors. Debtors acknowledged "certain Events of Default have occurred under the Loan, Lender has accelerated the indebtedness owed under the Loan Documents, and Lender has posted the Property for nonjudicial foreclosure on March 6, 2018;" Debtors owed $88,664,248.48 on the Gamma Loan; they had "no defenses against [their] obligation to pay;" and Omega "acted in good faith" and "a commercially reasonable manner." (JA334, JA338). Debtors also broadly released Omega and its affiliates, and reaffirmed their prior agreements. (JA333-345). On July 30, 2018, Omega bought the BAMCAP Loan. (JA900).

For the rest of 2018, Omega gave Debtors every opportunity to repay the loans. Omega signed *five* more FAs with similar terms, the last in December 2018. (JA333-503). Debtors let every forbearance period expire without repaying the loans or obtaining other financing. (JA900-01, JA507).

Plaintiffs now assert "Gamma thwarted" Thomas's attempts to secure financing. (Br.9-10). The SAC does not allege that happened between 2015 and December 27, 2018, a period when Plaintiffs allege JP Morgan and USAA were

"considering investing hundreds of millions of dollars in the project" and conducting due diligence, Thomas had "serious discussions" with "other potential lenders or financing partners" Bank of the Ozarks, Cargill and Triple 5 (JA867), and an unnamed "non-party lender" allegedly signed a letter of intent to lend $360 million. (JA885).

The SAC alleges interference with three lenders—Bluebell on December 27, 2018 (JA896-97); Columbia Pacific in January 2019 (JA899); and Hines in summer 2019, months after Debtors transferred title to the Property. (JA902-08). By then, as Judge Liman found, "Omega had already declared an event of default. If [Defendants] desired to obtain the Wade Park properties, they did not need to interfere with Thomas's efforts to obtain financing." (SPA71-74). They would not have allowed the numerous extensions and forbearances.

### 3.      WP Took Title to the Property in 2019 and Gave Debtors' Designee an Option to Buy it Back for $150 Million

On January 5, 2019, Omega again posted the Property for nonjudicial foreclosure. (JA891, JA507). The four-month bridge loan had stretched to almost two years. As Judge Liman found, Omega gave Debtors "the option either to allow Defendants to foreclose on the Wade Park properties—repaying their obligation to Defendants with Plaintiffs enjoying any remainder from the sale for themselves— or to sign over the deeds in exchange for a further extension and ultimate cancellation of the debt." (SPA130; JA505-56, JA904). On February 4, 2019,

Debtors chose the latter, and entered into the DIL. Debtors represented "the transactions contemplated in this Agreement are not a … voidable transfer [or] fraudulent conveyance … in violation of Applicable Bankruptcy Law or any similar state law." (JA514).

The DIL attached a form of Affidavit and Estoppel Certificate Debtors agreed to execute and deliver. (JA508). On March 1, 2019, Thomas swore in the Affidavit, on Debtors' behalf, they were "solvent and ha[d] no other creditors whose rights would be prejudiced by conveyance" of the Property deeds, "the consideration [for the deeds] represents the fair market value of" the Property, and Debtors "irrevocably waive any claim or right they may have to challenge the adequacy of such consideration." (JA581).

Plaintiffs assert "Kalikow assured Thomas [the DIL] would not cause a transfer of the deeds to Gamma," and the DIL required Omega's designee to "hold [the deeds] in escrow until the Gamma Bridge Loan and BAMCAP loan were repaid." (Br.10). But the SAC acknowledges the DIL required the deeds to be held in escrow only if Debtors "made certain payments," and on February 19, 2019, they defaulted on a "required" payment. (JA904-05). Accordingly, the deeds were transferred to Defendant-Appellee WP Development Partners LLC ("WP"), which recorded them. (JA967).

Plaintiffs assert the Property had a transfer date value of more than

$565 million. (Br.11). That conclusory allegation is not plausible. Their assertion that Debtors' creditors were prejudiced (Br.11) is therefore not plausible either. The SAC alleges $48.6 million or 64% of Debtors' liabilities (other than to Omega) were to related parties. (JA940-41).

Plaintiffs assert "Gamma promised to afford Thomas time to 'buy back' the property" but "did not" "honor that promise." (Br.10). But the DIL, which contains a merger clause (JA516), has no such promise. Moreover, as Plaintiffs acknowledge, WP in fact signed a six-week buy-back agreement (the "Buy-Back Agreement") on March 6, 2019, that gave WPL's affiliate, Wade Park Frisco Holdings, LLC ("WPF"), the right to buy back the Property for $150 million by April 15, 2019. (JA906, JA557-69). Although that price was well below the alleged $565 million valuation, WPF did not exercise the option. (JA907).

## B.  Procedural History

On August 27, 2020, more than eighteen months after Debtors' Property transfer, Plaintiffs filed this action in Georgia. That court referred it to the bankruptcy court, where Debtors had filed chapter 11 petitions the day before. Plaintiffs moved to withdraw the reference. The court did so on consent. (JA9). On October 16, 2020, Plaintiffs filed their FAC. (JA27-149).

On November 13, 2020, Defendants moved to transfer the action to New York and to dismiss. (JA10). Blake Goodman also moved to dismiss.

(JA10).  On February 24, 2021, Judge Batten granted Goodman's motion to dismiss and Defendants' motion to transfer.  *Wade Park v. Kalikow*, 522 F.Supp.3d 1341 (N.D.Ga. 2021).  Judge Liman directed the parties to re-brief Defendants' motion to dismiss.  (JA14-15).

On March 4, 2022, Judge Liman issued a well-reasoned 90-page Opinion dismissing the FAC with prejudice because Plaintiffs released their claims other than Counts I, XII, and XIII (SPA28), and failed to state a claim.  (SPA1-90).  Judgment was entered.

On March 18, 2022, Plaintiffs moved to amend the judgment and for leave to file the SAC to replead their fraudulent transfer claims and add a new Count XVII for fraudulent inducement of the DIL.  (JA18).

On July 6, 2022, the court granted Plaintiffs' request to replead the fraudulent transfer claims and denied their request to add Count XVII.  (SPA91-99).

On July 13, 2022, Plaintiffs filed their SAC.  Defendants moved to dismiss.  (JA20).  Plaintiffs moved to retransfer to Georgia.  (JA21).

On March 23, 2023, Judge Liman issued a well-reasoned 44-page Opinion dismissing amended Counts XII and XIII with prejudice for failure to state a claim and denied the retransfer motion.  (SPA100-143).

## SUMMARY OF ARGUMENT

I.  Judge Liman correctly dismissed SAC Counts XII and XIII.  They rest on the "utterly implausible" conclusory allegation that when Debtors transferred the Property in exchange for cancellation of their approximately $140 million debt to Omega, the Property was actually worth $565 million even though the SAC's factual allegations show the market did not value it at more than the approximately $140 million, let alone significantly more.  (SPA130-31).

II.  Judge Liman correctly dismissed FAC Count I for failure to state a claim.  It is also barred by Plaintiffs' releases.

III.  Judge Liman correctly dismissed FAC Counts V and VI because Plaintiffs released them and they fail to state a claim.

IV.  Judge Liman correctly dismissed FAC Count VII because Plaintiffs released it and it fails to state a claim.

V.  Judge Liman correctly denied Plaintiffs' request to amend the judgment dismissing the FAC to add a new Count XVII because Plaintiffs did not satisfy Rules 59(e) or 15(a).

## ARGUMENT

## STANDARD OF REVIEW

On a motion to dismiss, courts do not accept as true "legal conclusion[s]," "conclusory statements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or "unwarranted inferences."  *Kavanagh v. Zwilling*, 578 F.App'x 24, 24

(2d Cir. 2014).  To avoid dismissal, a complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief [is] … a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  A "claim has facial plausibility, [if] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  The "mere possibility" that a defendant committed misconduct is insufficient.  *Id.* at 678-79.

This Court is "free to affirm a decision dismissing a complaint on any grounds supported in the record, even if it is not one on which the trial court relied."  *Mandala v. NTT Data,* 975 F.3d 202, 207 (2d Cir. 2020).

## I.    THE DISTRICT COURT CORRECTLY DISMISSED COUNTS XII AND XIII

SAC Counts XII and XIII allege the transfer of the Property pursuant to the DIL was constructively fraudulent under the Bankruptcy Code and Georgia law.

Judge Liman correctly held the SAC fails to state these claims because Plaintiffs do not plausibly allege they "received less than 'a reasonable equivalent value [("REV")] in exchange for such transfer.'"  *In re Bernard Madoff Inv. Sec.*, 976 F.3d 184, 190 (2d Cir. 2020).

**A.      The Facts Alleged in the SAC, and the Documents Integral to it, Show the Transfer Was Not for Less Than REV**

REV does not mean "dollar-for-dollar equivalence." *In re Fundamental Long Term Care*, 873 F.3d 1325, 1344 (11th Cir. 2017).  Courts dismiss fraudulent transfer claims "where the complaint does not plausibly allege" a "significant disparity" between the value received and given.  *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 172-73 (2d Cir. 2021) (affirming dismissal as to two defendants); *In re Old CarCo LLC*, 509 F.App'x 77, 78 (2d Cir. 2013) (considering whether value received "is so disproportionately small as to constitute a lack of fair consideration").  Courts "examine the totality of the circumstances, including the arms-length nature of the transaction, and the good faith of the transferee." *Tribune,* 10 F.4th at 172.  A court need not accept "the implausible and economically irrational." *Kraft v. Third Coast Midstream*, 2021 WL 860987, *14 (S.D.N.Y. Mar. 8, 2021).

Debtors allege they received approximately $140.1 million, the purported amount of their debt, in exchange for the Property.  (JA943).  They allege the Property's value exceeded $565 million.  (JA939).  As Judge Liman held, that allegation is "utterly implausible" (SPA129), based on "[t]he Complaint's own allegations." *Fundamental*, 873 F.3d at 1345.  The SAC's allegations of market participant conduct show the market did not value the

Property at more than $140 million.  That conduct would be economically irrational if the Property was worth significantly more.

### 1. Plaintiffs Allege Thomas Could Not Obtain Alternative Financing

Judge Liman correctly found "Plaintiffs fail to allege facts showing why—if the Wade Park properties were worth in excess of $565 million—Plaintiffs would not have been able to obtain financing on those properties sufficient to pay off their $140 million indebtedness."  (SPA130).

The SAC alleges Thomas, one of this country's "most experienced and respected developers" of projects "uniquely attractive to debt and equity investors," "worked tirelessly to find a financing partner" as early as "2015." (JA852, JA859, JA866-67).  Yet, by 2017, when $93 million of mortgages were "set to mature," he still had not found one.  (JA866-67).

GRE was the "*only one*" "willing" to provide a "short-term bridge loan" of "sufficient funds." (JA867-68).  That $82.75 million January 17, 2017, loan gave Thomas four months to find other financing, but he could not.  (JA878; JA193-266).  The Loan was extended three times, to February 17, 2018, but he still could not.  (JA885).  In January, 2018, WPL defaulted on the BAMCAP loan and Omega declared a default on its loan.  (JA888).

Yet Omega agreed to extensions for another year, in numerous FAs. Thomas had "unfettered discretion" to refinance the Property and "aggressively"

tried to do so.  (SPA130; JA891, JA896, JA903, JA944).  But again he could not.  (JA900-01; JA333-502).  It is inconceivable that Thomas could not find another lender if *the market* valued Wade Park at more than the amounts owed to Omega, let alone anything close to $565 million.

In February 2019, Defendants gave Plaintiffs "the option either to allow Defendants to foreclose on the Wade Park properties—repaying their obligation to Defendants with Plaintiffs enjoying any remainder from the sale for themselves—or to sign over the deeds in exchange for a further extension and ultimate cancellation of the debt."  (SPA130).  Debtors *chose* to convey the Property "of their own free will" in lieu of foreclosure.  (JA514; JA901).

It is "utterly implausible" that Plaintiffs—who "were not only sophisticated real estate investors [but] also were represented by competent counsel of their own choosing" (SPA130-31)—would have agreed to the DIL if the Property was worth $565 million.  Had the Property been worth anything close to that, Plaintiffs "would have been able to obtain financing … with which to repay Defendants or, failing that, would have been able to dispose of the properties (either on the open market or through a foreclosure sale) for a sum far in excess of what they owed Defendants …. [T]he only plausible inference is that Plaintiffs agreed to the DIL Agreement because it represented reasonably equivalent value." (SPA130-132).

The DIL gave Plaintiffs "until March 13, 2019, to find alternative ways to repay Defendant," such as by refinancing or selling the Property "at a price that would have permitted Plaintiffs to repay Defendants and keep the profit." (SPA131). "Plaintiffs were then given even more time, until April 15, 2019, through the buy-back agreement, to repurchase the property after the transfer." (SPA131; JA558-59). But "Plaintiffs did not do so." (SPA131).

As Judge Liman explained, "[t]here would have been no reason for Plaintiffs not to avail themselves of those opportunities if there was a *market* for the Wade Park properties at their alleged valuation." (SPA131).

Plaintiffs argue Judge Liman drew an "inference against Thomas" that is "unsupported by the pleadings." (Br.28). Not so. The court found the SAC's valuation allegation is conclusory and not plausible because it contradicts the facts alleged in the SAC, is economically irrational, and is inconsistent with the court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Even Plaintiffs' *Amici* acknowledge Judge Liman faithfully followed the REV test "applied in district courts and bankruptcy courts in this Circuit" and "recently cited by this Court." (*Amici* Br.3). Plaintiffs' problem is with the Supreme Court's plausibility standard, not Judge Liman's decision.

Plaintiffs also argue the decision improperly "depends on Thomas and Gamma's subjective needs, preferences, and incentives." (Br.28-29). Not so.

Judge Liman applied an objective standard. Thomas's inability to refinance or sell, and the parties' conduct, objectively reflect *the market's* valuation of the Property. To the extent the court considered Thomas and Gamma's "incentives" it was to show their conduct—before and after the transfer—would not have been economically rational if the Property was worth $565 million. The cases cited by Plaintiffs are not to the contrary. (Br.29).

Plaintiffs contend the pleadings "support" three "explanations" "for Thomas's inability to refinance Gamma's loans that have nothing to do with the property's value." (Br.29-30). They do not. Moreover, Plaintiffs forfeited their second and third arguments because they "were available to [Plaintiffs] below and they proffer no reason for their failure to raise the arguments below." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008).

Plaintiffs' first "explanation" is that "Gamma repeatedly interfered with Thomas's efforts to secure funding." (Br.30). That is not plausible because it is "inconsistent with the pleadings." (SPA138).

*First*, the "interference" allegations are limited to Mr. Kalikow allegedly insulting a Bluebell principal in a December 27, 2018, call, and yelling at a Columbia executive in a "January 2019" call. (JA896, JA899). Neither can explain Thomas's failure to obtain financing from 2015 to December 27, 2018, or after the January 2019 call. The SAC mentions numerous other lenders as to whom

no interference is alleged before the buy-back period expired, and of course there are thousands of potential lenders.  (SPA139; JA867 (Bank of the Ozarks, Cargill, Triple 5, Hines, JP Morgan, USAA "and other lenders or potential financing partners")).[2]

*Second*, the SAC does not plausibly allege there was any Bluebell or Columbia deal that fell through because of Mr. Kalikow's calls.  He allegedly told Bluebell, "the Gamma Defendants would not allow a loan from Bluebell to move forward" (JA897), and Columbia, Defendants "would never agree to the terms Columbia Pacific had proposed."  (JA899).  But Plaintiffs' argument that Defendants' consent was required (Br.31) is "inconsistent with the underlying documents."  (SPA140).  The CLA granted the right to prepay the Gamma Loan "at any time."  (JA215 §3.3(a)).  The SAC does not allege the BAMCAP loan agreement barred prepayment, or payment after default.  It did not.  (JA988-1089).

---

[2] The SAC alleges Defendants "prevented Plaintiffs from securing refinancing during the buy-back period by telling potential lenders that the Gamma Defendants would not consent to a refinance of the BAMCAP Loan."  (JA945). That allegation is conclusory and nonsensical.  The buy-back period occurred *after* the Property had already been transferred in exchange for cancellation of the debt, *including the BAMCAP Loan*.

The SAC's allegations concerning Synovus and Ardent do not bear on Wade Park's value because they involved attempts by Thomas to extract equity from *other* properties.  (JA892-93).  Moreover, as Judge Liman found, Plaintiffs "do not allege facts in support of [the] assertion" that "Defendants' purchase of the loans was motivated by an intent to interfere with Plaintiffs' efforts to obtain financing."  (SPA71).

Plaintiffs cite CLA §8.2, which states "Borrower shall not, without the prior consent of Lender, incur any Indebtedness other than (a) the Loan." (JA249; Br.31). That did not prevent Thomas from repaying it. Plaintiffs also cite CLA §6.19, but that requires consent only for "[a]ny amendment, modification or termination of the documents evidencing" the loan, not for repayment.

Plaintiffs were also free to repay the BAMCAP Loan. The SAC alleges BAMCAP declared its loan in default in January, 2018, which made it due and payable. (JA888; JA1018). Debtors agreed, in the three FAs signed after Omega bought the Loan, and in the DIL, that both loans had been accelerated. (*E.g.*, JA375). The DIL expressly contemplates WPL paying that loan (WPH did not borrow from BAMCAP). (JA512).[3]

Plaintiffs argue that even if consent was not required, "the SAC alleges everyone acted as if Gamma had the right to withhold consent" and thus "potential deals fell through for reasons other than the property's value." (Br.30-31). Not so. The SAC only alleges Mr. Kalikow told Bluebell that "the Gamma Defendants would not allow a loan from Bluebell to move forward" (JA897), and Columbia that Gamma "would never agree to the terms [it] had proposed" (JA899),

---

[3]  *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F.Supp.2d 428, 439-40 (S.D.N.Y. 2010) (Br.31), did not involve a consent provision, and does not support Plaintiffs' implausible argument that "consent" was required to repay their defaulted, accelerated loans.

and does not allege those sophisticated lenders believed Gamma's consent was required. (JA896-900, 944-45). Plaintiffs argue Gamma's alleged interference was "effective" in "deterring refinancing opportunities" (Br.30), but the SAC does not allege any facts that support that implausible speculation. The SAC does not even allege when Bluebell and Columbia decided not to lend. (JA897; JA900).[4]

*Third*, the alleged interference cannot explain the failure to take "economically rational actions showing [Wade Park's] high value." (SPA138). For example, it cannot explain why Thomas agreed to transfer the Property instead of selling in a foreclosure sale, why Thomas signed the Affidavit, and why WP agreed to sell the Property for $150 million.

Plaintiffs' second" "explanation" for Thomas's inability to refinance is that "prospective lenders had concerns about Thomas's liquidity and his entities' risk of bankruptcy" because "[a]side from the transferred property and debt to Gamma, the Wade Park Plaintiffs had just $105.05 in assets compared to $75 million in liabilities." (Br.32). Plaintiffs forfeited this argument by not raising it

---

[4] Plaintiffs also cite the potential Hines transaction in "summer of 2019" (JA907-08), but the buy-back period expired in April 2019.

Plaintiffs argue Judge Liman rejected their interference argument based on these allegations because they failed to plead a tortious interference claim. (Br.30). But Judge Liman found this interference argument was "inconsistent" with the pleadings. (SPA138-39).

below.  And it is based on unpled conclusory speculation.  The SAC does not

allege lenders had any such "concerns."

Moreover, Plaintiffs' reasoning is flawed.  Their argument is based on

Debtors' alleged condition *after* transferring the Property.  However, lenders would

have lent against the Property as collateral, just as GRE did even though it had

concerns about Thomas filing for bankruptcy.  (Br.32).  Furthermore, the SAC does

not allege facts that suggest Debtors would have gone bankrupt if they still owned

the Property and it was worth significantly more than the $140 million they owed.

Plaintiffs also err in assuming the value of the Property depended on its future

development *by Thomas* and therefore his liquidity.  The SAC does not make any

allegation that supports that.[5]

Plaintiffs' third "explanation" is that (i) Thomas did not sell the

Property because he was "reluctant" to "abandon" property he "believed" had a

"developed value" of more than "$2 billion," and (ii) he "did not have enough

time" to "sell."  (Br.32).  Plaintiffs forfeited these arguments by not raising them

below.  Moreover, the SAC does not allege Thomas was "reluctant" to sell, or facts

showing there was not enough time to find a purchaser.  The SAC does not allege

_____

[5]  Plaintiffs argue the SAC alleges Thomas was "locked out of the equity on some
of his *other* large projects" that could have been used to pay Omega.  (Br.32).
That argument is barred because Plaintiffs did not raise it below.  Moreover,
Thomas's purported inability to pull money out of "other" projects says nothing
about Wade Park's market value.

he could have sold for *any price.*  And it is implausible and economically irrational to suggest he would not have sold if he could have got more than the $140 million Debtors owed when the alternative was giving up the Property for the cancellation of the debt.

Plaintiffs argue "the Sage Appraisal estimates that it would take '18-24 months' to 'effectively expose [Wade Park] to the market.'"  (Br.32).  But the SAC does not allege that or attach the Appraisal.  Moreover, Sage's unsupported "estimate" is for selling at Sage's as-is purported market price.  It does not say Thomas could not have sold Wade Park—or just a portion of Wade Park—quickly for substantially more than Debtors' liabilities if Wade Park was worth what Plaintiffs now contend.

Finally, any purported reluctance to *sell* cannot explain why Thomas was unable to *finance* the Property for four years.

## 2.  The $150 Million Market Price

The Buy-Back Agreement gave WPF the right to buy the Property for $150 million during a six-week period.  (JA559; JA906).  It was a binding sales contract "reflect[ing] the mutual agreement of the seller and purchaser."  (JA564).  It showed the market price immediately following the transfer.  *See United States v. 50 Acres of Land*, 469 U.S. 24, 25 & n.1 (1984) ("fair market value" is "what a willing buyer would pay in cash to a willing seller"); *In re Old CarCo*, 2011 WL

5865193, *10 n.12 (S.D.N.Y. Nov. 22, 2011) (same). Plaintiffs acknowledge "fair market sale price" is "a benchmark" for REV. (Br.27).

This further demonstrates Plaintiffs' $565 million valuation is implausible. It would have been economically irrational for WP to give WPF the option to buy the Property for $150 million if it was worth $565 million. Plaintiffs "cannot explain why Defendants would nonetheless offer a buy-back agreement of Wade Park in conjunction with the DIL Agreement for only $150 million." (SPA133); *Vaughn v. Air Line Pilots Ass'n,* 604 F.3d 703, 710 (2d Cir. 2010) ("Plaintiffs have offered no plausible explanation for why [defendant] would believe that [the challenged action] would be in its self-interest")).

### 3. Thomas's Affidavit Swore the Fair Market Value was $140 Million

On March 1, 2019, Debtors signed the Affidavit attached to the DIL. Thomas, a market participant with full knowledge of Wade Park, swore on Debtors' behalf that the consideration for the Property—the approximately $140 million of debt relief—"represents [its] fair market value" and waived any "challenge [to] the adequacy of such consideration." (JA581). Plaintiffs miss the point when they argue the Affidavit "merely" states a "subjective" belief. (Br.34). Market value is based on subjective beliefs.

Judge Liman found "the mere fact that Plaintiffs signed the Estoppel Certificate shows the implausibility of Plaintiffs' claimed value of the transfer"

because "Plaintiffs would not have signed … if the value was in excess of $565 million."  (SPA132-33).

Plaintiffs argue Judge Liman should not have considered Thomas's Affidavit because there is a "dispute" as to its "accuracy."  (Br.33).  But there is no dispute Thomas signed the Affidavit.  *That* is what the court found showed the implausibility of the SAC's claimed valuation, not the "truth of the matter asserted."  (SPA132-33).[6]  None of the cases Plaintiffs cite declined to consider an "integral" document where, as here, its authenticity and relevance are not disputed.  (Br.33).[7]

---

[6]  Plaintiffs contend Judge Liman said the SAC's conclusory allegations of value are "undermined by the more specific statements" in the Affidavit.  (Br.33).  That is what the court said when dismissing *the FAC*.  (SPA128-29).  In dismissing *the SAC*, the court stated "[n]or does the Court need to rely on the truth of the matter asserted in the Estoppel Certificate" because the fact Plaintiffs signed the Affidavit shows the implausibility of their valuation.  (SPA132).

[7]  For example, *US ex rel. Foreman v. AECOM*, 19 F.4th 85, 106-108 (2d Cir. 2021), held documents could not be considered because, unlike here, they were not "integral" to the complaint and there was a dispute about their "authenticity."  In *Global Network Commc'ns v. NYC*, 458 F.3d 150, 156-57 (2d Cir. 2006), unlike here, the documents were not "integral" to the complaint.  And *DiFolco v. MSNBC,* 622 F.3d 104, 111 (2d Cir. 2010), did not decline to consider documents referenced in the complaint.  References to "accuracy" in the cases Plaintiffs cite is to whether the documents are what they purport to be, not whether all parties agree their statements are true.  For example, in *Nicosia v. Amazon.com,* 834 F.3d 220, 235 (2d Cir. 2016), Nicosia disputed the "accuracy and authenticity" of a 2014 Amazon registration page that Amazon asserted depicted a version seen in 2008.

Moreover, Plaintiffs' argument that the Affidavit is "false" (Br.34) is not plausible.  Under Georgia law, making a false sworn statement is a felony.  O.C.G.A. §16-10-71.  And Thomas provided the Affidavit to "induce First American Title Insurance Company to insure title to the Property."  (JA582).  The SAC does not allege facts "explaining why Plaintiffs would have signed such a purportedly false statement" (SPA133 n.9) that irrationally exposed them to criminal and civil liability.

Plaintiffs argue *Defendants* knew the Affidavit was "false."  (Br.34).  But the SAC does not allege facts supporting that conclusory allegation.  *See Rothstein v. UBS,* 708 F.3d 82, 94 (2d Cir. 2013) (declining to consider conclusory allegation of defendant's knowledge).  Plaintiffs' assertion that "*Gamma* requested the independent Sage Appraisal" (Br.34) is refuted by the Appraisal, which states it was prepared at the request of Thomas's Lebanon 390WR.  (JA741).  Moreover, what Defendants allegedly knew is irrelevant.  They did not sign the Affidavit.

Plaintiffs contend the Affidavit was "not negotiated at 'arms-length' and does not reflect the 'good faith of the transferee.'"  (Br.34).  But the SAC does not allege facts supporting that conclusory allegation.

### B.     The SAC's Appraisal Allegations Are Conclusory and Implausible

Plaintiffs argue two Wade Park appraisals provide a plausible basis for their valuation.  Not so.  Judge Liman correctly found the SAC's appraisal

allegations are conclusory and implausible under *Twombly* and *Iqbal* in light of its other allegations showing *the market* did not value the Property above $150 million. (SPA135; SPA126 n.6). The SAC "contains no allegation about [the BBG report's] contents, save for its conclusion" and "[t]he report does not fall within the categories of attachable instruments." (SPA124-25).

Since Thomas, "a sophisticated investor tried for nearly two years to find on the open market persons who would value the property at more than what Defendants were offering in exchange and failed to do so, the appraisal from an appraiser with unknown credentials, based on an unidentified methodology, relying on undisclosed assumptions—none of which is stated to correspond with the underlying facts of the Wade Park properties—does not amount even to reliance upon an expert's *ipse dixit*." (SPA136-37). *See Fundamental*, 873 F.3d at 1345 (affirming dismissal for failure plausibly to plead REV where "conceptual inconsistency" in alleged value was "plain from the face of the Second Amended Complaint"); *Eclectic Props. E. v. Marcus & Millichap,* 751 F.3d 990, 999 (9th Cir. 2014) (rejecting "conclusory assertions of property values as facts" when "evidence in Plaintiffs' own complaint…undermines their allegation"); *cf. Gray v. Wesco Aircraft Holdings*, 847 F.App'x 35, 37 (2d Cir. 2021) (although "analysts' estimates" were higher than the consideration, "the complaint has far more compelling allegations that contradict Gray's theory: what potential buyers in fact

offered"); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (affirming

dismissal of claims based on "wholly conclusory and inconsistent allegations");

*DeBlasio v. Merrill Lynch,* 2009 WL 2242605, *26 (S.D.N.Y. July 27, 2009)

("because this broad contention sits in significant tension with Plaintiffs' other

allegations in the SAC, the Court is not obligated to accept it as true") (Sullivan,

J.).[8]

      The SAC's allegation concerning the BBG appraisal is only that "[i]n

a report issued January 2, 2019, independent appraiser BBG, Inc. appraised the as-

is market value … as of October 18, 2018, at $565 million."  (JA939).  The SAC

does not even allege facts that show BBG is independent.

      The SAC attaches a BBG letter that is as conclusory as the SAC's

one-sentence allegation.  It states "the appraisal constitutes a 'value opinion,'

'prepared for Churchill Commercial Capital [and] is intended only for its specified

use.'"  (SPA135).  As Judge Liman found, "[n]othing is said about BBG, who it is,

what its qualifications are, why it would know anything about the property in

particular or property valuations in general, and why its opinion should have any

weight."  "Nor is anything alleged about Churchill" except that "it did not think the

---

8   Unlike here, the allegations of the complaints did not contradict the appraisals in
    *In re Mina*, 2022 WL 2657481 (Bankr. W.D.N.Y. July 8, 2022), and *In re
    Integrity Graphics, Inc.*, 2021 WL 2036472, *3 (Bankr. D. Conn. May 20,
    2021) (Br.27).

appraisal was sufficiently compelling" to enter into a transaction relating to Wade Park.  The letter contends the appraisal is based on "reasoning," "assumptions and limiting conditions," but the SAC and letter do not allege "what the assumptions and limiting conditions were or explain BBG's reasoning, much less assert as a matter of fact that the assumption and limiting conditions were reasonable and constituted an appropriate and fair basis upon which to value [Wade Park]." (SPA135).

The SAC's allegations about the Sage Appraisal are similarly conclusory and thus do not satisfy *Iqbal's* plausibility standard.  (SPA126 n.6). The SAC alleges only Sage's conclusion (JA941), not what Sage was, or facts showing it was "independent," why it was engaged, or what was the basis for its opinion.

This Court need not consider the Sage report.  The SAC did not attach it.  Plaintiffs do not rely on it in their argument about Wade Park's value.  (Br.20-22).  Plaintiffs assert the SAC alleges that Gamma requested the Sage Appraisal. (Br.20).  The report itself shows that is not so.  Defendants submitted it to the court to show it says it was requested by a *Thomas*-managed entity.  (JA741).  Because the SAC's "abbreviated allegations are not sufficient to state a claim for relief," Judge Liman did "not consider whether the Sage appraisal report is incorporated by reference into or is integral to the SAC" or "Defendants' argument that the entirety

of the report further bolsters that conclusion." (SPA126-27 n.6). But the court's

reasoning for concluding the BBG report cannot be considered (SPA124-25)

applies equally to the Sage report.

Plaintiffs argue Judge Liman erred in ruling Sage was "further afield"

than BBG because the transfer occurred "more than two years after the 2016

Appraisal" and REV "is determined by the value" "*at the time* of the conveyance."

(SPA137-38). Plaintiffs contend Judge Liman improperly drew an "inference

against Plaintiffs" that the Property's value decreased over time. (Br.21-22). Not

so. The court rejected Plaintiffs' request to speculate that a 2016 valuation was

applicable to "an entirely different market period" in 2019. (SPA138). The SAC

contains no factual allegations that support such speculation. *See Twombly*, 550

U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief

above the speculative level").[9]

Plaintiffs argue the SAC alleges $70 million of "improvements" after

the Sage appraisal "raised Wade Park's market value." (Br.22). But there is no

basis to assume Debtors' spending increased or even maintained the as-is market

---

[9] Plaintiffs misplace reliance on BBG's statement that "[o]verall value in this area
have increased by about 40% since 2015." (Br.22 n.9). The SAC did not attach
BBG's report and the statement is conclusory. (JA1140). *In re Positive Health
Mgmt.*, 769 F.3d 899, 905 (5th Cir. 2014), and *Mina*, 2022 WL 2657481, *5
(Br.21), did not concern a complaint with allegations showing an old appraisal
was implausible when it was issued and at the time of transfer.

value.  The SAC does not describe the "improvements" or allege facts showing they had value for any other developer and would not have to be removed at great expense and therefore reduce the value.  (JA941).

Plaintiffs argue Judge Liman ruled "appraisals deserve no presumption of truthfulness" and may never be considered on a motion to dismiss.  (Br.26-27).  He did not.  The court explained "[i]t may be that, with appropriate allegations, an appraisal could provide factual support."  But the SAC's allegations were far too conclusory to render its valuation allegations or the appraisals plausible in light of its allegations that show the market did not value the Property at $565 million.  (SPA136-37).

The BBG and Sage appraisals are "subjective opinion[s]" of "idiosyncratic person[s]" who are "not in the market and [have] not expressed a willingness to purchase the property."  (SPA134; SPA136).  Courts have found consideration of expert opinions inappropriate at the pleading stage.  (SPA137 & n.10).  Since appraisals rely "heavily on the discretionary choices of the modeler," "[i]f the models and assumptions are worthless, so is the valuation."  (SPA136, citing cases).  Accordingly, because the SAC lacks allegations of the facts, methodologies, and assumptions underlying the appraisals, its appraisal allegations are inadequate.  (SPA137).

Plaintiffs argue they were not required to allege the "methodology or assumptions." (Br.23). But none of the cases they cite involved appraisals or other expert opinions, let alone a SAC whose factual allegations show the appraisals or opinions are implausible. Contrary to Plaintiffs' contention (Br.24 n.11), the finding in *First Nationwide Bank. v. Gelt Funding*, 27 F.3d 763, 771-72 (2d Cir. 1994), that an allegation of property value was implausible because the "methodology employed [was] so defective, and the conclusions reached so defy logic that no 'reasonable inferences' can be drawn," is instructive on motions not governed by Rule 9(b). (SPA135).

*In re Motors Liquidation Co.*, 576 B.R. 325, 425 (Bankr. S.D.N.Y. 2017) (Br.25), observes courts look to appraisals "[i]n the absence of a fair market sale price to use as a benchmark." Here, the Buy-Back Agreement provides a "fair market sale price" of $150 million. And Thomas's inability to obtain financing for years shows *the market* did not value the Property at $565 million.[10]

Plaintiffs argue the court got it "backwards" by "criticizing" the appraisals as "idiosyncratic and subjective" while relying on Debtors' Affidavit.

---

[10] *In re Roblin Indus., Inc.*, 78 F.3d 30, 38 (2d Cir. 1996), *In re Jesup & Lamont, Inc.*, 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014), *In re WRT Energy Corp.*, 282 B.R. 343, 405 (Bankr. W.D. La. 2001), *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 538-39 (1994), and *In re Glob. Technovations Inc.*, 694 F.3d 705, 717 (6th Cir. 2012) (Br.27), were not decided on a motion to dismiss, did not involve a complaint that contradicted an appraisal, and merely held that parties may rely on experts to prove insolvency or value at trial.

(Br.34).  But Judge Liman relied on the Affidavit for the fact that Thomas signed it, not for the truth of the matter asserted.

Plaintiffs contend the appraisals are "reliabl[e]" because the SAC alleges they were "independent," BBG's letter states the appraisal conforms with "USPAP" standards, BBG's credentials are alleged, and the BBG appraisal was not "made in anticipation of litigation."  (Br.24-25 & n.12).  Even if true, the appraisal allegations still would not be plausible in light of the SAC's other allegations that show market value.  Moreover, the SAC does not allege facts that support its conclusory allegations that BBG and Sage were independent or that BBG met USPAP standards and did not make its appraisal in anticipation of litigation.  Plaintiffs ignore that a Thomas-managed entity commissioned Sage, and both appraisals rely heavily on unverified Thomas projections.  (*See* below pp.37-38).

## C.    Count XIII Fails to Plead a Fundamental Element

Count XIII also fails to state a claim because the SAC does not allege debtors were located in Georgia "when the transfer [was] made," as O.C.G.A. §18-2-80 requires.

## D.    Plaintiffs Were Not Entitled to Replead

Plaintiffs contend "[t]he district court erred in denying leave to replead."  (Br.35).  Not so.  Plaintiffs *never* sought leave to amend *the SAC*.  "[N]o court can be said to have erred in failing to grant a request that was not made."

*Cruz v. FXDirectDealer,* 720 F.3d 115, 126 (2d Cir. 2013). "Because the plaintiffs in this case never requested leave to amend their [Second] Amended Complaint, the District Court did not err in declining to *sua sponte* grant leave to amend." *Hu v. NYC*, 927 F.3d 81, 107 (2d Cir. 2019).

Judge Liman's *sua sponte* consideration of whether to permit Plaintiffs to amend the SAC based on the full BBG report does not change that. (SPA140). "[A]mendment is not warranted absent some indication as to what [plaintiffs] might add to their complaint in order to make it viable." *Horoshko v. Citibank,* 373 F.3d 248, 249 (2d Cir. 2004). Plaintiffs did not provide any such indication. They do not dispute that simply attaching the 743-page report would not have satisfied pleading requirements (SPA125), nor do they identify any allegations concerning the report they would have incorporated in their *fourth* complaint. As for the Sage report, this Court need not consider an amendment to add it. The SAC did not attach it and Plaintiffs never asked to amend their pleading to include it.

Judge Liman correctly ruled that adding the BBG report would not have made Plaintiffs' SAC valuation allegations plausible because "[t]he statements of value in the BBG appraisal report are conclusory." (SPA140-41). The court did not conduct a "*Daubert*" analysis. (Br.36). It found BBG did not have sufficient non-conclusory *facts* to make a $565 million valuation "plausible"

"in the face of the years during which Plaintiffs were not able to find a single permanent source of financing or to sell the property." (SPA140-42).[11]

BBG, like Sage, has five components in its appraisal: the primary building site, excess land, Thomas's costs, lease values and Tax Increment Financing ("TIF"). The contradictions and inconsistencies between the two reports, and their lack of foundation in plausible facts or the SAC's allegations, further show they are not plausible and do not state a claim that Debtors received less than REV. *See* pp.27-33 above; *see also Grasso v. Donnelly-Schoffstall*, 2022 WL 728839, *1 (2d Cir. Mar. 11, 2022) ("the vague and internally inconsistent allegations in Grasso's complaint failed to provide an objective method for determining Donnelly-Schoffstall's obligations under the alleged contract"); *Perry v. NYSARC*, 424 F.App'x 23, 25 (2d Cir. 2011) ("factual assertions that are contradicted by the complaint itself" need not be accepted as true); *Savitsky v. Mazzella*, 210 F.App'x 71, 72 (2d Cir. 2006) (affirming denial of leave to amend because "allegations were either conclusory or contradictory").

---

[11] *Cabrega v. Campbell Soup Co.*, 2019 WL 13215191, *6 (E.D.N.Y. Nov. 18, 2019) (Br.36), considered allegations in the complaint derived from plaintiffs' expert's declaration, not the declaration itself. Here, the SAC does not contain any allegations derived from BBG except its conclusion. Moreover, unlike the BBG report, the declaration in *Cabrega* contained numerous facts and was supported by other allegations. *Id.* at *2-3.

The reports do not contain adequate factual allegations to support their land values. For example, BBG values the "primary building site" at $117 million or $45 per square foot—based on seven "comparables." That valuation is "infected by numerous unexplained and conclusory determinations." (SPA142; *see* JA1138-44). Four "comparables" "rely on confidential or unidentified 'brokers.'" (SPA142). Six closed or were expected to close at "much lower" prices but BBG "adjust[ed]" them upward by arbitrary amounts without a plausible explanation. (SPA142). Even when BBG mentions why adjustments might be made, it does not identify a basis for the *amounts* of the adjustments. (JA1141). Plaintiffs argue BBG's opinion is not conclusory because it purports to be based on the opinion of an unidentified local broker. (Br.39). That would be untenable even if BBG did not say it was "not able to verify" the information the broker asserted supported its "opinion." (JA1145).

BBG's $204 million "excess land" valuation is based on the same "comparables," and therefore is likewise "infected" by "unexplained and conclusory determinations." (SPA142). Moreover, the SAC and BBG do not provide facts that support valuing the excess land at only $5 per square foot less than the primary building site valuation, "aside from cursorily mentioning a 'discount for economies for scale.'" (SPA141).

Sage's land "valuation" further undermines BBG's plausibility. Sage's conclusory valuation of the primary and excess land is $18 and $16 per square foot.  (JA797-98).  That is less than half BBG's.  Neither the SAC nor BBG provides any factual basis for the implausible 250% jump from Sage's numbers to BBG's in just two years.  Moreover, Sage's "valuation," like BBG's, is "infected" by "unexplained and conclusory determinations," including "adjustments" to "comparables" by unexplained percentages and/or based on "personal observation and judgment of the appraiser."  (JA795-98).

As for the third component of the "valuations," Thomas's costs, Judge Liman correctly found "conclusory" BBG's assumption that Thomas's purported $71.3 million cost figure for "partially constructed buildings" increased the Property's value.  (Br.38; SPA141).  Neither BBG nor the SAC alleges any facts that show "partially constructed buildings" under Thomas's development plan had value for other developers or that a purchaser with different plans would not have to spend money removing those "partially constructed buildings."

Plaintiffs assert Sage "corroborate[s]" BBG because Sage "assigned an even larger dollar figure to the value of cost spent."  (Br.38).  The opposite is true.  The contradiction between Sage's $151.3 million number, arrived at two years *before* BBG's $71.3 million, further shows the SAC's allegations are not

plausible.  Thomas's costs could not have *dropped* by more than half over that period.

Beyond that, Sage obtained its $151.3 million number from "within the developer's organization."  Sage warned "third party verification of the reasonableness of these costs could not be verified" so "[t]he reader is advised to engage a third-party expert [to] review these costs in detail."  (JA799).  In other words, Thomas gave Sage a number that was twice what he gave BBG.  That does not make either number plausible.

BBG's lease and TIF valuations too are not plausible.  Both are also grounded on "projections from the 'developer,' Thomas."  (SPA141).  BBG values "Leases" at $99 million based on an "estimat[ion]" "provided by the developer," and TIF at $71 million based on the "economic impact projections of the developer."  (SPA141).  Plaintiffs argue the court must assume Thomas was correct.  (Br.37-38).  Not so.  Projections are not facts.  Allegations do not become less conclusory or speculative when they are repeated in a report and "the complaint fails to allege that the…[p]rojections were sufficiently likely."  *Gray*, 847 F.App'x at 37.  Moreover, Plaintiffs' reliance on Thomas is inconsistent with their argument that "the BBG appraisal's reliability" derives from BBG purportedly being "independent."  (Br.24).  BBG's cost, Lease and TIF valuations obviously are not "independent" if they are provided by Thomas.  *Doe v. Columbia*

*Univ.*, 831 F.3d 46, 48, 56 (2d Cir. 2016) (Br.38), does not hold conclusory allegations can survive a motion to dismiss, or courts must assume appraisals based on a party's own speculation are plausible.

And neither the SAC nor BBG provides any basis to speculate that Thomas's "Leases" could be assigned to a purchaser or that a purchaser would develop the Property in accordance with Thomas's plans and want to assume the leases.

Sage's $102.6 million "Lease" valuation is also not plausible. It assumes the Leases "will continue to maturity" even though Sage acknowledges half the leases are "speculative" and "the improvements have not yet been completed or constructed." It uses lease revenue "comparables" from unbuilt developments and estimates operating expenses based on conversations with unidentified "owners, brokers and agents." (JA807; JA811). And it assumes without any supporting SAC allegation that Wade Park would be developed under Thomas's plans and the leases could be assigned to a purchaser. (JA742; JA749; JA809-10). Sage concedes "if there is a measurable change [regarding lease assumptions], the conclusions within this report could change." (JA749).

As for the purported TIF benefits, BBG does not assert they would be available to a developer other than Thomas. BBG acknowledges that "to receive [the TIF] incentives, the developer must" satisfy eight requirements, including

having "[d]esign[ed] and construct[ed] the Project as a walkable development," but the SAC does not allege that was done and BBG concedes it was not.  (JA1104; JA1146).

Sage assumes "the developer" would receive a $79.9 million TIF benefit, but fails to mention the unmet conditions identified by BBG.  And Sage applies a 3.75% discount rate to calculate present value without providing a basis for that rate.  (JA742-43; JA817).

Finally, BBG has an "extensive list" of assumptions and caveats. Judge Liman correctly found "[n]o allegation appears that those assumptions … are well-founded."  (SPA141).  Plaintiffs do not challenge that ruling.  Furthermore, neither BBG nor Sage followed the practice of "most appraisers" identified by the Supreme Court in *CSX Transp. v. Georgia State Bd. of Equalization*, 552 U.S. 9, 17 (2007) (Br.35 n.19), to "estimate market value by employing not one methodology but a combination;" "[t]hese various methods generate a range of possible market values which the appraiser uses to derive what he considers to be an accurate estimate of market value, based on careful scrutiny of all the data available."

### E.   The Court Should Disregard *Amici*'s Arguments

*Amici* supporting Plaintiffs ask this Court to overrule *Tribune* and hold courts may not consider the "totality of the circumstances, including the arms-length nature of the transaction" and "the good faith of the transferee," when

determining REV.  This Court should decline to consider *Amici*'s arguments because Plaintiffs did not raise them below or on appeal.  An *amicus* brief is "not a method for injecting new issues into an appeal."  *Tiffany v. eBay,* 600 F.3d 93, 105 n.10 (2d Cir. 2010).  In fact, Plaintiffs contradict *Amici*.  (Br.19, 28 n.14).  *See Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits*, 726 F.3d 62, 82 (2d Cir. 2013) (noting "discordance between plaintiffs and *amicus*" when declining to accord significance to *amicus*'s argument).

If this Court considers *Amici*'s arguments, it should reject them. *Amici* acknowledge the test they seek to abolish is used by "this Court" and "district courts and bankruptcy courts in this Circuit."  (*Amici* Br.3).  They do not cite *any* court, in or out of this Circuit, that applies the test they propose for Bankruptcy and Georgia law.  The unique facts of this case should not be a vehicle for their sweeping change.

Moreover, there is no need in this case to adopt *Amici*'s primary proposal to eliminate consideration of the arm's length nature of the transaction and the transferee's good faith (*Amici* Br.13-18) because the SAC does not state a claim whether or not the arms-length nature of the transaction and the good faith of the transferee are considered.  Judge Liman cogently explained that the SAC's $565 million valuation is not plausible because, *inter alia*, for more than two years Plaintiffs could not repay or refinance a bridge loan that grew to $140 million.

*Amici* do not and cannot argue that "prioritizing creditor concerns" (*Amici* Br.3) should lead courts to reject the Supreme Court's plausibility standard on a motion to dismiss. Furthermore, there is no basis or need to overrule *Tribune* because its REV test already considers creditors' interests.

## II. THE DISTRICT COURT CORRECTLY DISMISSED COUNT I

The FAC explains Ventures was created to protect *Defendants*. (JA875). And Plaintiffs acknowledge in the August, October, and December 2018 FAs (the "Last Three FAs") and the DIL, which they signed (together with the deed transfers, the "Transactions"), that Debtors were in default on the Gamma and BAMCAP Loans, the Loans were accelerated, Omega posted the Property for non-judicial foreclosure, and Omega agreed to give Debtors more time to repay. Yet Plaintiffs assert in Count I that, having obtained the benefit of those extensions but still failed to repay the loans, they have the right to a declaration that the Transactions are void because Plaintiffs themselves purportedly violated LLCA §2.4(d) by entering into the Transactions with the affiliates of Ventures member GWL who gave them the extensions. Plaintiffs do not address the inequity of their request to escape their obligations under their contracts after they obtained the *benefits* of those contracts.

### A. Count I Does Not State a Claim

Judge Liman correctly found the Transactions "are not ultra vires

because they are not beyond the power authorized by" the LLCA for several independently dispositive reasons.  (SPA38-39).

*First,* under LLCA §3.1 (JA167-68), Ventures' "manager's power is expansive and includes modifying existing loans and amending loan documents." (SPA39).  §3.3 (JA168-69) prohibits Ventures' manager from causing Debtors to enter into any such transaction with a GWL Affiliate or Related Party only if there is no "written consent to the specific act by the Initial Lender."  (SPA39).  There was such consent here.  The LLCA states the Initial Lender includes "its successors and/or assigns."  (JA159).  That includes Omega (JA879), which consented to the Last Three FAs and DIL by signing them.  And the deeds were delivered pursuant to the DIL.  Accordingly, the Transactions are not *ultra vires.*  As Judge Liman observed, "Plaintiffs offer[ed] no response to Defendants' argument premised on Section 3.3."  (SPA38).  Accordingly, they cannot do so now.[12]

*Second,* §3.3(v)'s "more specific language" granting Ventures' manager authority to enter into related party transactions when the Initial Lender

---

[12]  The two cases Plaintiffs cite (Br.43-44) concern different provisions and support the decision below.  For example, *Sunline Com. Carriers v. CITGO,* 206 A.3d 836, 847-48 (Del. 2019), "read the contract as a whole" to determine what "makes commercial sense."  Here, it would not make "commercial sense" to read the LLCA as barring Plaintiffs from transferring the Property to the Lender's designee with the Lender's consent, particularly when Plaintiffs themselves allege the LLCA was intended to protect the *lender* by deterring Thomas from filing for bankruptcy.  (JA875-76).

consents, governs over §2.4(d)'s "general clause" that "appears to broadly withhold authority to enter into transactions with affiliate or related party entities." (SPA40). Contrary to Plaintiffs' argument (Br.43-44), this does not render §2.4(d) superfluous. §3.3 governs when the Manager has exercised its authority to cause the Company or any Subsidiary to enter into such transactions with the consent of the Initial Lender or as permitted under the Initial Loan Documents. §2.4(d) governs in other circumstances. It is Plaintiffs' reading of §2.4(d) to trump §3.3(v) that would make §3.3(v) superfluous.

*Third,* even if §3.3 did not control, §2.4(d) permits the Transactions because it states "the Initial Loan by the Initial Lender shall be deemed permitted under this section." (SPA40). The LLCA defines the "Initial Loan" to include the Gamma Loan "as the same may be amended, modified, [or] supplemented from time to time" (JA159), as it was in the Transactions. The LLCA therefore authorized the Transactions. The fact that the Transactions also modified the BAMCAP Loan does not change that. (SPA40). The Lender's agreement in the Transactions also to forbear from exercising rights under the BAMCAP Loan does not make the "Initial Loan" exception inapplicable.

*Fourth*, even if the LLCA had not authorized the Transactions, "they would be at most voidable—and subject to ratification—rather than void and ultra vires" under Delaware law, which governs (LLCA §11.6(a)). The Transactions

"were ratified when Plaintiffs signed the agreements and accepted the benefits of those agreements."  Holding otherwise would permit unfair gamesmanship: "Plaintiffs could simply enter into agreements beyond the authority provided under the LLC Agreement, enjoy the benefits of those agreements, and then subsequently disavow their obligations under those agreements for being ultra vires."  (SPA40-42).

Plaintiffs do not dispute that if the Transactions were voidable rather than void, they could be ratified.  Plaintiffs also do not dispute that they ratified the Transactions by signing the FAs and DIL.  And when they signed the DIL, they represented, warranted, and covenanted that they had full power and authority to execute and perform the DIL, it was their valid and binding obligation, and it would not breach any agreement or "organizational document" to which they were parties (JA513 ¶9(f)-(h)), which includes the LLCA.  They made similar warranties and representations in §5(d) of the Last Three FAs, that those agreements will not violate, breach or constitute a default under any agreement to which they were party.  (JA379, JA395, JA494).

Plaintiffs nevertheless argue the Transactions are void.  Not so.  The LLCA "nowhere provides that acts beyond the powers authorized by the agreement are void."  (SPA42).  *CompoSecure v. CardUX*, 206 A.3d 807, 816-17 (Del. 2018), and *Absalom Absalom Tr. v. Saint Gervais,* 2019 WL 2655787, *3 (Del.Ch.

June 27, 2019), found transactions void only because the LLC agreements in those cases *expressly* stated the transactions were "void," "null" and could not be ratified. (SPA40-42). Plaintiffs do not cite any authority that found transactions void when the applicable agreement did not so provide.[13]

### B.    Plaintiffs Released This Claim

Judge Liman found Plaintiffs' releases apply to most of their claims "with the possible exception of Count One for declaratory judgment." (SPA27).

Plaintiffs released Count I. Obligors (which include Plaintiffs) "forever" released Defendants, in DIL §6, from all claims connected to the loans, Property and related transactions "until the [DIL's] Effective Date." (JA511). Since Plaintiffs entered into the Last Three FAs before the Effective Date, §6 released any claim that those transactions were ultra vires.[14]

The DIL also released any claim that the DIL itself, and Debtors' transfer of the Property, was ultra vires. *First,* §6 releases "any claim to invalidate or otherwise avoid the transactions contemplated herein," which include the Property transfer. *Second,* §6's words "until the Effective Date" independently include conduct up to and including that date, such as Debtors' execution of the

---

[13]   The *Nevins* and *Coinment* cases Plaintiffs cite (Br.44-46) *rejected* arguments that actions were void.

[14]   Likewise, the releases in each of the Last Three FAs released ultra vires claims to that point.

DIL and transfer of the Property on that date. As Judge Liman explained, Plaintiffs, in the DIL, "gave up their deeds to the Wade Park properties for Defendants to hold in escrow until Plaintiffs paid the Gamma Bridge Loan and the BAMCAP Loan. It was at this moment that Plaintiffs lost their right to the deeds and were injured. Even if Defendants never recorded the deeds and instead kept the deeds in escrow indefinitely, Plaintiffs would still be injured by the fact that they no longer held the deeds." (SPA33-34). *Third,* §6 also releases claims arising from the "GRE Loan Documents," which include documents "evidencing the GRE Loan." DIL Recital A and §2(a) show the DIL is one of those documents. *Fourth,* §6 states it does not release "Lender from its obligations under this Agreement." That carve-out would be superfluous if the release did not include conduct on the Effective Date.[15]

Furthermore, Obligors waived their right to the equitable relief Count I seeks by agreeing, in DIL §12, that "they shall not be entitled to equitable ... relief in connection with this agreement, the transactions contemplated herein, the loan or the GRE Loan Documents or BAMCAP Loan Documents." (JA516). "There is no doubt that declaratory … relief" is an equitable remedy. *Bitter v. Chase Manhattan Bank,* 1983 WL 610, *1 n.1 (S.D.N.Y. Dec. 7, 1983).

---

[15] §6 "provides a limited exception for any claims for [Gamma's] fraud relating to this Agreement." (SPA29). But Count I is not grounded on any such fraud.

## III. THE DISTRICT COURT CORRECTLY DISMISSED COUNTS V AND VI

Count V alleges Defendants violated Ga. Code Ann. §16-14-4(a), which bars the acquisition of property through a pattern of racketeering activity. (JA123). Count VI alleges Defendants conspired to violate §16-14-4(a) and (b). (JA124).

### A. Plaintiffs Released their Georgia RICO Claims

Judge Liman correctly ruled Plaintiffs released these claims in the LMA, six FAs and the DIL. (SPA27).[16]

#### 1. "Inceptive Fraud" Does Not Invalidate the Releases

Plaintiffs argue their releases are not enforceable under Georgia law because Gamma engaged in "inceptive fraud" to induce them to enter into the CLA. (Br.47). That fails for several reasons.

*First,* "issues of the validity and enforceability or voidability of a release are plainly matters of substance as to which the parties' choice of law will be honored." *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987). Here, the LMA, FAs and DIL state New York law governs the construction, validity and performance of those agreements and obligations thereunder. (LMA, JA327-28 §13; first FA, JA341 §15; DIL, JA517 §18). Plaintiffs abandoned and have not

---

[16] Judge Liman dismissed these claims in the FAC (SPA62-65), but Plaintiffs cite the SAC's allegations. (Br.46-62).

stated a claim for inceptive fraud under New York law.  (SPA65-67).

      *Second,* even if Georgia law applied, Plaintiffs have not stated an "inceptive fraud" claim.  (SPA30-31; Point IV.B below).

      *Third,* even if Georgia law applied and Plaintiffs had stated an inceptive fraud claim with respect to the CLA, that would not invalidate the releases because Plaintiffs have not pled facts that plausibly show "Defendants intended not to perform" the LMA, FAs or DIL (SPA31), or that any of those agreements or any of their releases was procured by fraud.  Plaintiffs argue the "same fraud that induced Plaintiffs to enter the Gamma Bridge Loan invalidates the releases in the later" agreements because they "flowed from the initial fraud." (Br.47).  That is incorrect.  As Judge Liman explained, the releases in "subsequent agreements ... covered any claims Plaintiffs would have based on" fraudulent inducement of the CLA.  (SPA32; Point IV.B below).  If such releases were not enforceable, parties could not settle claims for fraud.[17]

### 2. Plaintiffs Cannot Narrow the Scope of the Releases

      Plaintiffs' attempts to narrow the scope of their releases fail.  *First*, the

---

[17] Plaintiffs quote *Estate of Ryan v. Shuman*, 288 Ga.App. 868, 874 (2007), and the *dissent* in *Nolan v. Calhoun*, 38 Ga.App. 227 (1928), but neither involved releases or inceptive fraud or supports Plaintiffs' theory that fraudulent inducement of one contract invalidates releases in subsequent contracts.  *City Dodge v. Gardner*, 232 Ga. 766, 770 (1974) (Br.48), holds a contract induced by fraud is void, but says nothing about releases in later contracts.

DIL's merger clause does not "supersede" (Br.49) their prior releases. Judge

Liman correctly found Plaintiffs waived this argument by not raising it before oral

argument. (SPA34-35); *see also Quituizaca v. Garland*, 52 F.4th 103, 114 (2d Cir.

2022). *Doninger v. Neihoff*, 642 F.3d 334, 352-53 (2d Cir. 2011) (Br.50 n.22), is

not to the contrary. It found "the parties' submissions" preserved the claim. *Id.*

Plaintiffs argue this Court has discretion to consider waived arguments

(Br.50 n.22), citing *Kashef v. BNP Paribas*, 925 F.3d 53, 62 (2d Cir. 2019), where

the Court did so for Sudanese atrocity victims. There is no basis to do so here.

Even had Plaintiffs not waived this argument, Judge Liman correctly

found it would fail. (SPA35-36). The DIL merger clause, §14, states the "entire

agreement" includes the "GRE Loan Documents," which include "all other

documents and instruments that evidence the Loan," such as the LMA and FAs.

(JA506, Recital D; JA516). And §15 states the GRE Loan Documents "are ratified

and confirmed, and shall continue in full force and effect" except where

inconsistent with the DIL. (JA516). The LMA and FA releases are not

inconsistent with the DIL.

Even had the DIL superseded the LMA and FAs, their releases would

not be "superseded" (Br.49) because nothing in the DIL revives the claims they had

already released. (SPA35-36).

Plaintiffs assert the FA releases were "covenants not to sue" that could

be superseded.  (Br.50).  Not so.  Titled "Waiver and Release of Claims," they state each obligor "hereby releases" a broad range of claims and "the release in this section constitutes a full and complete release of all released parties with respect to all released matters."  (*E.g.* JA338 §9).  They do not contain a covenant not to sue on the released claims.[18]

*Second*, Plaintiffs argue "the DIL's release does not apply to unaccrued claims."  (Br.50).  Not so.  Judge Liman observed, "[t]here is language in the releases suggesting that unaccrued claims are also included."  (SPA34 n.5).  The DIL release covers all claims "which [Plaintiffs] now have, ever had, or which they may have, whether known or unknown…arising…until the Effective Date, arising out of or resulting from the Loans, the GRE Loan Documents, the BAMCAP Loan Documents and the transactions contemplated thereby."  (JA511 §6).

As *Dantas v. Citibank*, 2018 WL 3023158, *4, *10 (S.D.N.Y. June 18, 2018), explained, releasing "any Cause of Action for any acts or omissions prior to the date of this Agreement, that arises from, is based on or relates to" specified matters "is clear, unequivocal, and independent of the moment at which a claim accrues."  *See Info. Superhighway v. Talk Am.*, 274 F.Supp.2d 466, 471 (S.D.N.Y.

---

[18]  Neither *Volk v. Liggett,* 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997), nor *Std. Sec. Life Ins. v. Berard,* 684 F.App'x 56 (2d Cir. 2017) (Br.49-50), found language like the FA releases was a covenant not to sue.

2003) (release "encompasses any claims that the releasor may have been able to assert after executing the release based on conduct occurring beforehand"); *Volk,* 1997 WL 107458, *4 ("agreement to waive 'any and all claims' is effective not only as to those claims 'already accrued'…but also as to any claims 'which might arise subsequent to the date of execution.'") (quoting *Skluth v. United Merchs.*, 163 A.D.2d 104, 107 (1st Dep't 1990)).[19]

Even had the DIL release not extinguished unaccrued claims, it would still have released Plaintiffs' Georgia RICO claims. Plaintiffs argue the "earliest [they] could have known their injuries were the 'result of a pattern of racketeering activity' was after the summer 2019, when they 'learned of [Gamma's] improper interference with Thomas's efforts to secure financing that would have paid the loans [Gamma] held.'" (Br.51). Not so. As Judge Liman found, "Plaintiffs' claims almost completely rely on *allegations* that precede at least one of the releases" and "allege *injuries* that precede at least one release." (SPA27, SPA33; Br.51). Moreover, the predicate acts Plaintiffs allege do not include the purported "interference." (JA953).

---

[19] *Dantas* distinguished *Benicorp Ins. v. Nat'l Med. Health Card Sys.*, 447 F.Supp.2d 339 (S.D.N.Y. 2006) (Br.50 n.23), because the release there, unlike the DIL release, "vaguely defined the scope of released claims based on when they may be asserted." *Dantas*, 2018 WL 3023158, *10. *Turk v. Morris, Manning & Martin,* 2023 WL 2359692, *4 (N.D.Ga. Feb. 13, 2023) (Br.50-51), is also inapposite because it addressed accrual for statute of limitation purposes, not a release, and New York law governs here.

### 3. The DIL Release Exception Does Not Apply

The DIL release contains "a single exception" (SPA26) for "any claims for Lenders' fraud relating to this Agreement." (JA511 §6). Plaintiffs argue that carveout applies to their RICO claims. (Br.52). As Judge Liman found, however, those "claims cannot fairly be characterized to be claims for fraud relating to the DIL Agreement when the overwhelming thrust of the allegations concerns allegations of fraud released by the forbearance agreements." (SPA30).

Plaintiffs argue this "ignores the bulk of the fraud-related allegations in the SAC." (Br.52). But Judge Liman dismissed the RICO claims *in the FAC*, and Plaintiffs' motion to amend the judgment did not seek leave to amend them. Moreover, Plaintiffs do not cite any fraud-related allegations Judge Liman ignored. And their FAC shows Judge Liman was correct. Plaintiffs' "wire fraud" allegations are based on five alleged misstatements. (Br.55).[20] Only one relates to the DIL. Points III.B and V.B below show it is insufficient.

### B. Plaintiffs Fail to State a Claim

Judge Liman correctly ruled Counts V and VI do not state a claim. (SPA62-65). Plaintiffs' wire fraud, theft of trade secrets and money laundering allegations underlying their federal RICO claims (SPA50-58) and "two additional

---

[20] They also allege "other predicate acts" "[b]uil[t] on" the wire fraud allegations. (Br.62.)

predicate acts under Georgia RICO" (Georgia Uniform Securities Act ("GUSA") and theft by deception allegations) "failed to plead a pattern of racketeering activity" (SPA64), let alone a pattern used to acquire property, as required by §16-14-4(a). Plaintiffs' arguments on appeal, which refer to the SAC even though Judge Liman dismissed these claims *in the FAC,* do not change this.

*First*, Plaintiffs argue Judge Liman erred by stating "[t]he Federal and Georgia RICO acts are 'essentially identical.'" (SPA62). That is misleading. The court made that statement about §16-14-4(b), on which Plaintiffs grounded Count IV. (SPA62). Plaintiffs do not appeal the dismissal of that Count.

Judge Liman dismissed Count V for "fail[ure] to plead a pattern of racketeering activity." (SPA64). Plaintiffs acknowledge that is a requirement. (Br.54).

*Second*, Plaintiffs argue Judge Liman erred in holding "the SAC did not sufficiently allege any predicate acts to show a pattern of racketeering activity." (Br.54). Plaintiffs argue they plausibly allege wire fraud, based on five misrepresentations. (Br.55). Not so.

Mail and wire fraud must be pled with particularity. Fed.R.Civ.P. 9(b); *Wang v. Verizon*, 2023 WL 309607, *2 (2d Cir. Jan. 19, 2023). "The elements" are "(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." *Williams v. Affinion,* 889 F.3d 116, 124 (2d

Cir. 2018).  "To make out such a scheme, a plaintiff must provide proof of a

material misrepresentation."  *Id.*  RICO claims premised on mail or wire fraud

"must be particularly scrutinized."  *One World v. Onoufriadis*, 2021 WL 4452070,

*2 (2d Cir. Sept. 29, 2021).

Judge Liman correctly found "numerous problems" with Plaintiffs'

wire fraud allegations.  All but one "fail to plead fraud with particularity."

(SPA52).  Plaintiffs argue "the SAC's fraud allegations" allege the required

"details."  (Br.55-56).  But Plaintiffs do not describe those "details" and the SAC

pages they cite do not contain them (nor did the FAC's).  Plaintiffs also fail to

plead with particularity that the third, fourth and fifth alleged misrepresentations

were made by wire.

Judge Liman also held "Plaintiffs fail to plead facts that demonstrate

that the statements were false when made."  (SPA52).  Plaintiffs argue this

"improperly drew inferences against Plaintiffs and ignored many allegations that

Kalikow and Gamma knowingly made misrepresentations to induce Thomas into

certain actions."  (Br.56).  But Plaintiffs do not identify any improper inferences or

ignored allegations.

*Plaintiffs' first purported wire fraud allegation* is that in December

2016, before the CLA was signed, Defendants falsely said "they did not want to

own" Wade Park.  (JA923).  That cannot be the basis of a fraud claim because it

states a desire, not a material fact.  *See Mecum v. Mooyer*, 166 A.D. 793, 801 (1st

Dep't 1915); *Option One Mortg. v. Allstate*, 2006 WL 2285358, *9 (N.D.Ga.

Aug. 3, 2006).  Moreover, Plaintiffs could not reasonably have relied because the

CLA superseded prior understandings and permitted GRE to foreclose if Debtors

defaulted.  (JA213, JA262).  It is "established law that a party cannot

claim fraud based on an alleged representation that is clearly contradicted by an

express term of the contract." *Conopco v. Wein*, 2007 WL 9818902, *8 n.14

(S.D.N.Y. Aug. 31, 2007).  Reliance on that (or the purported six-month buy-back

promise) is also implausible because Plaintiffs did not include any such promise in

their agreements, which contain integration clauses.  (JA259 §11.8 (CLA); JA328

§21 (LMA); JA341 §14 (First FA); JA560-61 §4(g) (Buy-Back Agreement)).

In addition, Rule 9(b) requires Plaintiffs to "(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were

fraudulent." *Lerner v. Fleet Bank,* 459 F.3d 273, 290 (2d Cir. 2006).  Plaintiffs fail

to identify which defendant made the statement.  *See Atuahene v. Hartford*, 10

F.App'x 33, 34 (2d Cir. 2001) (lumping defendants together fails to meet even

Rule 8's minimum pleading standard).

Nor do Plaintiffs allege facts that plausibly show the purported

statement was untrue.  As Judge Liman found, Plaintiffs' allegations that

Defendants repeatedly extended the Gamma Loan and signed six forbearance agreements "are utterly inconsistent with [Plaintiffs'] conclusory assertion" that "Gamma" wanted to own the Property. (SPA52-54). And not wanting to own is not inconsistent with foreclosing and owning after more than two years of accommodations. Plaintiffs argue repeated forbearances can be consistent with a desire for ownership (Br.57), but do not allege facts that show that was true here. Plaintiffs argue "Gamma maneuvered Thomas into signing the DIL Agreement" (Br.57), but Debtors represented, warranted and covenanted that they entered the DIL "of their own free will." (JA514 §9(k)). They could have allowed foreclosure instead. Moreover, the DIL "did not prevent Plaintiffs from finding a borrower who would refinance the properties to allow repayment or from selling the properties at a price that would have permitted Plaintiffs to repay Defendants and keep the profit." (SPA131).

      *Plaintiffs' second "wire fraud" allegation* is that Mr. Kalikow "made false statements about the Gamma Defendants' willingness to agree" to "Thomas's efforts to obtain financing from" Columbia Pacific. (JA923). Judge Liman correctly found this implausible because "Defendants did not need to 'let' [Thomas] borrow. He had the unilateral right to borrow without their consent" (SPA54) and to repay the Gamma Loan. (JA215). Plaintiffs contend (Br.58) that "in 2019 all parties acted *as if* Thomas needed Gamma's consent to refinance," but

the FAC does not allege that.[21]

Judge Liman correctly found *Plaintiffs' third "wire fraud" allegation,* that "Defendants encouraged the Bluebell loan and stated that they believed the loan to be a viable refinancing option," "falls short because Plaintiffs do not allege what Kalikow said to Thomas that was false or why it was false." (SPA55). Plaintiffs argue that in September 2018 Defendants said they "believed the loan to be a viable refinancing option" but then in December 2018 told Bluebell's principal that "Defendants would not allow a loan from Bluebell to move forward." (JA896-98). Plaintiffs say this shows "Gamma falsely represented its willingness to allow Thomas to refinance with Bluebell." (Br.59). Not so. The two statements are not inconsistent. The FAC does not allege any terms Bluebell proposed or whether it required Omega to provide a concession on its loan. Beyond that, Gamma could have changed its mind in the intervening three months. And Thomas did not need Defendants' permission to refinance anyway. (SPA54).

*Plaintiffs' fourth "wire fraud" allegation* is that in January and February 2019, "Kalikow and the Gamma Defendants expressed their support for a deal with Hines" (JA902), but rejected his proposals in the summer 2019. (JA907-

---

[21] The statement was not wire fraud for additional reasons. Plaintiffs allege it was made to Jay Sharp, a broker, not to any Plaintiff. (JA898). Plaintiffs do not allege they relied to their detriment. And the statement was puffery which is "not actionable as fraud." *See Nelson v. Publishers Circulation Fulfillment,* 2012 WL 760335, *4 (S.D.N.Y. Mar. 7, 2012).

08).  Judge Liman correctly found that is insufficient both because it lacks particularity and because "[f]acts had changed between January 2019 and the summer of 2019."  (SPA55-56).

Plaintiffs question (Br.60) Judge Liman's conclusion that "the obvious alternative explanation" is that Defendants "were simply trying to make money." (SPA44).  But the court said that in dismissing Count II for failure to plead a RICO enterprise.  (SPA42-46).  Plaintiffs do not appeal the dismissal of that count.

Plaintiffs argue Judge Liman erred in finding Defendants' interest in selling the Property to WPF after obtaining title was inconsistent with the allegation that they wanted to own it.  According to Plaintiffs, Defendants could "realize the full value of the property."  (Br.57).  That is a non sequitur.  If Defendants wanted the "full value" (and the FAC does not allege that), that would not mean they wanted to own the Property.  The FAC alleges Defendants gave WPF the option to buy-back the Property for $150 million and "continued to tell Thomas that he would have more time to buy back the Wade Park properties" after that option expired in April 2019.  (JA83-84).  Plaintiffs allege Defendants "changed the buy-back terms" after the option expired, but the only change alleged was requiring a buyer other than Thomas, not a price increase.  (JA84).

*Plaintiffs' fifth "wire fraud" allegation* is that in January and February 2019, Defendants told Thomas the DIL "would not actually cause a transfer of the

Wade Park deeds to Gamma," Defendants "would give Thomas time to 'buy back' the properties by paying off the loans," and "the buy-back period would be at least six months plus whatever additional time [Thomas] needed." (JA903-04). These allegations are insufficient for the reasons explained by Judge Liman (SPA51-52, 98 n.5) and in Point V.B below.

Plaintiffs argue Judge Liman should not have found their allegations of three other predicate acts—money laundering, GUSA violation, and theft by deception—failed to "satisfy Rule 9(b)" because the "SAC includes more than enough detail about the alleged misrepresentations." (Br.62). Not so. Plaintiffs do not cite any such details. The "money laundering" allegation also fails because, as Judge Liman found, it is predicated on Plaintiffs' insufficient allegations of wire fraud and theft of trade secrets. (SPA58). In addition, Plaintiffs do not allege the money laundering and GUSA violation were used to acquire the Property, as §16-14-4(a) requires.[22] The GUSA allegation also fails because Plaintiffs lack standing to assert fraud in connection with the purchase of a security under GUSA. Plaintiffs do not allege they purchased or sold any security, as Georgia's version of Rule 10b-5 requires. *Ledford v. Peeples*, 568 F.3d 1258, 1288 n.86 (11th Cir. 2009). Plaintiffs allege GWL purchased a 75% membership interest in Ventures

---

[22] Plaintiffs do not appeal Judges Batten and Liman's holdings that they did not sufficiently allege theft of trade secrets as a predicate. (SPA57).

(JA936) from Ventures (JA879-90), not from Plaintiffs. Plaintiffs' theft by

deception allegations fail for the same reasons as their mail and wire fraud

allegations and their allegations of fraud.

Judge Liman correctly dismissed Count VI because plaintiffs cannot

establish a conspiracy claim when they have not pled a substantive claim.

(SPA65).

## IV. THE DISTRICT COURT CORRECTLY DISMISSED COUNT VII

Count VII alleges Defendants fraudulently induced Plaintiffs to enter

into the CLA by representing *in that agreement* that the lender would not

unreasonably withhold consent to modify the BAMCAP Loan when they "did not

intend to comply with th[at] contractual obligation." (JA60; JA125-27).

### A. Plaintiffs Released Their Fraud Claim

Judge Liman correctly found Plaintiffs' LMA, FA, and DIL releases

released their Count VII claim. (SPA27-28). "[A]t the time Plaintiffs signed the

releases in the forbearance agreements, they were aware that Defendants would not

agree to the BAMCAP Loan modification." (SPA32; Point III.A above).

### B. Plaintiffs Fail to State a Claim

Judge Liman did not decide whether New York or Georgia law

governs Count VII because it fails either way. (SPA65). New York law governs.

Plaintiffs agree New York's choice-of-law rules apply and, in the

event of a conflict, require an "interest analysis." But they argue New York

"would apply the law of the state 'where the plaintiffs' injuries occurred'" and they "suffered injury to their businesses in Georgia, where they sustained the economic impact." (Br.64).

However, this Court has "reject[ed] the view…that the law of the place of injury ordinarily or always governs where conduct-regulating rules are involved," *Licci v. Lebanese Canadian Bank*, 739 F.3d 45, 51 (2d Cir. 2013), as they are in Count VII. "[W]here the loss was suffered is not conclusive and does not trump a full interest analysis." *Thomas Lee Equity Fund v. Mayer Brown,* 612 F.Supp.2d 267, 284 (S.D.N.Y. 2009). It "is not a dispositive factor" when it has "only limited connection to the conduct at issue, while a substantial portion of the fraudulent conduct has occurred in another locus." *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F.Supp.2d 104, 125 (S.D.N.Y. 2010).

New York has the greater interest in adjudicating Plaintiffs' claims arising from allegedly fraudulent acts here. *See*, *e.g.*, *In re Axa Equitable COI Litig.*, 595 F.Supp.3d 196, 239 (S.D.N.Y. 2022); *AHW v. Citigroup*, 980 F.Supp.2d 510, 524 (S.D.N.Y. 2013), *aff'd,* 661 F.App'x 2 (2d Cir. 2016). The CLA has a New York choice of law provision. Plaintiffs acknowledged the CLA was "negotiated in the State of New York, the loan was made by Lender and accepted by Borrower in the State of New York, and the proceeds of the loan delivered pursuant [thereto were] deemed to have been distributed from the State of New

York," and New York "has a substantial relationship to the parties and to the underlying transaction." (JA261 §11.5). LMA §13, FAs §15 and DIL §18 contain similar acknowledgments.[23]

### 1. New York Law

Judge Liman found Plaintiffs abandoned their Count VII claim under New York law because they conceded it fails to state a claim. (SPA65).

Judge Liman also correctly found Count VII fails under New York law because it "is a contract claim masquerading as a fraud claim," and its allegation of a misrepresentation of a future intent to perform under a contract is insufficient. (SPA66-67).

Plaintiffs do not appeal either holding.

### 2. Georgia Law

Even if Georgia law applied, it fails to state a fraud claim. Rule 9(b) required Plaintiffs to allege with particularity, "(1) a false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain

---

[23] Plaintiffs argued below that New York courts are reluctant to read choice-of-law clauses to cover extra-contractual claims, citing *J&R v. U.S. Bank Nat'l*, 2019 WL 6619329, *4 (S.D.N.Y. Dec. 5, 2019). That argument fails. First, Plaintiffs' fraud claim is not extra-contractual. They allege the CLA contains the purported misrepresentation. (JA60). Second, a choice-of-law provision "appl[ies] to claims for tort arising incident to the contract" when, as here, "the express language of the provision [is] sufficiently broad." 2019 WL 6619329, *4. Third, *J&R* does not hold that weight should not be given to the parties' contractual acknowledgement of the relevant conduct's locus.

from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; (5) damage to the plaintiff." *Roberts v. JP Morgan Chase Bank,* 342 Ga.App. 73, 78 n.5 (2017).

Plaintiffs acknowledge "[t]he general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future." *J. Kinson Cook v. Heery/Mitchell*, 284 Ga.App. 552, 558 (2007) (Br.65). But they argue they pled "inceptive fraud" by alleging "Gamma" made "the bridge loan with no intent to honor its promise not to unreasonably withhold consent to a modification of the BAMCAP loan." (Br.64, 66).

That is incorrect, as Judge Liman found, for several reasons. *First*, a "plaintiff must prove both that the defendant failed to perform a promised act and that the defendant had no intention of performing when the promise was made." (SPA67). But Plaintiffs do not and cannot allege "Gamma" failed to perform a promised act, because the CLA shows Defendants did not promise "to not unreasonably withhold consent to a modification." (SPA70, 74-78). CLA §6.19 states the lender may not unreasonably withhold consent to a modification of the BAMCAP Loan. However, §8.2 authorizes the lender to withhold consent to an increase in indebtedness for *any* reason, not just for a "reasonable" reason. (JA246, 249). "[T]he more specific language of Section 8.2 governs over the general language of Section 6.19 and relieves Defendants of any need to show that

their refusal to give consent was reasonable."  (SPA74-78, SPA70).

*Second*, the FAC does not allege facts that show Omega's denial of consent was unreasonable.  The "capitalization of the $530,000 ... represented incremental risk" to Gamma.  "[N]ot only did [WPL's] request for an extension of the BAMCAP Loan signal that [WPL] would be unable to pay even BAMCAP, but [WPL's] apparent inability to pay even the $530,000 in cash and its need to borrow that sum from BAMCAP demonstrated that, unless circumstances changed, [WPL] was even less likely to be able to satisfy its obligations to" Omega.  (SPA78-79).

*Third*, the FAC does not plead facts that support any inference of fraudulent intent, let alone a strong inference.  It merely relies on the conclusory allegation that Defendants did not intend to honor their promise, which "is sheer speculation not supported by any allegation of fact."  (SPA32).  "[T]he only factual support for this claim in the Complaint comes from the subsequent failure to give consent to modify the BAMCAP Loan."  (SPA68).  But "[e]vidence that [the defendant] failed to perform its promise is insufficient to support a fraud claim." *Saks Mgmt. v. Sung Gen. Contracting*, 356 Ga.App. 568, 575 (2020).

Plaintiffs misleadingly ask this Court to consider allegations *they added to their SAC*, but were not in their FAC, that "Gamma" had "no intention to honor its promise to consent to reasonable modifications of the BAMCAP loan." (Br.66).  Even if those conclusory allegations were appropriately considered, such

"naked assertion[s]" "devoid of further factual enhancement" fail to state a claim. (SPA69).[24]

Plaintiffs argue "Gamma's" conduct after the CLA was signed was "unusual, suspicious, or inconsistent" and supports an inference of fraudulent intent. (Br.67-68). As Judge Liman found, however, "Plaintiffs do not allege any 'subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith.'" (SPA32-33; SPA68). "Plaintiffs also have no well-pleaded allegations that Defendants used dishonest, unfair, or improper means" to interfere with Plaintiffs' efforts to refinance. (SPA72).

Plaintiffs allege Defendants purchased loans on other properties owned by Thomas and interfered with his efforts to refinance. But "[t]here is nothing 'wrongful' or 'culpable' about one obligee selling a loan to another." (SPA73). Plaintiffs do not provide any basis "to believe that Defendants acted from malice." (SPA71).[25]

---

[24] Plaintiffs' motion to amend the judgment dismissing the FAC did not ask for leave to amend Count VII. (SPA91-92). Judge Liman did not grant it. (SPA98-99). Plaintiffs added allegations to Count VII in their SAC anyway. *Compare* JA958-59 ¶¶415 & ¶419 *with* JA125-26 ¶¶375 & ¶379. Count VII still fails.

[25] *BTL COM v. Vachon*, 278 Ga.App. 256 (2006) (Br.68), is inapposite. Defendants falsely represented they had already invested more than $500,000 in

Plaintiffs' scienter allegations are also deficient.  They are grounded on speculation that the Property had great value and Defendants intended to create a default to acquire it.  (JA28, JA40, JA53).  Those allegations are implausible, fail to provide a compelling basis to infer fraudulent intent, and are far less compelling than the competing inference that the numerous opportunities Omega gave Plaintiffs to retain the Property show it did not want the Property, but no other lender was willing to provide financing.  Omega entered into the LMA, six FAs, the DIL and the Buy-Back Agreement that gave Plaintiffs more than twenty additional months to refinance the debt and retain the Property.  (JA78, JA333-569).  But after four years of looking, Debtors and WPF could not obtain alternative financing even to exercise the $150 million buy-back option in 2019.  (JA83).

*Fourth*, Plaintiffs do not plausibly allege they "sustained a loss or damage as the result of the alleged misrepresentation[]."  *Sims v. Bayside Cap.,* 327 Ga.App. 47, 52 (2014).  Debtors' repeated failures to repay the loan, not the alleged misrepresentation, caused their alleged loss.  Plaintiffs allege the purported misrepresentation caused WPL to default on the BAMCAP Loan in January 2018 and that default allowed Omega to declare a default on the Gamma Loan.  (JA64-

equipment.  *Id.* at 259.  Because they did not own it, they passed off a third party's equipment as their own.  *Id.* at 260-61.  No such conduct is alleged here.

65).  But Omega did not foreclose on the Property at that juncture.  It repeatedly

gave Debtors opportunities to avoid losing the Property by entering into FAs,

beginning in March 2018.  (JA67, JA346-58).  BAMCAP too did not foreclose.  In

July 2018, it sold its loan to Omega.  (JA77).  Omega gave Debtors three more

FAs.  That extended Debtors' reprieve through February 4, 2019, more than a year

after their initial defaults.  (JA77-78, JA373-503).  Omega then signed the DIL,

giving Debtors another opportunity to retain the Property.  (JA78, JA504-56).  It

was only after Debtors failed to satisfy the DIL's conditions, that the deeds were

released from escrow and recorded.  (JA82).

*Finally*, the AC fails to "inform each defendant of the nature of his

alleged participation in the fraud." *Ambrosia Coal & Constr. v. Pages Morales*,

482 F.3d 1309, 1317 (11th Cir. 2007).  Plaintiffs simply "lumped together all of the

defendants." *Id.*  (*See, e.g.*, JA55, JA60, JA125).  Plaintiffs do not allege any

misrepresentation by or scienter as to WP, GWL or Omega.

## V.    THE DISTRICT COURT CORRECTLY DENIED LEAVE TO AMEND THE JUDGMENT TO ALLEGE A NEW COUNT XVII

In March 2022, Plaintiffs moved to amend the initial judgment and for

leave to file a new Count XVII for fraudulent inducement of the DIL "under New

York law." (SPA91-92).  Judge Liman correctly denied that request.

Plaintiffs do not address the standard governing their request.  As

Judge Liman explained (SPA95), Plaintiffs had to "first have the judgment vacated

or set aside pursuant to Fed. R. Civ. P. 59(e) or 60(b)." *Axar Master Fund, v. Bedford*, 806 F.App'x 35, 39 (2d Cir. 2020).

A "court may grant a Rule 59(e) motion only when the [movant] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (SPA95). The "motion may not be used" "to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Axar*, 806 F.App'x at 39. The decision is within "the sound discretion of the district court." *Dynamic Worldwide Logistics v. Exclusive Expressions,* 2015 WL 5439217, *3 (S.D.N.Y. Sept. 14, 2015).

Plaintiffs did not meet Rule 59(e)'s requirements. Their appeal brief does not argue there was any change in controlling law, new evidence they were not previously aware of, or need to correct an error or prevent manifest injustice.

Had Plaintiffs satisfied Rule 59(e)'s requirements, then under Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires," but "has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." (SPA95-96).

Plaintiffs argue Judge Liman abused his discretion by citing their delay as the "only basis" for denying the motion. (Br.69). Not so. The court found "Plaintiffs have not convinced the Court why the Court should exercise its

discretion to permit amendment," and explained the "amendment would likely be futile."  (SPA98&n.5).

Even if the "only basis" for the court's denial of leave to amend had been Plaintiffs' delay, that would not have been an abuse of discretion.  The cases Plaintiffs cite (Br.69) did not address post-judgment Rule 59(e) motions.

Plaintiffs misleadingly argue they waited to add Count XVII because they "reasonably believed Georgia law applied to their tort claims."  (Br.69).  But they did not previously plead the claim under Georgia law either.  Plaintiffs did not include their proposed Count XVII in the Joint Appendix.  Dkt. 62-4 (redline) at ¶¶506-10 in 1:21-cv-01657-LJL-RWL (S.D.N.Y.) ("PSAC") shows Count XVII is a new claim.  "Plaintiffs did not need the benefit of the Court's decision to include these allegations in their pleadings."  (SPA98).

Moreover, Plaintiffs were on notice long before judgment was entered that New York law might apply to their tort claims.  "[A]fter the case was transferred from [Georgia to New York], Defendants argued that re-briefing the motion to dismiss was necessary in part because 'New York law, rather than Georgia law, applies to plaintiffs' tort claims.'  Dkt. No. 35 at 2.  At that point (or any time after the case was transferred), Plaintiffs could have amended their Complaint to add this claim under New York law.  Plaintiffs chose not to do so."  (SPA98).

Furthermore, Count XVII fails to plead the elements of fraud under New York law: "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff, and damages." *Eurycleia Partners v. Seward & Kissel,* 12 N.Y.2d 553, 559 (2009). Rule 9(b) requires fraud allegations to be "stated with particularity." A complaint "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Resch.*, 174 F.3d 79, 84 (2d Cir. 1999). Plaintiffs must also "allege facts that give rise to a strong inference of fraudulent intent." *Lerner,* 459 F.3d at 290. Conclusory allegations are insufficient. *Coppelson v. Serhant*, 2021 WL 148088, *6 (S.D.N.Y. Jan. 15, 2021). Count XVII does not meet these requirements.

*First,* Judge Liman found Count XVII's allegations "appear conclusory with respect to knowledge of the falsity of the alleged material misrepresentations." (SPA98 n.5). Plaintiffs' allegations that when Defendants entered into the DIL, they "did not intend to give Plaintiffs at least six months to buy back the property" and "instead intended to take ownership" are conclusory. (PSAC ¶190.1).

*Second*, as Judge Liman held in dismissing Plaintiffs' RICO "wire fraud" claim based on these representations, "Plaintiffs fail to plead facts that

demonstrate that the statements were false when made." (SPA52-53). The only factual support Plaintiffs allege is that one month later, Defendants entered into a shorter buy-back agreement, and after Debtors failed to satisfy the DIL's conditions, Omega released the deeds and its affiliate recorded them. (PSAC ¶¶192, 195). As Judge Liman held in dismissing Plaintiffs' Count VII for fraud, such allegations about a failure to comply with an alleged promise are insufficient. (SPA68-69).

Plaintiffs argue *Vaughn v. Air Line Pilots Assn.,* 377 F.App'x 88 (2d Cir. 2010), permits them to allege knowledge of falsity "generally." Actually, this Court cautioned that "relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations," and affirmed dismissal of a fraud claim. *Id.* at 90.[26]

*Third,* the alleged representations that the DIL would not cause a transfer of the deeds to Gamma and that Defendants would not own the Property

---

[26] *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS*, 752 F.3d 173, 184 (2d Cir. 2014) (Br.70), did not hold scienter may be established through "conduct which is highly unreasonable." It ruled "recklessness" under the federal securities laws can be shown by "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Iowa Pub. Empls. Ret. Sys. v. Deloitte & Touche* 919 F.Supp.2d 321, 331 (S.D.N.Y. 2013) (Br.70), dismissed securities fraud claims against an auditor because the allegations did not support an inference of recklessness.

cannot provide a basis for a fraud claim because they are contradicted by Debtors' agreement in the DIL *to transfer the deeds and title to the Property* to Gamma or its designee. (JA507 §3). *See* Point III.B. above.

      *Fourth,* Plaintiffs do not plausibly allege "the misrepresentations directly caused the[ir] loss." *Fin. Guar. Ins. v. Putnam Advisory.*, 783 F.3d 395, 402 (2d Cir. 2015). Count XVII does not allege facts showing they would not have lost the Property had they not entered into the DIL. Plaintiffs acknowledged and agreed in the DIL that the lender had already "accelerated the indebtedness owed" and "posted the Property for nonjudicial foreclosure," and "there are no defenses, setoffs or counterclaims as to any part or all of the Indebtedness." (JA507-08 at Recital L, §§1(e)&2(a)).

      Plaintiffs *benefitted* from entering into the DIL by obtaining yet another chance to repay their debt. Their failure to do so, not any alleged misrepresentations, caused their alleged loss. The PSAC does not allege facts showing Plaintiffs could have repaid the loans or bought the Property at foreclosure had they not entered into the DIL, nor that after they signed the DIL they could have bought the Property if they had a six-month buy-back period. Any such allegations would be speculation. *Starr Found. v. AIG*, 76 A.D.3d 25, 28 (2010) (under New York's out-of-pocket rule, plaintiffs cannot be awarded damages for a "lost bargain" that was "undeterminable and speculative").

*Fifth*, Count XVII is "insufficiently specific about when the statements were made," *Cambridge Cap. v. Ruby Has*, 565 F.Supp.3d 420, 462 (S.D.N.Y. 2021), and whether they were made before the DIL's February 4, 2019 Effective Date. Plaintiffs allege Defendants did so "at the same time" as negotiations in "early 2019," "in January and February 2019," or "[t]hroughout this period." (PSAC ¶¶181, 182, 186, 194). Representations after the Effective Date could not have induced Plaintiffs to enter into the DIL.

*Sixth*, "in bringing claims of fraud against multiple defendants, the plaintiff must inform each defendant of the nature of his alleged participation." *HSM Holdings, v. Mantu I.M. Mobile,* 2021 WL 918556, *5 (S.D.N.Y. Mar. 10, 2021). Count XVII does not. Plaintiffs' allegations "conflat[e] defendants in vague collective allegations." *Id.* (*See, e.g.,* PSAC ¶¶186, 189, 190.1, 194, 194.1, 195, 198, 204.1).

*Seventh,* in light of the DIL's merger clause (JA518), Plaintiffs' alleged sophistication (JA852), the fact that Defendants made other representations in the DIL (JA511-12 §§7, 8), and the size of the transaction, Plaintiffs could not plausibly allege they reasonably relied on Defendants' purported representations, because they are not mentioned in the DIL. (JA518 §14). In *Emergent Cap. Inv. Mgmt. v. Stonepath Grp.,* 343 F.3d 189, 196 (2d Cir. 2003), this Court found such factors preclude reasonable reliance.

*Eighth*, Plaintiffs argue (Br.63-65) Georgia law applies to their fraud claims because their injury was suffered in Georgia. If that is correct (and it is not), they cannot assert a fraud claim under New York law.

## <u>CONCLUSION</u>

The Court should affirm the judgment of the District Court.

Dated: October 19, 2023
      New York, New York

               Respectfully submitted,

               KRAMER LEVIN NAFTALIS & FRANKEL LLP

               By: */s/ Michael J. Dell*
                    Michael J. Dell
                    Karen S. Kennedy
                    Tobias B. Jacoby
               1177 Avenue of the Americas
               New York, New York 10036
               Telephone: (212) 715-9100
               Facsimile: (212) 715-8000
               Email: mdell@kramerlevin.com

               *Attorneys for Defendants-Appellees Jonathan Kalikow, WP Development Partners LLC, Gamma Lending Omega LLC, Gamma Real Estate Capital LLC and GRE WP LLC*

# CERTIFICATE OF COMPLIANCE

I, Michael J. Dell, hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7), as modified by this Court's August 4, 2023 Order granting Appellees' Motion for Leave to File an Oversized Answering Brief of No More than 17,000 Words, because the document contains 16,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019, in 14-point Times New Roman font.

Dated:  October 19, 2023
        New York, New York

                                    */s/ Michael J. Dell*
                                    Michael J. Dell