# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of June, two thousand twenty-four.

PRESENT: John M. Walker, Jr.,
Steven J. Menashi,
 *Circuit Judges*,
Nusrat J. Choudhury,
 *District Judge.*[*]

_____

IN RE: WADE PARK LAND HOLDINGS, LLC,
WADE PARK LAND, LLC,

 *Debtors*.

_____

---

[*] Judge Nusrat J. Choudhury of the United States District Court for the Eastern District of New York, sitting by designation.

WADE PARK LAND HOLDINGS, LLC, WADE PARK LAND, LLC,

  *Debtors-Plaintiffs-Appellants*,

THE THOMAS FAMILY TRUST, BY AND THROUGH ITS TRUSTEES, ACTING IN THEIR OFFICIAL CAPACITIES,

  *Plaintiff-Appellant*,

  v.              No. 23-591-bk

JONATHAN KALIKOW, WP DEVELOPMENT PARTNERS, LLC, GAMMA LENDING OMEGA, LLC, GAMMA REAL ESTATE CAPITAL, LLC, GRE WP, LLC,

  *Defendants-Appellees*.[†]

_____

| | |
|---|---|
| *For Plaintiffs-Appellants*: | JAMES COBB, Caplan Cobb LLC, Atlanta, Georgia (David L. Bury, Jr., Thomas B. Norton, Stone & Baxter, LLP, Macon, Georgia; Lisa Geary, RMP LLP, Springdale, Arkansas; Julia Blackburn Stone, Sarah Brewerton-Palmer, Michael Eber, Caplan Cobb LLC, Atlanta, Georgia; Renee Bea, |

---

[†] The clerk of court is directed to amend the caption as set forth above.

Richard Weingarten, Slarskey LLC, New York, New York, *on the brief*).

*For Defendants-Appellees*: MICHAEL J. DELL (Karen S. Kennedy, Tobias B. Jacoby, *on the brief*), Kramer Levin Naftalis & Frankel LLP, New York, New York.

Appeal from a judgment of the United States District Court for the Southern District of New York (Liman, J.).

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgment of the district court is **AFFIRMED**.

This adversary proceeding arises out of the bankruptcy of Debtors-Plaintiffs-Appellants Wade Park Land Holdings, LLC, and Wade Park Land, LLC (the "Wade Park Entities"). The Wade Park Entities held two parcels outside of Dallas, Texas, known as Wade Park—the site of an ambitious development project by Georgia-based developer Stanley Thomas. Defendants-Appellees WP Development Partners, LLC, Gamma Lending Omega, LLC, Gamma Real Estate Capital, LLC, and GRE WP, LLC (collectively, "Gamma") lent the Wade Park Entities approximately $83 million and took the Wade Park properties as security. The Wade Park Entities filed for bankruptcy in the Northern District of Georgia after Thomas's development project failed and Gamma took title to the properties pursuant to a deed-in-lieu-of-foreclosure agreement (the "DIL Agreement"). The debtors brought this adversary proceeding asserting, *inter alia*, claims of constructive fraudulent transfer, violations of the Georgia RICO statute, and fraudulent inducement. The district court dismissed the operative complaint for failure to state a claim. We assume the parties' familiarity with the facts, the procedural history, and the issues on appeal.

# I

Thomas and his affiliates acquired the Wade Park land, approximately 176 acres, between 2012 and 2015. Thomas's "vision" for the completed project included "over five million square feet of office space in two office towers, over one million square feet of high-end retail space, approximately 2,400 luxury residential housing units, and five hotels." J. App'x 863. According to Thomas's internal analyses, the completed development would be worth over $2 billion.

By the spring of 2016, Thomas and his affiliates had invested over $60 million in Wade Park and owed approximately $45 million and $48 million to two lenders: Bridge Capital, LLC, and BAMCAP Partners, LP. The loans were secured by mortgages on the north and south parcels of Wade Park. Throughout 2016, Thomas attempted to secure permanent financing on a larger scale that would pay off the existing debt and enable further development. In late 2016, Bridge Capital told Thomas that it could not extend the maturity date of its loan any further to accommodate the prospective lenders' due diligence processes. As a result, Thomas decided to seek a bridge loan to pay back Bridge Capital and to finance development for a short period until permanent financing was in place. The only lender willing to advance sufficient funds and "close the deal quickly" was Gamma. *Id.* at 868.

Thomas and Gamma entered into a term sheet for a $196 million bridge loan in October 2016, but Gamma was ultimately willing to lend only approximately $83 million. This was enough to pay back Bridge Capital but not enough to finance additional construction until Thomas could find a permanent financing partner. In addition, Gamma insisted on a term it called "the Hammer," which gave Gamma a 75 percent ownership interest in a newly formed entity called Wade Park Ventures, LLC ("Ventures"). Ventures, in turn, would be the sole owner of two special-purpose entities—the Wade Park Entities—which would own the north and south parcels. If Gamma's loan was not repaid within sixty days of its maturity date, Gamma would retain its 75 percent ownership interest in Ventures.

At the same time, Jonathan Kalikow, an officer at Gamma, assured Thomas that Gamma "did not want to own the Wade Park project." *Id.* at 876. The parties executed the documents evidencing the bridge loan—primarily the Construction Loan Agreement—on January 17, 2017. Simultaneously, Gamma entered into an intercreditor agreement with BAMCAP, which gave Gamma an option to purchase BAMCAP's loan if Wade Park Land—the borrower on the loan—defaulted.

During 2017, the plaintiffs repeatedly exercised their right to extend the maturity date of the Gamma loan, ultimately pushing its maturity date from May 17, 2017, to February 17, 2018. Throughout this period, Thomas continued his efforts to find a permanent lender. The plaintiffs assert that "Kalikow and Gamma improperly and tortiously interfered with Thomas's efforts to obtain permanent financing." *Id.* at 886. According to the plaintiffs, this interference "caused these potential development partners—who otherwise were willing to invest in the Wade Park project—to walk away." *Id.*

The BAMCAP loan was set to mature in January 2018, but Thomas still had not secured permanent financing. Thomas and BAMCAP negotiated a one-month extension of the BAMCAP loan in exchange for a fee of approximately $530,000, which was to be capitalized into the principal amount of the loan. Thomas needed Gamma's consent to modify the BAMCAP loan, however, and Gamma did not consent. As a result, the BAMCAP loan went into default, which led Gamma to declare a default on its own loan. *See id.* at 888 ("Under the terms of the Gamma Bridge Loan, BAMCAP's declaration of default then allowed the Gamma Defendants to declare their own default on the Gamma Bridge Loan."). Over the following months, the Wade Park Entities and Gamma entered into a series of forbearance agreements pursuant to which Gamma agreed not to foreclose in exchange for consideration "amount[ing] to more than $38 million in cash and property." *Id.* at 890-91.

5

Despite the default, Thomas "continued to work tirelessly to obtain financing" in order to repay Gamma. *Id.* at 890. The plaintiffs assert that Kalikow and Gamma "interfered in every attempt by Thomas to obtain financing." *Id.* at 892. Gamma allegedly bought up loans secured by Thomas's other properties to prevent him from refinancing those loans and using his equity in the properties to pay Gamma. In addition, the plaintiffs allege that after Thomas—with Gamma's encouragement—obtained a term sheet for a $725 million loan from Bluebell International, "Kalikow called Bluebell's principal, Rick Lee, … a 'thief' and a 'scumbag,' and stat[ed] that [Gamma] would not allow a loan from Bluebell to move forward." *Id.* at 896-97. Bluebell subsequently backed out of the financing arrangement. A similar incident allegedly took place after Thomas, again with Gamma's encouragement, reached a deal with Columbia Pacific to refinance the property and fund construction going forward. The plaintiffs further allege that, at a meeting in January 2019, "Kalikow yelled at the Columbia Pacific executives; he said that [Gamma] would never agree to the terms Columbia Pacific had proposed; and he said that [Gamma] would never agree to let Wade Park Land and Wade Park Land Holdings refinance the Gamma Bridge Loan." *Id.* at 899. Columbia Pacific eventually walked away from the deal.

Meanwhile, in the summer of 2018, Gamma purchased the BAMCAP loan, which meant that Gamma owned all of the loans encumbering Wade Park. Between the summer of 2018 and early 2019, the Wade Park Entities entered into three more forbearance agreements with Gamma. In February 2019, the parties entered into the DIL Agreement, pursuant to which the Wade Park Entities would transfer the Wade Park deeds to Gamma, which would hold the deeds in escrow until the Gamma and BAMCAP loans were repaid. Kalikow and Gamma allegedly assured Thomas that the DIL Agreement "would not actually cause a transfer of the Wade Park deeds to Gamma"; rather, Gamma "would give Thomas time to 'buy back' the properties by paying off the loans." *Id.* at 903. However, Gamma refused to execute a written buy-back agreement until after the execution of the DIL Agreement. According to the plaintiffs, Gamma "repeatedly changed the

6

proposed buy-back terms, slowly whittling them down to shorter and shorter periods." *Id.* at 905-06. Ultimately, on March 6, 2019, the parties entered into a written buy-back agreement with a six-week buy-back period.

Thomas was unable to secure financing to pay back the loans. The deeds to Wade Park were therefore released from escrow on February 21, 2019, and recorded in Texas in favor of Gamma. On April 15, 2019, the buy-back period expired. Kalikow and Gamma nonetheless offered Thomas another opportunity to buy back the properties, with the caveat that "whoever bought the Wade Park properties back must be a 'strawman'—in other words, someone other than Thomas or a Thomas-affiliated entity." *Id.* at 907. In the summer of 2019, Gamma discussed a potential purchase of Wade Park with Hines, "one of the largest real-estate development firms in the world," which "ha[d] a long-standing relationship with Thomas." *Id.* at 902, 907. However, "the Gamma Defendants rejected every proposal by Hines—and told Hines that the Gamma Defendants would not sell the properties to Hines if Thomas would be involved in any way." *Id.* at 907-08. Hines eventually walked away from the deal. Meanwhile, Wade Park Land and Wade Park Land Holdings filed petitions for relief under Chapter 11 of the Bankruptcy Code in the Northern District of Georgia.

The plaintiffs filed this action against Kalikow, Gamma, and Blake Goodman[1] as an adversary proceeding in bankruptcy court. On October 14, 2020, the U.S. District Court for the Northern District of Georgia issued an order withdrawing the reference to the bankruptcy court, and the plaintiffs filed their initial complaint on October 16, 2020, asserting eighteen causes of action. On February 24, 2021, the district court granted Goodman's motion to dismiss the case as to him and granted the motion of the other defendants to transfer the case. The case was transferred to the Southern District of New York on February 25, 2021.

---

[1] The parties have stipulated to the dismissal of this appeal with prejudice with respect to Goodman.

On March 4, 2022, the U.S. District Court for the Southern District of New York issued an opinion and order dismissing the complaint with prejudice and denying leave to amend. The plaintiffs subsequently moved pursuant to Federal Rules of Civil Procedure 15(a)(2) and 59(e) to amend the judgment and for leave to file the second amended complaint ("SAC"). The district court granted the plaintiffs' motion insofar as it sought leave to re-plead Counts Twelve and Thirteen, which contained the fraudulent transfer claims. However, the district court denied the plaintiffs' motion insofar as it sought to add a new claim for fraudulent inducement under New York law. Finally, on March 23, 2023, the district court entered another opinion and order dismissing the fraudulent transfer claims and dismissing the entire SAC with prejudice. The district court again denied leave to amend the complaint. This appeal followed.

## II

"We review a district court's grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021) (quoting *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021)). We "examine the complaint for 'facial plausibility,' considering whether the 'factual content' 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III

The plaintiffs argue that "[t]he district court erroneously dismissed [their] fraudulent-transfer claims for failing to plausibly allege that the transfer of Wade Park [pursuant to the DIL Agreement] was for less than 'reasonably equivalent value.'" Appellants' Br. 16. In particular, the plaintiffs claim that the district court "improperly disregarded allegations that two independent, pre-litigation appraisals determined the value of the property was more than three times what Plaintiffs later received for the transfer." *Id.* The plaintiffs also claim that the

district court's decision was "based on improper and unfounded factual assumptions about Thomas's ability to obtain refinancing, his ability to sell the property, and the representations in an Estoppel Certificate." *Id.* We agree with the district court that the plaintiffs failed to state a constructive fraudulent transfer claim.[2]

The Bankruptcy Code allows the trustee—or a debtor-in-possession—to avoid a transfer as constructively fraudulent if the debtor "received less than a reasonably equivalent value in exchange for such transfer" and "was insolvent on the date that such transfer was made … or became insolvent as a result of such transfer." 11 U.S.C. § 548(a)(1)(B)(i), (ii)(I). Similarly, the Uniform Voidable Transactions Act, as enacted in Georgia, provides that a transfer is voidable if the

---

[2] It is undisputed that the transfer of Wade Park pursuant to the DIL Agreement was in satisfaction of an antecedent debt. The well-established general rule is that good-faith transfers in satisfaction of antecedent debts are presumed to have been for reasonably equivalent value. *See* Douglas G. Baird, Elements of Bankruptcy 146 (6th ed. 2014) ("The UFCA, the UFTA, and § 548 [of the Bankruptcy Code] … provid[e] that a transfer on account of antecedent debt is conclusively presumed to be one for which fair consideration or reasonably equivalent value is given."); *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) ("[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper.") (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (1st Dep't 1993)). The district court held that the presumption did not apply in this case. At oral argument on appeal, the plaintiffs suggested that the presumption applies only in cases of undisputed dollar-for-dollar equivalence between the property transferred and the consideration received—which is to say, in essence, that the presumption serves no purpose. *See* Oral Argument Audio Recording at 31:20 (Q: "Well, if you have a dollar-for-dollar satisfaction, why would you need a presumption that it's reasonably equivalent value? That means the presumption doesn't really exist." A: "I agree with you." Q: "So you think the presumption does not exist?" A: "I do, under New York law."). That suggestion contradicts numerous authorities that attest to the scope of the presumption. Yet because we conclude that the plaintiffs fail to allege adequately that the transfer in this case was for less than reasonably equivalent value, we need not address the holding of the district court that the presumption did not apply in this case.

9

debtor made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Ga. Code § 18-2-74(a)(2). Outside of the foreclosure context, the term "reasonably equivalent value" will "ordinarily [have] a meaning similar to fair market value." *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 545 (1994). "To determine whether reasonably equivalent value was provided, 'the Court must ultimately examine the totality of the circumstances, including the arms-length nature of the transaction; and the good faith of the transferee.'" *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 172 (2d Cir. 2021) (alteration omitted) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 334 (Bankr. S.D.N.Y. 2011)). The district court correctly held that the plaintiffs did not plausibly allege that the transfer of Wade Park pursuant to the DIL Agreement was for less than reasonably equivalent value.

## A

The plaintiffs argue on appeal that it is plausible that the transfer was for less than reasonably equivalent value because of two appraisals: one issued in November 2016 by the Sage Group, which valued Wade Park at $466.8 million as of November 10, 2016 (the "Sage Appraisal"), and one issued on January 2, 2019, by BBG, Inc., which valued Wade Park at $565 million as of October 18, 2018 (the "BBG Appraisal"). The plaintiffs point to our decisions in *Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020), and *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732 (2017), for the proposition that a plaintiff may rely on a professional assessment of value at the pleading stage. Such reliance is *permissible*. But when applying the plausibility standard of *Iqbal* and *Twombly* on a motion to dismiss, the district court must "view[] the allegations of the complaint as a whole." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011). In this case, the district court correctly concluded that the values stated in the Sage and BBG Appraisals were not plausible when viewed in light of other allegations in the complaint—in particular, the conduct of the parties and Thomas's inability to refinance Wade Park.

10

The history of the financing efforts for Thomas's Wade Park development project renders implausible the notion that the property was worth significantly more than what the Wade Park Entities owed Gamma in 2019. When Thomas initially sought a bridge loan in late 2016 to pay off the $45 million owed to Bridge Capital, Gamma was the only lender who "expressed both a willingness to loan sufficient funds and … to close the deal quickly." J. App'x 868. Thomas originally sought a much larger bridge loan of $196 million from Gamma. Gamma, however, was ultimately willing to lend only $83 million. And in order to secure the $83 million bridge loan from Gamma, Thomas not only had to mortgage the entirety of the Wade Park properties but also had to give Gamma a contingent 75 percent ownership interest in the Wade Park project to protect Gamma in case Thomas filed for bankruptcy. Thus, despite his best efforts, Thomas was able to secure only $83 million in financing—on lender-favorable terms—for a property that was carrying approximately $93 million in debt, $45 million of which would be paid off with the new loan. These facts render the Sage Appraisal, which concluded that the market value of Wade Park in November 2016 was $466.8 million, implausible.

Thomas's inability to refinance Wade Park and pay off Gamma reinforces this conclusion. For approximately two years, from the spring of 2017 to the spring of 2019, Thomas engaged in extensive efforts to obtain permanent financing and to repay the bridge loan from Gamma. As the district court correctly determined, Thomas did not need Gamma's consent to refinance the bridge loan,[3] and he was incentivized to do so by the prospect of paying fees to Gamma for the repeated

---

[3] The bridge loan gave the borrower the right to prepay in full at any time. In addition, once the loan was prepaid, Gamma was *required* to release its mortgage on Wade Park and to terminate the bridge loan and associated security documents. The plaintiffs argue that Thomas would have needed to borrow to repay Gamma, and the bridge loan contained a covenant requiring Gamma's consent to any borrowing. According to its terms, however, the Construction Loan Agreement—including all of its covenants—would be terminated upon repayment. Thomas therefore could have arranged for the borrowing and the repayment and termination to become effective at the same time.

extensions he required to avoid foreclosure. The plaintiffs contend, based on the Sage and BBG Appraisals, that the Wade Park property was worth between $465 and $565 million throughout this period. That valuation is implausible given Thomas's inability to refinance the property when it was encumbered by less than $150 million in debt. If the property were worth anything close to what the plaintiffs claim—or, indeed, significantly more than the debt that it was already carrying—it is not plausible that Thomas would have been unable to refinance.

The plaintiffs argue that Thomas was unable to refinance Wade Park because Gamma "repeatedly interfered with [his] efforts to secure funding." Appellants' Br. 30. The plaintiffs claim that (1) Gamma bought up the loans secured by Thomas's properties in other states to prevent him from refinancing those loans and using the proceeds to pay off the bridge loan and (2) Kalikow verbally abused representatives from other lenders who were considering a deal with Thomas and said that Gamma would not agree to a refinancing. As the district court explained, however, Thomas did not need Gamma's consent to refinance the mortgages Gamma held on Wade Park, and it would have been in Gamma's interest to allow the refinancing so that Gamma could be paid what it was owed. The district court observed that the only plausible reason for prospective new lenders to talk to Gamma was to "ask[] for concessions in satisfying the loan." *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 390 (S.D.N.Y. 2022). But Gamma was entitled to refuse any such concessions. And if Thomas could not obtain new financing without concessions from Gamma, that would further support the conclusion that the property was not worth significantly more than the value of the debt held by Gamma.

Finally, Gamma's actions in connection with the DIL Agreement are inconsistent with the plaintiffs' contention that Gamma knew the true value of Wade Park and schemed to take the property for itself. After Gamma acquired title to Wade Park pursuant to the DIL Agreement, it nonetheless offered Thomas the option to buy the property back for $140 million—the amount that Gamma was owed. That offer would have been irrational if Gamma believed that the property

was worth much more. According to the plaintiffs' theory, Gamma—having accomplished its goal of obtaining title to Wade Park—offered to frustrate its own plan by selling Wade Park back to Thomas at an enormous discount. The district court correctly recognized that the plaintiffs "cannot explain why [Gamma] would … offer a buy-back agreement of Wade Park in conjunction with the DIL Agreement for only $150 million or why, with the buy-back agreement, [Thomas] still could not find an independent buyer for the Wade Park properties." *Wade Park Land Holdings, LLC v. Kalikow*, No. 21-CV-1657, 2023 WL 2614243, at *14 (S.D.N.Y. Mar. 23, 2023).

The plaintiffs object that the district court's conclusion "depends on Thomas and Gamma's *subjective* needs, preferences, and incentives—which are irrelevant to the *objective* test for determining fair market value." Appellants' Br. 28. But the district court did not rely on Thomas's or Gamma's subjective beliefs; rather, it relied on the objective fact that despite over two years of effort by Thomas, he was unable to obtain financing on Wade Park in an amount significantly greater than the $140 million of debt that was discharged when he transferred Wade Park to Gamma. The district court also appropriately relied on the fact that Gamma's actions—particularly its offer of the buy-back agreement—were inconsistent with the plaintiffs' theory. The district court correctly concluded that—based on all the allegations in the complaint, including the history of the parties' relationship and Thomas's efforts to obtain financing—it could not draw a reasonable inference that the Wade Park Entities did not receive reasonably equivalent value in exchange for transferring Wade Park to Gamma.

## B

Even when considered apart from the parties' conduct, there were good reasons for the district court not to rely on the BBG and Sage Appraisals. We have previously observed that valuations of real estate involve uncertainty and depend on the information, assumptions, and methodology used by the appraiser:

> [A]s with any estimate, the result of a property appraisal is only as reliable as the information used and the manner in which it is employed to approximate the factors that influence property values in the real world. Given the number of variables that can influence real estate values, an estimate necessarily involves a substantial amount of guesswork about how both present and future conditions will impact on the market, making it difficult to construct a reliable model.

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994); *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) ("[F]inancial valuation models depend so heavily on the discretionary choices of the modeler—including choice of method (*e.g.*, discounted cash flow vs. market-based methods), choice of assumptions (such as the proper discount rate or cost of capital for a particular firm or industry), and choice of 'comparables' that the resulting models and their predictions can only fairly be characterized as subjective opinions."). Because of these contingencies, we have said that, in cases in which appraisal values were put forward to defeat a motion to dismiss, "[n]o amount of detail can save [a] complaint when the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions." *Gelt*, 27 F.3d at 772.

The methodology and assumptions of the BBG and Sage Appraisals are questionable. Many of the inputs to the models used to generate the appraisals were provided by Thomas himself, and there are no independent factual allegations establishing that those inputs were accurate. The district court correctly observed that the BBG Appraisal's value opinion was particularly unsupported: "The $565 million valuation is made up of several components and the assumptions or explanations underlying those components are either absent or informed by [Thomas]. There is no indication, as to the most significant of those components, as to the objective facts relied on for the valuation." *Wade Park*, 2023 WL 2614243, at *17. The Sage Appraisal, meanwhile, was prepared in 2016, more than two years prior to the transfer. *Cf. Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th

at 172 ("[R]easonably equivalent value is determined by the value of the consideration exchanged between the parties at the time of the conveyance … which is challenged.") (quoting *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999)). Both appraisals ascribe considerable value to Thomas's improvements to the land and the leases he secured based on those improvements. But, as the defendants point out, the complaint "does not describe the 'improvements' or allege facts showing they had value for any other developer and would not have to be removed at great expense and therefore reduce the value." Appellees' Br. 31.

The district court properly relied on the flaws in the BBG and Sage Appraisals as well as the plausibility of the complaint as a whole.

## C

The transfer of the Wade Park property to Gamma pursuant to the DIL Agreement was for reasonably equivalent value for another reason. The alternative to the DIL Agreement was foreclosure; by entering into the DIL Agreement, Gamma granted Thomas an accommodation that offered him the chance to retain title to Wade Park by paying off the debt. The opportunity to retain ownership of Wade Park, rather than letting it proceed to foreclosure, was evidently valuable to Thomas. These circumstances resemble the situation in which a creditor grants forbearance to a debtor; courts in this circuit have held that forbearance of foreclosure on a defaulted loan can constitute "reasonably equivalent value" by itself or in addition to other consideration. *See In re Jesup & Lamont, Inc.*, 507 B.R. 452, 471 (Bankr. S.D.N.Y. 2014) (citing cases). Here, when Gamma accommodated Thomas by offering the DIL Agreement instead of foreclosing, it similarly gave him reasonably equivalent value in the form of the opportunity to retain ownership of Wade Park.

In *1756 W. Lake St. LLC v. Am. Chartered Bank*, 787 F.3d 383 (7th Cir. 2015), the Seventh Circuit considered a similar scenario. American Chartered Bank ("ACB") loaned $1.5 million to Lake Street and took a mortgage on Lake Street's

real property as security. *Id.* at 385. Lake Street was unable to repay, and after negotiating a series of forbearance agreements, finally agreed to transfer the deed to the mortgaged property in escrow to ACB. *Id.* at 385-86. When Lake Street eventually defaulted, the deed was released from escrow and recorded in ACB's name. *Id.* at 386. Lake Street later sought to avoid the transfer of title as a constructive fraudulent transfer, arguing that the property was in fact worth $1.7 million. Judge Posner, writing for a unanimous court, explained the reasonableness of Lake Street's agreement to the transfer:

> Lake Street could have allowed the bank to foreclose the mortgage. The foreclosure sale would have yielded Lake Street, if its valuation of the property is correct, $200,000. … If instead Lake Street placed the deed in escrow, then while it would risk losing the $200,000 because the bank would now own the property rather than being entitled just to the payment of Lake Street's debt to it, Lake Street would be continuing to use the property in its business with the hope … that the use would yield it income greater than $200,000, and even … that it might keep the property.

*Id.* In other words, Lake Street "gambl[ed] that the property might eventually be worth more than it was thought to be worth—and if it was worth more than Lake Street's mortgage debt the surplus would accrue to the bank as owner of the property by virtue of having acquired the deed." *Id.* In Judge Posner's view, "[a]s an original matter one might think that … Lake Street has no ground to stand on" in seeking to undo the transaction it made based on its gamble that it could avoid foreclosure. *Id.*

Nonetheless, "rightly or wrongly," the parties in *Lake Street* agreed that "the transfer of the deed … was not intended (any more than foreclosure would be intended) to yield the bank a 'profit,' which is to say a value in excess of the $1.5 million that Lake Street owed the bank." *Id.* at 386-87. The Seventh Circuit concluded that the transfer was not constructively fraudulent because the series of forbearances granted by ACB were worth at least $200,000 to Lake Street, so Lake

Street received reasonably equivalent value in exchange for title to the property. *Id.* at 387-88.

In this case, however, the parties do *not* agree that the DIL Agreement was never intended to transfer a value that exceeded the debt owed to Gamma. Rather, the defendants argue that the plaintiffs are "[u]nhappy with the consequences" of "their decision to enter into the DIL" and have "brought this case in a brazen attempt to turn their failure to honor their obligations into a windfall." Defendants' Br. 1. Under these circumstances, the plaintiffs have "no ground to stand on." *1756 W. Lake St.*, 787 F.3d at 386. Indeed, the parties agree that if Gamma had simply foreclosed on the Wade Park property, the foreclosure would not have amounted to a fraudulent conveyance.[4] The accommodation—which gave Thomas the option of avoiding foreclosure and continuing operations by agreeing to transfer the deed in escrow—did not transform it into one. *See 1756 W. Lake St.*, 787 F.3d at 386.

D

The district court was also correct to dismiss the plaintiffs' claims for declaratory judgment. The plaintiffs allege that in five separate transactions—the forbearance agreements of August, October, and December of 2018, the DIL Agreement, and the transfer of the deeds to Gamma—the Wade Park Entities purported to enter into a transaction with an affiliate of another member of Ventures, in violation of Ventures's LLC Agreement.

The district court determined that the LLC Agreement did not prohibit the transactions at issue and that, even if it had, the transactions "would be at most voidable—and subject to ratification—rather than void and ultra vires." *Wade Park*, 589 F. Supp. 3d at 372.[5] The Delaware Supreme Court has recently clarified that,

---

[4] Oral Argument Audio Recording at 13:00, 22:45.

[5] Delaware courts interpreting LLC agreements follow "[t]he common law rule … that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling

17

while parties may provide in an LLC agreement that acts which would be merely voidable—and thus subject to ratification—under the common law shall be incurably void, the parties must do so explicitly and unambiguously. *Holifield v. XRI Inv. Holdings LLC*, 304 A.3d 896, 934 (Del. 2023). Although no "talismanic magic words" are required, Delaware courts insist on "emphatic language of incurable voidness." *Id.* Even the use of the word "void" may not be enough; the Delaware Supreme Court in *Holifield* declined to hold that "any use of the word 'void' in a contract renders the noncompliant act incurably void." *Id.* at 933. The district court correctly held that section 2.4(d) of the LLC Agreement does not contain the sort of unambiguous and emphatic language that Delaware courts would accept as evidence of the parties' intent to render prohibited actions incurably void.[6]

The challenged transactions were at most voidable, rather than void, and the transactions were ratified when the plaintiffs "signed the agreements and accepted the benefits of those agreements." *Wade Park*, 589 F. Supp. 3d at 373.

---

within the power of a corporation, though not properly authorized, and are subject to equitable defenses" such as ratification. *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816-17 (Del. 2018).

[6] The district court held that section 3.3 rather than section 2.4(d) governed in this case, applying the rule that the more specific provision controls when two contractual provisions conflict. *See* 11 Williston on Contracts § 32.10 (4th ed.) ("When general and specific clauses conflict, the specific clause governs the meaning of the contract."). The plaintiffs argue on appeal that sections 2.4(d) and 3.3 can be harmonized by reading section 3.3 as merely adding an additional condition precedent—the written consent of Gamma—in order for Ventures to enter into one of the affiliate transactions that are carved out from section 2.4(d)'s broad prohibition. That reading cannot be correct. Section 3.3 contains the exact same carve-out as section 2.4(d); it expressly does *not* create a written consent requirement for affiliate transactions permitted by section 2.4(d). The district court correctly determined that the two provisions conflict and that section 3.3 governs.

18

* * *

We have considered the plaintiffs' remaining arguments, which we conclude are without merit. We affirm the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court